1   LATHAM & WATKINS LLP
      Bob Steinberg (Bar No. 126407)
2   *bob.steinberg@lw.com*
    355 South Grand Avenue
3   Los Angeles, California  90071-1560
    Telephone:  (213) 485-1234
4   Facsimile:   (213) 891-8763

5      Alexander E. Long (Bar No. 216634)
    12636 High Bluff Drive, Suite 400
6   San Diego, CA 92130
    *alexander.long@lw.com*
7   Telephone:  (858) 523-5400
    Facsimile:   (858) 523-5450

8
    Attorneys for Plaintiff
9   ADOBE SYSTEMS INCORPORATED

10

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                SAN FRANCISCO DIVISION

14

15  ADOBE SYSTEMS INCORPORATED,          CASE NO. CV-11-02243-JST

16            Plaintiff,                 **ADOBE SYSTEMS INCORPORATED'S OPENING
                                         CLAIM CONSTRUCTION
17       vs.                             BRIEF AND MOTION FOR SUMMARY
                                         JUDGMENT OF INFRINGEMENT**
18  WOWZA MEDIA SYSTEMS, LLC, and
    COFFEE CUP PARTNERS (f/k/a
19  WOWZA MEDIA SYSTEMS, INC.,           Date:      September 10, 2013
                                         Time:      10:00 a.m.
20            Defendants.                Ctrm:      9, 19th Floor
                                         Judge:     Hon. Jon S. Tigar
21

22

23

24

25                  PUBLICALLY FILED REDACTED VERSION

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................... 1

II.     THE INVENTIONS OF THE ASSERTED PATENTS ......................................... 3

        A.      The '658 and '509 Patents ......................................................................... 3

        B.      The '878 and '287 Patents ......................................................................... 6

III.    WOWZA'S ACCUSED WMS PRODUCT ........................................................... 8

IV.     AGREED CLAIM CONSTRUCTIONS ............................................................. 10

V.      DISPUTED CLAIM TERMS .............................................................................. 10

        A.      "priority-based" – '658 Patent, claim 12; '287 Patent, claims 1 and 12 ................................................................................................................. 11

        B.      "consist of" – '658 Patent, claims 12 and 21; '509 Patent, claims 1, 10, 22, and 27 ........................................................................................... 12

        C.      "new media chunk" – '658 Patent, claims 12 and 21; '509 Patent, claims 1, 10, 22, and 27 ........................................................................... 17

        D.      "new time chunk" – '658 Patent, claims 12 and 21; '509 Patent, claims 1, 10, 22, and 27 ........................................................................... 20

        E.      "scheduling algorithm" – '658 Patent, claims 12 and 21 ....................... 22

        F.      "transmitting ones of […] plurality of chunks" – '658 Patent, claims 12 and 21 ..................................................................................... 23

        G.      "reserved for random data" – '878 Patent, claims 1, 15, and 17; '287 Patent, claims 1, 12, and 33. ........................................................... 24

        H.      "reserved for random data in accordance with a Real Time Messaging Protocol (RTMP) random byte section" – '878 Patent, claims 1, 15 and 17 ................................................................................. 25

                1.      "A Real Time Messaging Protocol (RTMP) random byte section" was well-understood and is not indefinite ................................. 27

                2.      There is no reason to limit the "random byte section" to 1528 bytes ....................................................................................... 28

        I.      "processing the data payload" – '287 Patent, claims 12 and 23 ......................... 29

        J.      "new media type" – '287 Patent, claim 13 ............................................. 30

VI.     THE COURT SHOULD GRANT SUMMARY JUDGMENT OF INFRINGEMENT ................................................................................................ 32

A.  Summary Judgment Standards..............................................................32

B.  Undisputed facts show that WMS infringes Adobe's '658 and '509 Patents ...................................................................................................32

   1.  WMS is a "computer program product" that meets the elements of claim 21 of the '658 Patent..................................33

   2.  Wowza and WMS users perform the method of claim 12 of the '658 Patent ...............................................................36

   3.  WMS is a "computer program product" that meets the elements of claim 27 of the '509 Patent..................................37

   4.  Wowza and WMS users perform the method of claim 22 of the '509 Patent ...............................................................39

C.  Undisputed facts show that WMS infringes Adobe's '878 and '287 Patents ...................................................................................................39

   1.  WMS is a "computer program product" that meets the elements of claim 17 of the '878 Patent..................................40

   2.  Wowza and WMS users perform the "handshake" steps of claim 15 of the '878 Patent .........................................42

   3.  WMS is a "computer program product" that meets the elements of claim 12 of the '278 Patent..................................42

   4.  Wowza and WMS users perform the steps of claim 1 of the '278 Patent ...................................................................45

D.  Undisputed facts show that Wowza Induces Infringement of Adobe's Asserted Patents ..................................................................46

   1.  Legal Standards.................................................................46

   2.  Wowza Actively Induced Infringement of the Asserted Patents ...............................................................................46

E.  Undisputed facts show that Wowza Contributorily Infringes Adobe's Asserted Patents ..................................................................48

   1.  Legal Standards.................................................................48

   2.  Wowza Contributed to the Infringement of the Asserted Patents. .........................................................................48

VII.  CONCLUSION......................................................................................50

1

## <u>TABLE OF AUTHORITIES</u>

2

Page

3

## **CASES**

4

*Akamai Techs., Inc. v. Limelight Networks, Inc.,*
   692 F.3d 1301 (Fed. Cir. 2012)................................................................46

5

*Andersen Corp. v. Fiber Composites, LLC,*
   474 F.3d 1369 (Fed. Cir. 2007)................................................................20

6

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)................................................................32

7

8

*Apple Computer, Inc. v. Articulate Sys., Inc.,*
   991 F. Supp. 1189 (N.D. Cal. 1997)................................................................46

9

*Apple Inc. et al. v. Motorola, Inc. et al.,*
   No. 11-8540 (N.D. Ill. March 12, 2012)................................................................23

10

11

*Arris Group, Inc. v. British Telecomms PLC,*
   639 F.3d 1368 (Fed. Cir. 2011)................................................................48

12

*Bell Commc'ns Research v. Vitalink Commc'ns Corp.,*
   55 F.3d 615 (Fed. Cir. 1995)................................................................11

13

14

*Biosig Instruments, Inc. v. Nautilus, Inc.,*
   No. 2012-1289, 2013 U.S. App. LEXIS 8486 (Fed. Cir. Apr. 26, 2013)................27, 28

15

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
   334 F.3d 1294 (Fed. Cir. 2003)................................................18, 21, 31

16

17

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)................................................................32

18

*CollegeNet, Inc. v. ApplyYourself, Inc.,*
   418 F.3d 1225 (Fed. Cir. 2005)................................................................11

19

20

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
   460 F.3d 1349 (Fed. Cir. 2006)................................................13, 15

21

*Cybor Corp. v. FAS Techs., Inc.,*
   138 F.3d 1448 (Fed. Cir. 1998)................................................................32

22

23

*Digene Corp. v. Third Wave Techs., Inc.,*
   323 Fed. Appx. 902 (Fed. Cir. 2009)................................................................13

24

*Dow Chem. Co. v. United States,*
   226 F.3d 1334 (Fed. Cir. 2000)................................................................21

25

26

*DSU Med. Corp. v. JMS Co.,*
   471 F.3d 1293 (Fed. Cir. 2006)................................................46, 48

27

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

iii

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
    508 F.3d 1366 (Fed. Cir. 2007)..................................................................................2, 11

*Enzo Biochem, Inc. v. Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010)................................................................................12, 21

*Epistar v. Int'l Trade Commission*,
    566 F.3d 1321 (Fed. Cir. 2009)......................................................................................21

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011)............................................................................................46, 49

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
    607 F.3d 776 (Fed. Cir. 2010)........................................................................................27

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)..................................................................................48, 49

*INOVA Diagnostics, Inc. v. Euro Diagnostica AB*,
    No. 08-0845, 2009 U.S. Dist. LEXIS 74899 (S.D. Cal. 2009)......................................15

*Insituform Techs., Inc. v. Cat Contr., Inc.*,
    385 F.3d 1360 (Fed. Cir. 2004)......................................................................................48

*King Pharms. Inc. v. Purdue Pharma, L.P.*,
    718 F. Supp. 2d 703 (W.D. Va. 2010) ....................................................................13, 17

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004)........................................................................................23

*Linear Tech. Corp. v. ITC*,
    566 F.3d 1049 (Fed. Cir. 2009)................................................................................21, 31

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)................................................................................49, 50

*Mannesmann Demag Corp. v. Engineered Metal Products Co.*,
    793 F.2d 1279 (Fed. Cir. 1986)......................................................................................13

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007)................................................................................12, 18

*MGM Studios, Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005)........................................................................................................46

*Norian Corp. v. Stryker Corp.*,
    363 F.3d 1321 (Fed. Cir. 2004)......................................................................................13

*Northrop Grumman Corp. v. Intel Corp.*,
    325 F.3d 1346 (Fed. Cir. 2003)......................................................................................23

*Pause Tech., LLC v. Tivo, Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005)......................................................................................10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................passim

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
    182 F.3d 1298 (Fed. Cir. 1999)............................................................... 32

*Playtex Prods., Inc. v. Procter & Gamble Co.,*
    400 F.3d 901 (Fed. Cir. 2005)................................................................ 32

*Power-One, Inc. v. Artesyn Techs., Inc.,*
    599 F.3d 1343 (Fed. Cir. 2010)............................................................. 27

*Renishaw PLC v. Marposs Societa' per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998)............................................................. 22

*Ricoh Co. v. Quanta Computer Inc.,*
    550 F.3d 1325 (Fed. Cir. 2008)............................................................. 48

*SanDisk Corp. v. Memorex Prods., Inc.,*
    415 F.3d 1278 (Fed. Cir. 2005)................................................. 19, 20, 31

*Specialty Composites v. Cabot Corp.,*
    845 F.2d 981 (Fed. Cir. 1988)............................................................... 19

*SynQor, Inc. v. Artesyn Techs., Inc.,*
    709 F.3d 1365 (Fed. Cir. 2013)............................................................. 46

*Terlep v. Brinkmann Corp.,*
    418 F.3d 1379 (Fed. Cir. 2005)....................................................... 11, 23

*Thorner v. Sony Computer Entm't Am. LLC,*
    669 F.3d 1362 (Fed. Cir. 2012)............................................................... 2

*Univ. of Cal. v. Hansen,*
    54 U.S.P.Q.2D (BNA) 1473, 1999 U.S. Dist. LEXIS 21833 (E.D. Cal. Nov. 8,
    1999)....................................................................................................... 46

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)............................................................... 19

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
    442 F.3d 1322 (Fed. Cir. 2006)............................................................... 8

**STATUTES**

35 U.S.C. § 271(b)...................................................................... 45, 48

35 U.S.C. § 271(c)...................................................................... 48, 49

**OTHER AUTHORITIES**

http://en.wikipedia.org/wiki/Object..................................................... 33

U.S. Patent No. 7,272,658...........................................................passim

U.S. Patent No. 7,587,509 ................................................................................................. passim

U.S. Patent No. 7,961,878 ................................................................................................. passim

U.S. Patent No. 8,051,287 ................................................................................................. passim

**RULES**

Fed. R. Civ. P. 56(a) ............................................................................................................ 31

1  **I.     INTRODUCTION**

2          This lawsuit involves the efforts of an admitted "copycat" to pilfer the investments of an

3  industry leader for its own gains.  Plaintiff Adobe Systems Incorporated ("Adobe") is a global

4  supplier of digital marketing and media solutions.  Among its offerings are the popular Flash®

5  Media Server[1] and Flash® Player products, which are based on an integrated set of technologies

6  for efficiently communicating multimedia applications and other content, including audio, video,

7  and data, over the Internet.  Concerned with the vulnerabilities associated with downloading,

8  content owners sought an efficient way to stream their content to end-users so they could view

9  the content without recording it.  As a technology innovator, Adobe developed the Real-Time

10 Messaging Protocol ("RTMP") to ensure quality real-time "streaming" of digital content to a

11 wide range of user devices.[2]  Adobe also developed a secure version of that protocol known as

12 "RTMPe," which enables content-providers to better protect their high-value content  from being

13 "hacked" and unlawfully altered and/or copied.  Adobe incorporated these protocols  into its

14 Flash products, which significantly enhanced their success and made them the most popular

15 platform for streaming content.[3]

16         Adobe has protected its technology investments with patents, including U.S. Patent Nos.

17 7,272,658 ("the '658 Patent") and 7,587,509 ("the '509 Patent"), which cover RTMP and its

18 various flavors, including RTMPe, and U.S. Patent Nos. 7,961,878 ("the '878 Patent") and

19 8,051,287 ("the '287 Patent") (collectively, the "Asserted Patents"), which additionally cover

20

21 [1]  The Flash Media Server is now branded as the "Adobe Media Server" and was formerly branded as the
22      "Flash Communications Server."  For consistency with prior pleadings, Adobe will continue to refer to
       the Adobe Media Server as the Flash Media Server.

23 [2]  Adobe will provide a fuller presentation of the relevant technology background in its Technology
       Tutorial, to be submitted separately from this brief.

24 [3]  Soon after its commercial release, RTMP became the leading streaming protocol, "well-received by
       major content owners and licensees."  Ex. 5 at 1.  Today, RTMP is used to stream content by media
25     companies such as ESPN, MTV, Bloomberg, and The Street.com.  *See, e.g.,* Ex. 6 at 2.  Similarly,
       Adobe's RTMPe protocol has achieved significant industry adoption, due to features such as security,
26     scalability and simplicity.  *See, e.g.,* Ex. 7 at 1.  (All citations to "Ex." refer to exhibits to the
       concurrently filed Declaration of Ryan E. Hatch in Support of Adobe's Opening Claim Construction
27     Brief and Motion for Summary Judgment.).  Ex. 1 is the '658 Patent, Ex. 2 is the '509 Patent, Ex. 3 is
       the '878 Patent and Ex. 4 is the '287 Patent.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ADOBE'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. C 11-02243 JST

RTMPe.[4]  Adobe asserts that Defendant Wowza's[5] "Wowza Media Server" ("WMS") product, which as discussed below implements the RTMP and RTMPe protocols *by design* so it can interoperate with Adobe's Flash Player, infringes each of these patents.  Indeed, Wowza's business model is premised on exploiting the innovations of Adobe by reverse-engineering Adobe's successful products, and then reproducing and marketing them under Wowza's own label.

Still, Wowza denies infringement based on misguided efforts to rewrite the clear claim terms of the Asserted Patents.  The claim terms at issue either use words with well-known meanings to those of ordinary skill in the art, or words that are self-defining in the claims themselves.  Yet, Wowza attempts to import limitations from the specifications to narrowly limit their scope in an effort to avoid infringement.  In doing so, however, Wowza disregards multiple well-established canons of claim construction in direct violation of Federal Circuit precedent.  Wowza ignores, for example, the long-recognized "'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  As such, "[c]laim terms are entitled to a "heavy presumption" that they carry their ordinary and customary meaning to those skilled in the art."  *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007).  The Federal Circuit recognizes <u>only</u> two exceptions to this rule: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  However, neither exception applies to the construction of the claim terms at issue here.  Adobe adheres to

---

[4]  Wowza does not dispute that Adobe's asserted patents cover RTMP and RTMPe.  In fact, Wowza refers to the '658 and '509 Patents as the "RTMP Patents" and the '878 and '287 Patents as the "RTMPe Patents."  *See* Dkt. 31 (Answer) at 5; *see also* Ex. 8 at 31 ("The '658 and '509 patents are known as the RTMP patents.  The '878 and '287 patents are known as the RTMPE patents.").  Wowza's experts agree that RTMP and RTMPe "are the subjects of the patents at issue[,]" Ex. 9 at 5, and that RTMPe "covers the inventions of the '878 and '287 patents."  Ex. 10 at 24.

[5]  The original named defendant, Wowza Media Systems, Inc., has since been restructured and now comprises two entities, Wowza Media Systems, LLC and Coffee Cup Partners, Inc. (together, "Wowza").

1    these fundamental rules of claim construction, while Wowza repeatedly disregards them.  Once

2    the Court properly construes the claims, Wowza's infringement becomes self-evident.

3    **II.    THE INVENTIONS OF THE ASSERTED PATENTS**

4         Adobe's patented RTMP and RTMPe protocols are used for efficient streaming of digital

5    media files, comprising audio, video, and/or data content.  As one example, a client computer

6    installed with Adobe's Flash Player software may use RTMP or RTMPe to access a television

7    program or movie streamed over the Internet from a remote server, where the original media file

8    may be stored.  As another example, the remote server may receive content from the client

9    computer as part of a video conference or "chat" session.

10        **A.    The '658 and '509 Patents**

11        The '658 and '509 Patents specifically cover communications using RTMP.[6]  They

12   describe a media stream divided into "chunks" for transmitting and receiving content.  *See, e.g.*,

13   '658 Patent, Abstract.  In addition to the "payload," consisting of media content, each chunk has

14   a "header" that provides information about how to interpret the chunk.  *Id.* at 6:22-28.  For

15   example, set forth below is the embodiment depicted in FIG. 9 of the '658 Patent, annotated with

16   color-highlighting for emphasis.  FIG. 9 depicts the flow of multiple video (**V**) chunks (orange)

17   and audio (**A**) chunks (red), labeled with odd numbers **901-915**, with corresponding headers

18   shown as even numbers **902-916**, sent from a streaming transmitting entity **91** (such as the media

19   server) to a receiving entity **92** (such as the Flash Player) (each in yellow).  FIG. 9 only shows

20   the headers associated with chunks **901-915**, and does not show the chunk payload:

---

6   *See supra* note 4.  The '509 Patent is a "continuation" patent of the '658 Patent and shares
substantially the same written description.  For ease of reference, Adobe only cites to the specification
of the '658 Patent when referencing the specifications of both the '658 and '509 Patents.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

ADOBE'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. C 11-02243 JST



FIG. 9

As illustrated in the example of FIG. 9, audio chunk **901** has a header **902** (blue) comprising a chunk state (or type ID) ("ChType"), chunk stream ID ("ChID"), message stream ID ("StrID"), message length ("L"), message type (*e.g.*, video) ("TYPE"), and the time change from the prior message ("Δ").  In accordance with the invention, the chunk headers may vary in size depending on the purpose of the chunk.  For example, the next audio chunk in order, **903**, has a smaller header **904** (blue) that includes only the chunk state (or type ID) and chunk ID (green).  The headers are able to vary in size because a "state machine" – which may simply be one or more data structures in the software installed on the transmitting or receiving computers (*see, e.g,* '658 Patent at FIGs. 5B to 5E, 9:33-10:24) – is able to keep track of the flow of header information from chunk to chunk.  The state machine reads the chunk state (or type) of each successive chunk and, based on the value of two bits, is able to *reuse* one or more of the header parameters from a previous chunk (*e.g.*, pink highlights in header **902**) to interpret the next incoming associated chunk (*e.g.*, pink highlights in header **904**).  In the embodiment of FIG. 9, a state machine keeps track of the stream ID, message length, message type, as well as the time change from the last message that was sent in chunk header **902** and, based on the chunk states

(or types), applies those parameters to the header **904** of the next audio chunk in order.   In this way, the state machine uses the chunk state (or type) to interpret the header of each chunk without requiring all of the header parameters to be present, and thereby efficiently instructs the sending or receiving software how to process the payload (*e.g.*, such as reassembling the underlying video data – *see, e.g.*, '658 Patent at 12:65-13:3) of each successive chunk.

In the example embodiment illustrated in FIG. 9, the chunk state (or type), represented by "ChType," is two bits (each having the binary value of either "1" or "0").  Two bits can only encode up to four possible purposes of each chunk (since $2^2 = 4$).[7]  Accordingly, the chunk state (or type) assigned to, or associated with, each successive chunk indicates that the chunk's header contains either:

- all new parameters.  For example, stream ID (StrID), length (L), message type (TYPE) and time delta (Δ) are shown in chunk headers **902** and **906** in FIG. 9.  *E.g.*, '658 Patent at 15:22-30, 7:45-62, Table 2 at 8:53-59; or

- a plurality of new parameters, and relies on at least one parameter from a previous chunk header.  For example, chunk header **910** includes only two new parameters, length (L) and time delta (Δ), and therefore relies on the stream ID (StrID) and message type (TYPE) parameters from a previous header.  *Id.* at 7:63-8:13; Table 2 at 8:60-64; or

- at least one new parameter, and relies on a plurality of parameters from a previous chunk header.  For example, chunk header **916** includes only one new parameter and therefore relies on a plurality of parameters from a previous header.  *See also id.* at 8:14-22, Table 2 at 64-66; or

- no new parameters, and instead relies on a plurality of parameters from a previous header.  For example, chunks **904**, **908**, **912**, and **914** include no new parameters.  *See also id.* at 8:23-45, Table 2 at 9:9-13.  In the example of FIG. 9,  only the Chunk ID

---

[7]  For example, Table 2 in the '658 Patent specification shows a binary encoding of the two "Chunk Type Bits," such that values 00, 01, 10, and 11 correspond to Types 0, 1, 2, and 3, respectively.

and the two-bit chunk state are in the header. *Id.* at 15:42-46.

The invention enables the use of smaller chunk headers, thereby increasing the overall efficiency of the communication stream by increasing the bandwidth available to deliver the payload and, thus, deliver more chunks across a network faster than before. *Compare, e.g.*, '658 Patent at 5:58-6:12 (describing the prior art message stream **20** shown in FIG. 2 of the patent, comprising message packets **21-24**: "The repeated information in [prior art] message packets **21-24** clogs the available bandwidth of the entire system."). As further described in the specification, among other benefits:

> [I]nstead of resending the same header with each data packet, the teachings of the present invention preferably allow this information to be sent only once, with subsequent chunks leveraging the state machine in order to reduce the overhead sent with each subsequent chunk. *The amount of repetitive information is, therefore, favorably reduced, increasing the available bandwidth over the connection.* '658 Patent at 10:13-20 (emphasis added).

## B.   The '878 and '287 Patents

The RTMPe protocol is a secure version of RTMP and is covered by the '878 and '287 Patents.[8]   In practice, RTMPe incorporates the same protocol of "chunking" as RTMP, but modifies the pre-defined "handshake" procedure used to set up RTMP connections in order to establish secure (*e.g.*, authenticated and/or encrypted) sessions. The '878 and '287 Patents address the handshake procedure, which can be used to establish either encrypted or non-encrypted sessions, as illustrated in FIG. 1 from the patent:



FIG. 1

A central challenge of setting up secure communications between a sender and a receiver

---

[8]   *See supra* note 4.  The '878 Patent addresses the handshake aspects of RTMPe.  The '287 Patent combines the "chunking" aspects of RTMP with the handshake aspects of RTMPe.

over a public network (*e.g.*, the Internet) is the need to exchange a shared "key" that is used to "unlock" those communications.  Without knowledge of the key, the communications would remain either unauthenticated or encrypted.  On the other hand, if the key becomes readily available, having a "lock" at all would become meaningless.  The invention implements an elegant solution to this problem of establishing secure RTMP connections by taking advantage of the well-known random byte section of the pre-defined RTMP protocol handshake:

> Adobe Systems Incorporated has promulgated a communication protocol for the FLASH® Media Server in which a communication session is established through handshake communications between the server and the client.  **As part of this handshake, the Real Time Messaging Protocol (RTMP) included a random byte section** in the communications for use in estimating the available bandwidth for the session between the client and the server.
>
> <p style="text-align:center">***</p>
>
> The handshakes 150a and 150b include a block of bytes that contain **random data**, and the block of bytes **can also include information useable for authenticating the network communications between server and client, and information for establishing an encrypted session**.  '878 Patent at 1:33-40; 4:1-6 (emphasis added).

The invention places the "key"  (*i.e.*, cryptographic information) needed to authenticate and/or encrypt subsequent communications at a location *within* the pre-defined RTMP random byte section **310**, as illustrated in FIG. 3 of the '878 Patent below:[9]



In the above figure, the key **320** (purple) is "hidden" within the RTMP random byte section, **310** (blue).  Since the key appears random, the '878 Patent explains that it is "hidden in plain sight."  *Id.* at 4:53-62.  By re-using the random byte section of the RTMP handshake in this

---

[9] "The network communication **300** includes a pre-defined portion **310** that includes random data.  In addition, the pre-defined portion **310** includes embedded cryptographic information at a location 320."  '878 Patent at 4:56-59.  *See also* '287 Patent at Fig. 3A, 9:10-10:15.

way, the invention of the '878 and '287 Patents "can handicap reverse engineering attempts," and yet still provide desirable "interoperability [*i.e.*, backwards compatibility] with previously written software" that implemented unsecured communications using RTMP. *Id.* at 3:44-51. The patents explain that the location, **320,** of the key may also vary, thereby further handicapping reverse engineering attempts. *Id.* at 4:63-65.

### III.   WOWZA'S ACCUSED WMS PRODUCT

When evaluating disputes over claim construction, the Federal Circuit has noted that district courts can benefit by considering those disputes in the context of the specific accused infringing product or process. *See, e.g.*, *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 (Fed. Cir. 2006).  Here, Adobe accuses Wowza of infringing the Asserted Patents by making and selling WMS,[10] which streams using unauthorized versions of RTMP and RTMPe.  Wowza's foundations for infringement are revealed in the WMS User Guide:

REDACTED

Ex. 11 at WOWZA0243824-825.   Wowza designed WMS especially to work with Adobe's Flash Player using Adobe's RTMP and RTMPe, and WMS competes directly with Adobe's Flash Media Server. *See, e.g.,* Ex. 25  at WOWZA0212567; Ex. 18 at 41:10-23.  In fact, Wowza advertises itself as "the only commercially available alternative to Adobe's Flash Media Server" in promoting its unauthorized support of RTMP and RTMPe.  Ex. 26 at ADOBEWOW0001912.

---

[10]  Prior to WMS 3.5, Wowza included all relevant RTMPe functionality in the base WMS product without the need to install a separate RTMPe component. *See* Ex. 12 at 14. With WMS version 3.5, Wowza pulled out the RTMPe functionality as a Wowza-supplied "RTMPe AddOn" component.  Ex. 28 at 243:5-23; Ex. 43 at WOWZA0242178.  As discussed further below, WMS 3.5 and the RTMPe AddOn both infringe the '878 and '287 Patents.

In addition, Wowza's website and marketing materials prominently feature a chart directly comparing WMS to Adobe's media server products – expressly referencing WMS's support for RTMP and RTMPe.  *See, e.g.,* Ex. 27 at WOWZA0149178; Ex. 28 at 273:8-276:2.

Wowza was founded by former Adobe employees David Stubenvoll and Charlie Good in November 2005 right after they left Adobe.  David Stubenvoll's title at Adobe was Entrepreneur in Residence, and Charlie Good's title at Adobe was Director of Engineering.  REDACTED

in

REDACTED

.

Wowza  does  not  deny  its  efforts  to           REDACTED

REDACTED  Nor does it deny that Adobe's asserted patents cover RTMP and RTMPe.  *See supra* note 4.  WMS infringes the Asserted Patents in providing support for RTMP and RTMPe in competition with Adobe's Flash Media Server.  Indeed, after admitting that      REDACTED

Logically,  Wowza  cannot  legitimately  claim  that  it  does  not  infringe  the asserted patents when: 1) it concedes that those patents cover Adobe's products and protocols, 2)

REDACTED

Wowza does not and cannot genuinely dispute these facts.  Ultimately, as set forth in the accompanying Declaration Of Peter Alexander in Support of Adobe Systems Incorporated's Opening Claim Construction and Summary Judgment Brief ("Alexander Decl."),[11] Wowza's own source code for WMS firmly establishes infringement under the asserted claims.  As such, Adobe requests that the Court grant summary judgment of infringement.

## IV.   AGREED CLAIM CONSTRUCTIONS

As reflected in the parties' June 15, 2012 Joint Claim Construction Statement Pursuant to Patent L.R. 4-3 (Dkt. 98), as well as subsequent correspondence, the parties agree on the proper construction of the following five claim terms appearing in the asserted patent claims:

| Claim Terms | Agreed Construction |
|---|---|
| **"chunk"** ('658 Patent, claims **12**, and **21**; '509 Patent, claims **1, 10, 22**, and **27)** | A piece of a message stream |
| **"handshake"** ('287 Patent, claim **1** and **12**) | A procedure for establishing a communications session |
| **"network communication"** ('878 Patent, claims **1, 15** and **17**; '287 Patent, claims **1** and **12**) | A communication that is sent across a network |
| **"establishing […] communication session"** ('287 Patent, claims **1** and **12**) | Setting up … communication session |
| **"cryptographic information"** ('878 Patent, claims **1, 15,** and **17**; '287 Patent, claims **1** and **12)** | Information for authenticating or encrypting |

## V.   DISPUTED CLAIM TERMS[12]

Claim construction is the first step in the two-step process of determining infringement. *E.g.*, *Pause Tech., LLC v. Tivo, Inc.*, 419 F.3d 1326, 1335 (Fed. Cir. 2005).  The goal is simply to

---

[11] *See infra* note 16.

[12] Per the Court's May 6, 2013 Order (Dkt. 323), the parties have stipulated to 9 out of 10 claim terms to present to the Court for construction.  *See* Dkt. 325.  As part of this stipulation, Wowza has agreed that certain previously-disputed claim terms will be afforded their plain meaning: "real-time," "media message sub-stream," "purposes," "variable location," "using at least part of the network communication to determine the location," and "set of possible purposes including."

understand the scope of the claim language as it exists in the patent, *Bell Commc'ns Research v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995), by "elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005).

### A. "priority-based" – '658 Patent, claim 12; '287 Patent, claims 1 and 12

| Adobe's Proposed Construction | Wowza's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, or<br><br>Order-based | A system that assigns different priority values to different media types and uses these priority values to determine what chunks to transmit |

The claims of the '658 and '287 Patents recite a "real-time, ***priority-based*** network communication" as part of the message stream. Adobe asserts that "priority-based" has a plain and ordinary meaning as used in this context. In accord with the "heavy presumption" that claim terms retain their plain and ordinary meanings as understood by persons of ordinary skill in the art, *Elbex Video*, 508 F.3d at 1371, "priority-based" has such a meaning and does not require any construction by the Court. *See* Alexander Decl., App. A-1[13] at 5-6. If any construction is desired by the Court, however, "order-based" is the proper construction and may be used as helpful clarification for the jury. *See, e.g.,* Joint Claim Construction Statement ("Joint Statement"), Dkt. No. 98, at 7-8.

Wowza's contrived construction improperly imports three unnecessary limitations in an attempt to narrow "priority-based" to require a particular kind of "system" that orders chunks in a particular kind of way: it 1) "assigns different priority values"; 2) "to different media types"; and 3) "uses these priority values to determine what chunks to transmit." Wowza's construction seeks to rewrite otherwise clear claim language, defying the cardinal rule of claim construction forbidding examples from the specification from being imported into the claims. *See, e.g., CollegeNet, Inc. v. ApplyYourself, Inc.,* 418 F.3d 1225, 1231 (Fed. Cir. 2005). Accordingly, it would be error for the Court to adopt Wowza's construction and import limitations absent "a

---

[13] For ease of reference, Appendices A-1 through A-4 of the Alexander Infringement Report are attached directly to the Alexander Declaration.

textual reference in the actual language of the claim with which to associate" those limitations. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1331 (Fed. Cir. 2007).  And there is none here.  The term "priority-based" simply does not include or require "priority values," "media types," or "transmitting."

Moreover, certain dependent claims in the patents do add these limitations, highlighting the fact that Wowza's proposal for reading those limitations into the *independent* claims is improper.  *See Phillips,* 415 F.3d at 1314-15; *Enzo Biochem, Inc. v. Applera Corp.,* 599 F.3d 1325, 1342 (Fed. Cir. 2010) ("presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim") (citations omitted).  For example, Wowza's proposed extraneous limitations are addressed in dependent claim 9 of the '658 Patent, which recites "*a priority assigned* to" different media types, *i.e.*, to "each of: said *audio* format chunks; said *video* format chunks; and said *data* format chunks."[14]  Similarly, dependent claims 8, 19, and 31 of the '287 Patent recite "associating *priority values* with the sub media streams."  Likewise, the concept of "us[ing] … *priority values* to determine what chunks to transmit" appears, for example, in dependent claims 9-11 of the '658 Patent.[15]  Clearly, these limitations do <u>not</u> appear in the independent claims where "priority-based" stands alone without qualification, and the Court would commit error if it read similar limitations into those claims, as Wowza proposes.

## B.     "consist of" – '658 Patent, claims 12 and 21; '509 Patent, claims 1, 10, 22, and 27

| Adobe's Proposed Construction | Wowza's Proposed Construction |
| --- | --- |
| Includes only the following purposes but does not preclude purposes indicated by information other than the state or type identifier | Includes the following, and only the following |

---

[14] *See also* '658 Patent, dependent claims 19 and 27, which recite "assigning a priority to each sub-stream."

[15] *See also* '658 Patent, claims 19 and 20, and '287 Patent, claims 8, 9, 19, 20, 31, and 32, which also recite using priority values to determine what chunks to transmit.

"Consist of" is a common transitional phrase in patent claim drafting.[16]  When used in the claim preamble, it is generally considered "closed" to unlisted elements.  *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331 (Fed. Cir. 2004).  However, where, as here, "consist of" appears in the *body* of the claim rather than at the end of the preamble to the claim, "it does not limit the entire claim as such."  *Digene Corp. v. Third Wave Techs., Inc.*, 323 Fed. Appx. 902, 909 (Fed. Cir. 2009).  It <u>only</u> limits "the clause for which it acts as a transition to only those elements found in that particular clause."  *Id.*; *see also Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279, 1282 (Fed. Cir. 1986) (affirming district court's construction of "consisting of" as not "excluding all other elements from the claim as a whole").

In addition, the context in which the phrase "consist of" is used is key to understanding its scope.  As the Federal Circuit has held, "[a]lthough 'consisting of' is a term of restriction, the restriction is not absolute."  *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1360 (Fed. Cir. 2006).  Rather, the term "does not limit aspects ***unrelated to the invention***."  *Id.* (emphasis added) (additional element "unrelated" to the invention did not preclude infringement even where "consisting of" was used) (citing *Norian*, 363 F.3d at 1331 (reversing summary judgment of non-infringement because addition of a spatula was unrelated to the claimed invention for a kit "consisting of" certain chemicals)).  In *King Pharms. Inc. v. Purdue Pharma, L.P.*, 718 F. Supp. 2d 703 (W.D. Va. 2010), for example, the district court correctly construed the ordinary meaning of "the first layer consisting of opioid antagonist" – where that term appeared in the body of the patent claim – as "the first layer contains only the opioid antagonist *and other ingredients unrelated to the invention*."  *Id.* at 715 (emphasis added).  Thus, to determine what is unrelated to the invention or beyond what the claim requires, the Court must evaluate the claimed context in which the phrase "consist of" appears.[17]  Here, the context is as

---

[16] Since "consist of" is a newly added term to the parties' stipulated list of terms requiring construction (Dkt. 325, May 31, 2013), Adobe provides herewith the Alexander Decl. to address this newly-added term.

[17] Additionally, "[w]hile certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."  *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003).

follows:

- "wherein said states indicate possible purposes of a corresponding chunk, and wherein the possible purposes indicated by said *states* <u>consist of</u>:" ('658 Patent, claim 12 at 18:6-9.)

- "wherein said state assignments indicate possible purposes of a corresponding chunk, and wherein the possible purposes indicated by said *state assignments* <u>consist of</u>:" ('658 Patent, claim 21 at 19:37-39.)

- "the state association indicating one of a plurality of possible purposes for each respective chunk, wherein said possible purposes indicated by said *state associations* <u>consist of</u>:" ('509 Patent, claim 1 at 16:31-35.)

- "the state assignments indicating one of a plurality of possible purposes for each corresponding chunk, and wherein the possible purposes indicated by said *state assignments* <u>consist of</u>:" ('509 Patent, claim 10 at 17:49-52)

- "wherein said chunk type identifiers indicate possible purposes for said chunk, and wherein the possible purposes indicated by said *chunk type identifiers* <u>consist of</u>:" ('509 Patent, claim 22 at 19:10-13.)

- "wherein said chunk type identifiers indicate a purpose of a plurality of possible purposes for said chunk, and wherein the possible purposes indicated by said *chunk type identifiers* <u>consist of</u>:" ('509 Patent, claim 27 at 20:5-8.)

The above claims identify the possible chunk purposes using either "state associations," "states," "state assignments," or "chunk type identifiers."[18]  The possible chunk purposes

---

[18]  The '658 Patent, claims 12 and 21, and the '509 Patent, claims 1 and 10, use the words "state associations," "states," and "state assignments," whereas the '509 Patent, claims 22 and 27, use "chunk type identifiers."  Both the '658 and '509 Patent specifications make clear that the chunk state and the chunk type identifiers are the same and that these words can be used interchangeably to identify chunk purposes.  *See* '658 Patent, 7:38–44, 46–48, 62–67, 8:14-16.  Also, Adobe's construction for "consist of" uses "state" instead of "state associations" and "state assignments" since these words are also used interchangeably to mean chunk purposes.  The prosecution history confirms this:  "Moreover, the present amendments of claims 1, 12, and 21 further set forth that *purposes identified or indicated by the state associations, states, or state assignments* are selected from a new stream chunk, a new media chunk, a new time chunk, and a continuation chunk.  The amended language further recites detail with

enumerated by the state or type identifiers "consist of" four different possible purposes expressed in the claims.  Taken in this context, "consist of" means that while the claims embrace only the enumerated possible purposes, they *do not preclude possible purposes indicated by information other than the state or type identifiers*.[19] *See* Alexander Decl. at ¶¶ 7-9.

Adobe's construction of "consist of" is in accord with these well-established principles of law, as well as the claims and the specifications.  For example, Adobe's construction provides that the claim element "includes only the following purposes," in accordance with the generally closed nature of "consist of."  At the same time, Adobe's construction does not preclude possible purposes indicated by information other than the state or type identifiers.[20]  This construction is consistent with the plain language of the claims.  For example, '509 Patent, claim 22 recites "wherein the possible purposes indicated by said chunk type identifiers <u>consist of</u>" four chunk possible purposes.  Thus, to the extent the term "consist of" is limiting, it limits only this particular claim element that relates to the *possible* purposes indicated by the state or type identifiers, and does not preclude purposes that may be indicated by *other information*.  In fact, the corollary to the claim language, and to Adobe's construction, is that any uses (or "purposes") indicated by information other than the state or type identifier are superfluous to the claim, since they are not related to the claimed invention and thus cannot preclude infringement of the claim. *See Conoco*, 460 F.3d at 1360.

Dependent claim 25 of the '509 Patent is illustrative of this point, as it contemplates another purpose (a low level protocol message) indicated by other information (the chunk stream

---

respect to the inclusion of parameters within a chunk header and/or use of parameters from a previous header with respect to the various chunk purposes." Ex. 14 at 16.

[19] Adobe's construction is supported by the file wrapper.  In an amendment during prosecution of the '658 Patent, the Applicant explained that the state associations, states, or state assignments identify or indicate "a purpose" of the associated chunk.  Ex. 14 at 14-15 (emphasis added).  Adobe's proposed construction provides that chunks may have *other* purposes indicated by *other* information, and that such other purposes are not precluded by the claim.

[20] Other constructions of "consist of" have recognized that it does not preclude aspects unrelated to the invention. *See, e.g., INOVA Diagnostics, Inc. v. Euro-Diagnostica AB*, 2009 U.S. Dist. LEXIS 74899, at *6-7, 19 (S.D. Cal. 2009)) (construing "consisting of" to mean "the claimed invention contains only what is expressly set forth in the claim and does not exclude additional components that are *unrelated to the invention*") (emphasis added).

identifier).  Claim 25 recites "reading a chunk stream identifier of each said control headers; and determining, using an associated one of said chunk stream identifiers, whether a corresponding chunk is a low-level protocol message[.]"  '509 Patent at 19:38-43.  The "chunk stream identifier" is *not* a state or type identifier and thus it is other information not limited by the "consist of" term in the independent claim 22 of the '509 Patent.[21]  Thus, even where a state or type identifier can indicate only four possible purposes (*e.g.*, in independent claim 22), the claims themselves make unambiguously clear that they do not preclude other chunk purposes indicated by other information – such as a low-level protocol message that is  "used to control administrative aspects" like the  "maximum chunk size" that is determined by "other information," such as a chunk stream ID.  '509 Patent, claim 25; '658 Patent at 7:7-9, 11:39; *see also id.* at 10:37:-39 ("Many other optional low-level protocol messages may also be provided for in various embodiments of the invention.").

Adobe's construction is also consistent with the specification, which describes using 2-bit state/chunk type identifiers that indicate up to four ($2^2 = 4$) possible chunk purposes:

> In furtherance of the state machine concept implementing the embodiments of the present invention, **chunk type ID 41 provides four states/types for classifying each chunk message**.  Unlike the media type indicator of message type ID **101** (FIG. 1) that identifies the format of the data payload, **chunk type ID 41 identifies the type or purpose of the chunk**. '658 Patent at 7:38-44 (emphasis added).

The specification then goes on to describe the four possible purposes for the chunks in "certain embodiments of the present invention" with reference to Table 2 of the specification.  *Id.* at 7:47-48.  Table 2 specifies four purposes that: 1) use all new parameters in the chunk header (chunk type "00"), 2) use only a plurality of new parameters in the header (chunk type "01"), 3) use only one new parameter (chunk type "10"), and 4) use no new parameters, (chunk type "11").  The implementation of the invention described in Table 2 is in contrast with, for example, a different

---

[21]  Indeed, the chunk stream identifier may indicate various purposes as provided by Table 1, '658 Patent at 7:10-20, that are different and in addition to the chunk purposes provided by the chunk state or type provided for in Table 2.  *See* '658 Patent at 8:47-67, 9:1-13.  The chunk stream identifier does not denote the chunk state (or type) of the chunk.

1  implementation that uses a 3-bit chunk type identifier to identify eight ($2^3 = 8$) possible purposes,

2  and therefore does not "consist of" only four purposes.

3      On the other hand, Wowza's construction, "includes the following, and only the

4  following," ignores the context in which "consist of" is used in the claims, and ignores the

5  Federal Circuit precedent concerning this term. In particular, Wowza's construction presumes

6  that the term is an absolute restriction.  As discussed above, "consist of" is not an absolute

7  restriction, as it does not limit aspects "unrelated to the invention."  *Conoco*, 460 F.3d at 1360.

8  Even if Wowza were to concede that their construction in the context of the claims does not

9  preclude other purposes indicated by other information, in order to avoid confusion, the jury

10  would be better served by making this point clear in the construction.  As discussed above, the

11  term "consists of" means that the claims embrace only the enumerated possible "purposes," but

12  do not preclude purposes *indicated by information other than the state or type identifiers*.

13  Wowza's construction is overly restrictive, since it ignores the claim context, and thus must be

14  rejected. *King Pharms*, 718 F. Supp. 3d at 715  (rejecting construction of "consisting of" as "that

15  which is specifically recited and nothing more" for failure to address elements "unrelated to the

16  invention").

17  **C.**  **"new media chunk" – '658 Patent, claims 12 and 21; '509 Patent, claims 1,**
    **10, 22, and 27**

18

| Adobe's Proposed Construction | Wowza's Proposed Construction |
|---|---|
| A chunk having a plurality of new parameters in its header and using at least one other parameter from a previous header | A chunk of a media message sub-stream that is of a different media type than the media type of the immediately preceding chunk with the same chunk stream id. |

22  A "***new media chunk***" is one of the four possible chunk purposes that are "indicated" by

23  the state or type identifiers recited in the claims of the '658 and '509 Patents.  The meaning of

24  "new media chunk" is self-defined by the language of the claims themselves.  As the Federal

25  Circuit has held, "the claims themselves provide substantial guidance as to the meaning of

26  particular claim terms." *Phillips*, 415 F.3d at 1314.  "While certain terms may be at the center of

27  the claim construction debate, the context of the surrounding words of the claim also must be

28  considered in determining the ordinary and customary meaning of those terms." *Brookhill-Wilk*

1  *I,* 334 F.3d at 1299.

2       Read in context, claim 12 of the '658 Patent, for example, expressly recites: "wherein the

3  possible purposes identified by said state associations consist of: … *a new media chunk*

4  associated with a new media message sub-stream *wherein said new media chunk includes a*

5  *plurality of new parameters in a corresponding one of said headers and uses at least one other*

6  *parameter from a previous header.*"[22]    The plain language of the claim defines "*new media*

7  chunk" to be a chunk that has a "plurality of new parameters in its header and using at least one

8  other parameter from a previous header."[23]  *See, e.g.,* Joint Statement at 15.

9       Wowza's proposed construction of "new media chunk" imports extraneous limitations

10  into the claims, once again violating the cardinal rule against reading specific embodiments into

11  the claims.  Wowza's proposed construction requires at least three unnecessary limitations: 1) a

12  different media type, 2) than the media type of the immediately preceding chunk, and 3) with the

13  same chunk stream id. The phrase "new media chunk" and the rest of claim language do not

14  require any specific media **"type,"** let alone "one that is different from the media type of the

15  immediately preceding chunk with the same chunk stream id." Indeed, Wowza's proposed

16  construction has no textual basis with the claims whatsoever.  *See MBO Labs.*, 474 F.3d at 1331

17  ("a textual reference in the actual language of the claim" is necessary to import additional

18  limitations).

19       Moreover, the specification clearly contradicts Wowza's unduly restrictive position.  The

20  specification explains that a "new media indicator" chunk need not include a new media type

21  parameter at all, but instead may only use  "the new specified time delta (*i.e.*, the time stamp

22  change from the last message) and the specific length."  '658 Patent at 7:67-8:2.  This

23  embodiment is shown explicitly in FIG. 9, discussed above, where chunk header **910** includes

24  new length (L) and time delta (Δ) parameters, but a media type parameter is not even included in

25

26  ---
    [22] *See also*, *e.g.*, '509 Patent, claim 1.

27  [23] *See supra* note 18. The prosecution history confirms that the claim language itself defines the various
    chunk purposes.  *See* Ex. 14 at 16.

28

1    the header.  And as the Federal Circuit has repeatedly emphasized, "[a] claim construction that

2    excludes a preferred embodiment … is rarely, if ever, correct."  *SanDisk Corp. v. Memorex*

3    *Prods., Inc.,*  415 F.3d 1278, 1285 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic,*

4    *Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).  Table 2 in the specification also makes explicit that a

5    "Type 1" chunk can "begin a new message using specified [time delta], new length, **and/or** new

6    message type ID."  '658 Patent at 8:61-65.  Table 2 then describes the mix of new and reused

7    parameters the Type 1 chunk will "generally contain" – *i.e.*, not *always* contain.  *Id.*  The

8    specification therefore makes clear that no *specific* mix of new or reused parameters is required

9    by a "new media chunk."  *See, e.g.*, *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987

10   (Fed. Cir. 1988) ("Nowhere does the specification of the [asserted] patent teach that external

11   plasticizers *must* be used.") (emphasis in original).  Further, upon allowing the amended claims,

12   the PTO Examiner also made clear that the "enabling portions" of the specification "suggest the

13   state machine expecting chunks to identify possible purposes **according to Table 2**[.]"  Ex. 29 at

14   2.  In this way, even the Examiner acknowledged that the chunk purposes identified in the claims

15   by the state or type identifier relate to a *general* mix of parameters, and are not limited to any

16   specific parameters.

17         Finally, the dependent claims also demonstrate why Wowza's construction is improperly

18   narrow.  Certain dependent claims add the limitation of having a media type – invoking the

19   presumption that a media type parameter is *not* required by the corresponding independent

20   claims.  For example, Claim 6 of the '658 Patent, which depends on claim 1, does specify that

21   the "new parameters" in the "new media chunk" include "new ones of one or more of: a stream

22   ID parameter; a length parameter; *a media type indicator parameter*; and a time delta

23   parameter[.]"  Similarly, dependent claim 4 of the '509 Patent recites "wherein said parameters

24   include one or more of: a stream ID parameter; a length parameter; *a media type parameter*; and

25   a time delta parameter."  *See also* '658 Patent, claims 5, 6, and 16.  Since the narrower dependent

26   claims explicitly recite a specific "media type parameter," this parameter should not be imported

27   into the "new media chunk" recited in the independent claims, let alone be required to be

28   different from "the media type of the immediately preceding chunk with the same chunk stream

1  id," as Wowza argues. *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed.

2  Cir. 2007); *see also SanDisk*, 415 F.3d at 1285.

3      **D.**    **"new time chunk" – '658 Patent, claims 12 and 21; '509 Patent, claims 1, 10,**
4          **22, and 27**

| Adobe's Proposed Construction | Wowza's Proposed Construction |
|---|---|
| A chunk having at least one new parameter in its header and using a plurality of other parameters from a previous header | A chunk that is of the same substream of the immediately preceding chunk and the only difference between parameters of that chunk and the previous chunk is the time parameter associated with that chunk |

9      Adobe's construction of "***new time chunk***" is self-defined by the claim language, which

10 defines this chunk purpose as "having at least one new parameter in its header and using a

11 plurality of other parameters from a previous header," but does not require any *particular*

12 parameters to be "new" or reused. Adobe's construction is faithful to the plain language of the

13 claims and the specification. *See, e.g.*, Joint Statement at 19-20. By contrast, Wowza's

14 construction of "new time chunk" commits the same error made in its proposed construction of

15 "new media chunk" by importing unnecessary and extraneous limitations: 1) a specific

16 parameter – in this case a "time parameter" that is the "only difference" between the chunk and

17 the previous chunk; and 2) that the chunk be "of the same substream of the immediately

18 preceding chunk."

19     Again, Wowza reads an embodiment in the specification into the claims as a mandatory

20 requirement. Contrary to Wowza's position, the specification is clear that the claimed "new time

21 chunk" need not *require* a new time parameter For example, the specification describes that "in

22 certain embodiments" the chunk "state or type for a new message [is] defined only by a single

23 piece of header information, *such as* the time delta (Type 2), in a new time indicator." '658

24 Patent at 8:14-18. The specification is explicit in that the time delta is provided only as an

25 example, not as a required embodiment, and goes on to say: "A Type 2 chunk *preferably* has all

26 of the same header information from the previous chunk except *possibly* for a change in the time

27 delta." *Id.* at 8:18-20. Thus, the specification does not require the time parameter be included at

28

1   all, much less require that it be the "only difference" between the parameters of the chunk and

2   the previous chunk, or that the chunk have the same substream as the immediately preceding

3   chunk.   And, as the Federal Circuit has made clear, "statements from the description of the

4   preferred embodiment are simply that – descriptions of a preferred embodiment … [which] do

5   not indicate that the invention can only be used in such a manner." *Brookhill-Wilk*, 334 F.3d at

6   1301.   Indeed, "[a]bsent a clear disclaimer of particular subject matter, the fact that the inventor

7   anticipated that the invention may be used in a particular manner does not limit the scope to that

8   narrow context."   *Id.*   As such, while a time delta parameter <u>may</u> be included in some

9   embodiments, it is not *required* by the claims.   *See Linear Tech. Corp. v. ITC*, 566 F.3d 1049,

10   1058 (Fed. Cir. 2009); *Epistar v. Int'l Trade Commission,* 566 F.3d 1321, 1337 (Fed. Cir. 2009)

11   (it would be error to import limitations from embodiments described as "merely exemplary" and

12   not required).

13        Moreover, the specific "time parameter associated" with the chunk that Wowza requires

14   be included in the construction for "new time chunk" is expressly recited in dependent claims,

15   further highlighting why Wowza's construction is improperly narrow.   Again, limitations

16   appearing in the dependent claims are presumptively not required by the independent claims

17   from which they depend.   *See Phillips*, 415 F.3d at 1314-15; *Enzo Biochem*, 599 F.3d at 1342;

18   *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000).   For example, claim

19   6 of the '658 Patent, which depends on claim 1, expressly states "wherein said at least one new

20   parameter included in a corresponding one of said headers of said *new time chunk* is a *new time*

21   *delta parameter*."   The patent clearly identifies the "new time delta *parameter*" when discussing

22   the time *parameter* that Wowza seeks to import into the independent claim.[24]   The time

23   parameter is never recited in the independent claims, which instead refer to the "new time

24   *chunk*," which it defines as a chunk that has "at least one new parameter."   Clearly, the claims

25   distinguish between a "new time chunk" and a time delta "parameter," and do not require the

26
27
---
[24] *See* '658 Patent, claims 6, 16 and 25, and '509 Patent, claims 4 and 17 (reciting that parameters include a stream ID parameter, a length parameter, a media type parameter, and a "time delta parameter.")

28

parameter to be imported into the definition of the chunk.

E.   **"scheduling algorithm" – '658 Patent, claims 12 and 21**

| Adobe's Proposed Construction | Wowza's Proposed Construction |
|---|---|
| An algorithm for selecting data to transmit | An algorithm that prioritizes some media chunk types over other media chunk types, and directs which chunk to transmit next in order to achieve good playback and minimize jitter |

Claims 12 and 21 of the '658 Patent recite a method and computer code for communicating media streams in which there is "transmitting ones of said plurality of chunks according to a **scheduling algorithm**." Taken in the context of the claim language, a "scheduling algorithm" is "an algorithm for selecting data to transmit." Adobe's construction is not only consistent with the plain claim language, but with the specification as well. *See, e.g.,* Joint Statement at 24-25. For example, the specification describes an example scheduler that "executes a scheduling algorithm *to determine which chunks should be transmitted* in which order." '658 Patent at 13:27.

In its proposed construction of "scheduling algorithm," by contrast, Wowza once again improperly imports limitations from the specification by requiring two unnecessary limitations for which there is no textual basis in the claims: 1) "prioritizes some media chunk types over other media chunk types," and 2) "directs which chunk to transmit next in order to achieve good playback and minimize jitter." The Federal Circuit has been unequivocal that "a party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). Wowza cannot do so.

Furthermore, while the specification describes that a *goal* of such an algorithm "is to achieve an efficient mix of audio, video, and data chunks that results in a good playback that minimizes the audio or video jitter in the playback," '658 Patent at 15:59-62, mere reference to "objectives that can be achieved through use of the invention … does not suggest that the invention must always be used in a manner that achieves that objective." *Northrop Grumman*

*Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004) ("The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives."). Similarly, in this case, nothing in the intrinsic record *requires* the recited scheduling algorithm to be limited by the goal of "achieving good playback and minimizing jitter"[25] as Wowza's construction proposes.

Moreover, certain dependent claims in the patents do add limitations relating to priority values – highlighting the fact that Wowza's proposal for reading those limitations into the *independent* claims is improper. *See, e.g., Phillips,* 415 F.3d at 1314-15. For example, dependent claims 9-11, 19, 27 and 28 of the '658 Patent, and claims 8, 9, 20, and 21 of the '509 Patent relate assigning or using priority values for scheduling. These limitations do <u>not</u> appear in the independent claims reciting "scheduling algorithm" and therefore should not be imported to restrict the scope of that term. *See, e.g., Terlep v. Brinkmann Corp.*, 418 F.3d at 1382 (goal of claim construction is to "understand and explain, but not to change, the scope of the claims").

## F.    "transmitting ones of […] plurality of chunks" – '658 Patent, claims 12 and 21

| Adobe's Proposed Construction | Wowza's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Individually transmitting chunks |

The "transmitting" term relates to *how* the "scheduling algorithm" of the claimed communication method (claim 12) and computer program code (claim 21) transmits chunks. This term has an ordinary meaning that should not be disturbed. As set forth above, "scheduling algorithm" is already being construed, and the plain text of the surrounding language in the claims is clear. *See, e.g.,* Joint Statement at 42.

Wowza's construction – "individually transmitting chunks" – once again is improperly

---

[25] Moreover, the phrase "jitter in the playback" introduces subjective and ambiguous terms that themselves need to be further defined. As a result, this construction will not assist the jury in understanding what "scheduling algorithm means." *See, e.g.,* Ex. 13 at 1 (Order, *Apple Inc. et al. v. Motorola, Inc. et al.*, No. 11-8540 (N.D. Ill. March 12, 2012) (Dkt. 663) (Posner, J.) (rejecting claim constructions that "are not in language intelligible to jurors" because "there is no point in giving jurors stuff they won't understand")).

limiting.   There is <u>no</u> reference in the claims, specification or file wrapper to a scheduling algorithm for "individually transmitting" chunks, which implies transmitting single, *whole* chunks, one at time.[26]   That said, Wowza's construction is contrary to the plain meaning of "transmitting ones of a plurality of chunks," which does not require transmitting only one whole chunk at a time.[27]   As such, there is no legitimate basis on which to limit the claims to a scheduling algorithm that individually sends chunks, as opposed to dispatching multiple chunks or even portions of a chunk (for example, across two or more TCP/IP packets) for transmission over a network, such as the Internet.   Wowza's construction is merely an attempt to avoid infringement by unnecessarily narrowing the claim, and therefore must be rejected.

### G.   "reserved for random data" – '878 Patent, claims 1, 15, and 17; '287 Patent, claims 1, 12, and 33.

| Adobe's Proposed Construction | Wowza's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Reserved for data produced in a manner where there was an equal probability for each possible value |

As explained above, the '878 and '287 Patents describe a clever and novel use of a portion of the RTMP handshake in which to hide a cryptographic key "in plain sight" – that is, within a "pre-defined portion of the network communication … *reserved for random data*." Adobe contends that "reserved for random data" has a plain and ordinary meaning, and there is no cause for the Court to disturb or otherwise deviate from that plain meaning. *See, e.g.*, Joint Statement at 55-56.

Wowza's construction, by contrast, seeks to rewrite the claim language and in doing so, writes-out the ordinary meaning of "reserved for random data" and unnecessarily imports two extraneous limitations: 1) "reserved for data *produced*" in a certain manner; and 2) "where there was an equal probability for each possible value."   With this proposed construction, Wowza

---

[26]   For example, Wowza cites to no evidence that chunks are transmitted "individually." *See* Joint Statement at 42-45.

[27]   Additionally, the claims should not be limited to any particular embodiment of a scheduling algorithm, since the specification clearly states that "other interleaving scheduling algorithms and/or efficiency algorithms may be implemented" besides those exemplified in the specification.  '658 Patent at 15:57.

1  requires the handshake to <u>actually contain</u> random data – directly conflicting with the claim

2  language itself which only requires it to be *reserved* for random data.  Such a construction,

3  however, is also contrary to the clear description of the invention given in the specification,

4  which states that the handshake communication "need only be reserved for random data, *but*

5  *need not actually include random data* in all implementations."  '878 Patent at 11:31-35; '287

6  Patent at 25:63-67.

7  　　　　Wowza's construction also improperly attempts to narrow the claim by requiring a

8  specific type of random data – a uniform (or flat) distribution of data having an "equal

9  probability for each possible value."  However, this construction is directly contrary to the patent

10  specification, which states that "the random data need <u>*not*</u> be truly random data, but rather can be

11  pseudo random data."  '878 Patent at 11: 31-32; '287 Patent at 25:63-64 (emphasis added).  In

12  addition, references contemporaneous to the filing of the '878 and '287 Patents show that

13  persons of ordinary skill in the art did not equate "random data" with data having an "equal

14  probability for each possible value."  Mieghem,[28] for example, describes at least <u>eight</u> different

15  types of random data distributions applicable to the field of communications networks and

16  systems, including a *uniform* distribution (where there is "an equal probability to attain any

17  value"), but also an *exponential* distribution, *Gaussian* distribution, *Gamma* distribution, *Cauchy*

18  distribution, *Weibull* distribution, *Pareto* distribution, or a *Lognormal* distribution.  *See* Ex. 15

19  (Mieghem) at 43-57; Alexander Decl., Ex. B at 179.  Of all these possibilities, Wowza seeks to

20  restrict the meaning of "random data" to data in which "an equal probability that any of the

21  possibilities can occur."  Thus, Wowza's construction cannot be correct and must be rejected.

22  　　　**H.**　　**<u>"reserved for random data in accordance with a Real Time Messaging</u>**
　　　　　**<u>Protocol (RTMP) random byte section" – '878 Patent, claims 1, 15 and 17</u>**

23

| Adobe's Proposed Construction | Wowza's Proposed Construction |
|---|---|
| Plain and ordinary meaning, or<br><br>a section reserved for random data in RTMP | (1)  Indefinite and inadequately supported by '878 Patent |

24

25

26

27  [28] Ex. 15 (*Performance Analysis of Communications Networks and Systems*, Piet Van Mieghem, Cambridge University Press (2006)) ("Mieghem").

28

| | (2)  Real Time Messaging Protocol (RTMP) random byte section is the portion of a RTMP handshake that contains 1528 bytes of random data |
|---|---|

Beyond "reserved for random data," Wowza disputes the meaning of "reserved for random data *in accordance with a Real Time Messaging Protocol (RTMP) random byte section*" as that term appears in each of the asserted claims of the '878 Patent.[29]

Adobe contends that the term has a plain meaning to persons of ordinary skill in the art and does not require a construction by the Court.  As noted above, the meaning of "reserved for random data" is clear.  The additional language "in accordance with a Real Time Messaging Protocol (RTMP) random byte section" is also clear.  *See, e.g.,* Joint Statement at 56-57.  As discussed in Section II.B above, at the time the '878 Patent was filed in October 2007, the specification expressly described RTMP as a known communication protocol having a handshake with a random byte section:

> Adobe Systems Incorporated has promulgated a communication protocol for the FLASH® Media Server in which a communication session is established through handshake communications between the server and the client.  **As part of this handshake, the Real Time Messaging Protocol (RTMP) included a random byte section** in the communications for use in estimating the available bandwidth for the session between the client and the server.

'878 Patent at 1:33-40 (emphasis added).  The '878 Patent then graphically depicts this random byte section reserved for random data as component **310** (blue outline) of network communication **300** in FIG. 3:



*See* '878 Patent at 4:53-57.

---

[29]  The asserted claims of the '287 Patent, by contrast, do not recite this phrase.

1    The meaning of "reserved for random data in accordance with a Real Time Messaging

2    Protocol (RTMP) random byte section" could not be clearer and does not require any

3    construction.  However, if the Court determines that a construction is desirable, Adobe proposes

4    "a section reserved for random data in RTMP."  This construction is consistent with the intrinsic

5    record, as described above, and does not read any extraneous limitations into the claim.

6    Disputing this plain and ordinary meaning, Wowza argues in the alternative that: (1) the

7    term is "indefinite and inadequately supported by '878 Patent'"; or (2) the term should be

8    construed as a "Real Time Messaging Protocol (RTMP) random byte section is the portion of a

9    RTMP handshake that contains 1528 bytes of random data."  However, neither argument is

10   sustainable.

11          **1.    "A Real Time Messaging Protocol (RTMP) random byte section" was
               well-understood and is not indefinite**

12

13   As a threshold matter, Wowza carries a very high burden to establish that the "random

14   byte section" limitation is indefinite.  "A claim is indefinite only when it is 'not amenable to

15   construction' or 'insolubly ambiguous.'"  *Biosig Instruments, Inc. v. Nautilus, Inc.*, No. 2012-

16   1289, 2013 U.S. App. LEXIS 8486, at *11 (Fed. Cir. Apr. 26, 2013).  "[I]f the meaning of the

17   claim is discernible, even though the task may be formidable and the conclusions may be one

18   over which reasonable persons will disagree," the claim is still "sufficiently clear."  *Power-One,*

19   *Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1350 (Fed. Cir. 2010).  Inasmuch as Wowza's

20   challenge to the definiteness of this limitation would render the relevant claims in which it

21   appears invalid, Wowza must "demonstrate by clear and convincing evidence that one of

22   ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim

23   language, the specification, the prosecution history, and the knowledge in the relevant art."

24   *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010).

25   Wowza cannot come close to meeting its burden.  First, the mere fact that Wowza itself

26   has proffered a construction for the "random byte section" demonstrates that it *is* "amenable to

27   construction" and is therefore not "insolubly ambiguous."  Second, the intrinsic evidence amply

28   supports the "boundaries" of "a Real Time Messaging Protocol (RTMP) random byte section."

The specification expressly identifies and describes this random byte section, including by specifying that it must be at least long enough to embed the cryptographic key.  *See* '878 Patent at 3:38-51, 4:53-62; *Biosig*, 2013 U.S. App. LEXIS 8486 at *15-16 (claim sufficiently definite where, though it did not provide precise parameters, it did provide a general boundary range).  Moreover, the file wrapper confirms that the PTO Examiner considered the term to be definite and discernible from the specification and the "knowledge in the relevant art."  This limitation was added to the claims in an Examiner's Amendment made in connection with a Notice of Allowance, which expressly stated that relevant support "can be found at least in paragraphs 17, 19, 23-27, 31, 32, 35, 41, and 42 of the specification."[30]  *See* Ex. 17 at 3.

Finally, it is indisputable that those of ordinary skill understood that an RTMP handshake included a discernible random byte section.  Even *Wowza* had implemented an RTMP handshake with a random byte section by no later than February 2007 – months prior to the October 2007 filing date of the '878 Patent – when Wowza launched WMS 1.0, implementing the full functionality of RTMP.  *See* Ex. 12 at 12-13.  Wowza's founder and CTO Charles Good admitted that he learned all he needed to know about RTMP "through research on the internet" and reverse-engineering actual RTMP communications.  *Id.* at 11-12.  Accordingly, the random byte section of an RTMP handshake had definite meaning to those of ordinary skill in the art by October 2007.

### 2.    There is no reason to limit the "random byte section" to 1528 bytes

Shifting into reverse, Wowza next argues that the random byte section – to the extent it is clear – must be limited to a specific length of 1528 bytes.  However, nothing in the intrinsic record supports Wowza's attempt to import this extraneous limitation.  To the contrary, the '878 Patent states that, with respect to the length, "it will be appreciated that the random data section needs to be larger than the total length of the message authentication code and the encryption parameters, *e.g.*, larger than one hundred and sixty bytes when using a thirty two byte HMAC

---

[30]  These twelve paragraphs correspond to '878 Patent, 3:38-51 (¶ 17), 3:62-4:9 (¶ 19), 4:63-6:7 (¶¶ 23-27), 6:47-7:4 (¶ 31), 7:5-20 (¶ 32), 7:47-59 (¶ 35), 8:66-9:8 (¶ 41), and 9:9-21 (¶ 42).

and one hundred and twenty eight bytes of Diffie Hellman information." '878 Patent at 8:33-38. Thus, while the random byte section needs to be at minimum long enough to hold the cryptographic information located within it, it is not limited in the patent to any particular size and certainly not 1528 bytes. This "alternate" construction of the "random byte section" term offered by Wowza must also be rejected.

I.    **"processing the data payload" – '287 Patent, claims 12 and 23**

| Adobe's Proposed Construction | Wowza's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Assembling and playing, in a player, a media presentation from the payload |

Wowza also disputes the meaning of "***processing the data payload***" as it is used in the asserted claims of the '287 Patent: "processing the data payload based at least in part on the identified purpose and the stored values of the parameters." Taken in context, "processing the data payload" has a plain and ordinary meaning and does not require a construction by the Court. *See, e.g.,* Joint Statement at 66. The plain and ordinary meanings of the terms "processing" and "data payload" are broad and not limited to any particular types of processing activity or data, and nothing in the claims or specification of the '287 Patent require limiting these terms beyond their plain meaning.

Wowza continues its pattern of improperly attempting to limit the claim language by importing limitations from the specification into the claims. There are several extraneous limitations included in Wowza's construction, including: 1) assembling; 2) playing; 3) in a player; and 4) a media presentation. Nothing in the claims requires that processing the data include "assembling and playing" the data payload, nor that the data payload make up a "media presentation." Whereas a client device on which the Adobe Flash Player is installed may "play" the payload from a video file, for example, nothing in the claims requires that the software code be implemented only on such a client device, or that the payload itself be a "playable" media presentation. WMS, for example, is server software that also receives transmissions of chunks and executes steps for "processing the data payload" even if it does not use a player to play a media presentation, as Wowza argues. *See* Alexander Decl., Ex. A at 33 and 30-31.

1    Further demonstrating that its construction improperly imports limitations, Wowza also

2    reads in limitations from dependent claims relating to "assembling and playing, in a player,"

3    contrary to the doctrine of claim differentiation. *See Phillips,* 415 F.3d at 1314-15 ("the presence

4    of a dependent claim that adds a particular limitation gives rise to a presumption that the

5    limitation in question is not present in the independent claim."). For example, dependent claim 6

6    of the '287 Patent recites "*assembling a playable portion* of the sub media stream[;] and *playing*

7    the assembled portion[.]" *See also* '287 Patent, claims 17 and 29. For these reasons, Wowza's

8    proposed construction for processing the data payload should be rejected.

9    **J.    "new media type"[31] – '287 Patent, claim 13**

10

| Adobe's Proposed Construction | Wowza's Proposed Construction |
| --- | --- |
| A type associated with a new media chunk | A change in media type within a stream having the same chunk stream ID |

12

13    Finally, the parties dispute the meaning of "***new media type***," which appears in claim 13

14    of the '287 Patent reciting: "wherein identifying the purpose comprises identifying the purpose

15    from a set of possible purposes including: … indicating *a new media type*, the second header

16    portion including the one or more values corresponding to fewer than all of the parameters."

17    '287 Patent at 29:52-54.

18    Adobe's construction for "new media type" as "a type associated with a new media

19    chunk" is faithful to the claims and specification. *See, e.g.,* Joint Statement at 68-69. This chunk

20    type is the analog to the "new media chunk" of the '658 and '509 Patents (discussed in Section

21    V.C above), and is similarly self-defined by the claim language, having a header "including the

22    one or more values corresponding to fewer than all of the parameters." As such, Adobe's

23    construction "type associated with a new media chunk" is the proper one.

24    _____

25    [31] Wowza also contends that the term "communicating" should be construed in place of "new media
     type." *See* Dkt. 325. Adobe disagrees that the term requires construction, and objects to Wowza's
26    belated attempt to add a new term to the list at this late stage. Because Adobe streamlined its claim set
     to the present twenty asserted claims as ordered by the Court (Dkt. 323) in part based on the previously
27    identified disputed claim terms, Wowza's belated attempt to add "communicating" to the list at this
     late stage is improper.

28

By contrast, Wowza's construction of "new media type" to require "a change in media type within a stream having the same chunkstream ID" improperly reads limitations from the specification into the claim.  Indeed, Wowza's arguments for "new media type" are defective for all the same reasons its arguments for "new media chunk" are also defective.  First, the "new media type" chunk does not literally require "a change in media type."  There is nothing in the claim or specification that requires a change in media type, and in fact the specification states only that "in some embodiments" it will indicate "*any* new message type ID," *id.* at 12:13, and that the described embodiments can "optionally" include other features, such as "one or more of a stream ID parameter, a length parameter, a media type parameter, and a time delta parameter." *Id.* at 4:53; 5:16-18.  This is shown, for example, in the embodiment of FIG. 9 of the '287 Patent (which is the same as FIG. 9 in the '658 and '509 Patents), where the header **910** of chunk **909** uses a new length and time delta parameters, but does not require an actual change of "media type."  (The media type parameter is reused from a previous chunk header.)  This is consistent with the claim language that merely requires the header to have "one or more values corresponding to fewer than all of the parameters."  Moreover, the specification expressly states that the new media chunk can indicate "a specified new time change/time delta … and the specified length," which changes these two parameters but not the media type.  '287 Patent at 12:13-16.  Thus, not only would Wowza's construction improperly render optional features of the invention mandatory in the claims, *cf. Linear Tech.*, 566 F.3d at 1058; *Brookhill-Wilk*, 334 F.3d at 1301, but it would exclude a preferred embodiment, which is "rarely, if ever, correct." *SanDisk Corp.,*  415 F.3d at 1285.

Second, Wowza's construction also improperly reads the limitation "within a stream having the same chunkstream ID" into the claim.  Such limitation does not appear anywhere in the claims or specification of the '287 Patent.  The specification only describes "some embodiments" in which a subsequent message "belongs to the same sub media stream ID, but that is a different type/format and a different time delta than the previous network communication."  '287 Patent at 12:11, 17-23.  Nothing in the intrinsic record makes this limitation mandatory, and thus Wowza's overly restrictive construction must be rejected.

## VI.   THE COURT SHOULD GRANT SUMMARY JUDGMENT OF INFRINGEMENT

In light of the foregoing, Adobe moves for summary judgment of infringement on claims 12 and 21 of the '658 Patent, claims 22 and 27 of the '509 Patent, claims 15 and 17 of the '878 Patent, and claims 1 and 12 of the '287 Patent.  The undisputed facts demonstrate that Wowza literally infringes both directly and indirectly at least the foregoing claims of the asserted patents.

### A.   Summary Judgment Standards

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is "material" if it "might affect the outcome of the suit," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the initial burden to identify portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Where the moving party has the burden of proof on an issue, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Id.* at 325.

Summary judgment of infringement requires a two-step analysis.  "First, the claims of the patent must be construed to determine their scope.  Second, a determination must be made as to whether the properly construed claims read on the accused device."  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted).  To find infringement, "the court must determine that every claim limitation is found in the accused device."  *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005).  The patentee bears the burden of proving infringement by a preponderance of the evidence. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1467 (Fed. Cir. 1998).

### B.   Undisputed facts show that WMS infringes Adobe's '658 and '509 Patents

The asserted claims of the '658 Patent cover methods and computer program products that transmit digital content over a network using RTMP streaming.  Similarly, the asserted

claims of the '509 Patent cover methods and computer program products that transmit or receive digital content over a network using RTMP. In accordance with the forgoing constructions proposed by Adobe, Wowza's accused WMS products infringe exemplary claims 12 and 21 of the '658 Patent and claims 22 and 27 of the '509 Patent.[32]

### 1. WMS is a "computer program product" that meets the elements of claim 21 of the '658 Patent

Claim 21 of the '658 Patent covers a computer program product for transmitting media content using RTMP. The undisputed facts show that WMS literally meets each of the claim elements:

> *a.* ***"A computer program product having a computer readable medium with computer program logic recorded thereon,"***

Wowza does not dispute that WMS is a "computer program product" as recited in claim 21. *See* Alexander Decl., App. A-1 at 58; Ex. 8 at 137-138.

> *b.* ***"said computer program product comprising: code for breaking down each one of a plurality of media sub-streams making up a message stream into a plurality of associated chunks;"***

WMS treats video, audio, or data components of a multimedia stream as a "plurality of media sub-streams." *See* Alexander Decl., App A-1 at 58-60. WMS then breaks down these sub-streams into a plurality of chunks for transmission over a network. *Id.* at 60-66. Wowza does not dispute that these elements are met. *See* Ex. 8 at 137-138.

> *c.* ***"code for implementing a state machine that processes state assignments for each of said plurality of associated chunks representative of information regarding said media sub-streams and said message streams, wherein said state assignments indicate possible purposes of a corresponding chunk, and wherein the possible purposes indicated by said state assignments consist of:"***

REDACTED

---

[32] Factual disputes concerning non-infringement exist with respect to the claim constructions Wowza proposes. Adobe will address any factual disputes in opposition to Wowza's Summary Judgment Motion.

REDACTED

*See* Alexander Decl., App. A-1 at 66-75.

These data structures process state assignments that indicate the possible purposes consisting of the four recited chunks, and therefore meet this claim element.[34]  *See id.*     REDACTED

These bits indicate the four possible chunk purposes recited by the claim, as discussed further below in Sections VI.B.1.d through VI.B.1.g.  *See also* Alexander Decl. ¶¶ 10-17, Ex. A at 46.

d.     **"a new stream chunk associated with a new media message sub-stream wherein said new stream chunk includes a plurality of new parameters in a corresponding one of said headers and uses no parameters from a previous header,"**

WMS implements a "new stream chunk," *i.e.*, a chunk with a plurality of new parameters in the header and no parameters from a previous header.  *See* Alexander Decl. ¶¶ 10-17, App. A-1 at 75.  Notably, Wowza does *not* dispute this.  *See* Ex. 8 at 139.  WMS generally indicates chunks having the purpose of a "new stream chunk" by writing a two bit value into the state assignment portion of the header.  Chunks with this state assignment have a plurality of new parameters in the header and no parameters from a previous header.  *See* Alexander Decl. ¶¶ 10-17, App. A-1 at 75.  Wowza does not dispute this either.  *See* Ex. 8 at 139.

e.     **"a new media chunk associated with a new media message sub-stream wherein said new media chunk includes a plurality of new parameters in a corresponding one of said headers and uses at least one other parameter from a previous header,"**

Similarly, WMS implements a "new media chunk" in accordance with Adobe's construction, *i.e.*, a chunk with a plurality of new parameters and at least one other parameter from a previous header.  *See* Alexander Decl. ¶¶ 10-17, App. A-1 at 75-77.  REDACTED

Chunks with this state assignment have a plurality of

---

[33] In computer science, an "object" is a location in computer memory having a value and referenced by an identifier.  An object can be a variable, function, or data structure.  *See,e.g.,* http://en.wikipedia.org/wiki/Object_(computer_science).

[34] There is no factual dispute that WMS infringes under Adobe's construction of "consist of."  Factual disputes may exist with respect to Wowza's non-infringement position based on its proposed construction of "consist of."  Adobe will address any factual disputes in opposition to Wowza's Summary Judgment Motion.

new parameters in the header and at least one parameters from a previous header. *Id.* Wowza does not dispute this.

        f.      ***"a new time chunk associated with said new media message sub-streams wherein said new time chunk includes at least one new parameter in a corresponding one of said headers and uses a plurality of other parameters from a previous header,"***

WMS also implements a "new time chunk" in accordance with Adobe's construction, *i.e.*, a chunk with at least one new parameter and using a plurality of other parameters from a previous header. *See* Alexander Decl. ¶¶ 10-17, App. A-1 at 77-78.     REDACTED

            *Id.* Wowza does not dispute this, and instead argues that it removed such chunks from its later-released WMS version 3.0.3, patch 12 on Jan. 5, 2012. *See* Ex. 8 at 140. Regardless, there is no dispute that WMS transmitted a "new time chunk" *prior to* WMS Version 3.0.3, patch 12, and Wowza only argues that it discontinued the use starting with that version. *See* Ex. 8 at 114.[35]

        g.      ***"and a continuation chunk requiring no new parameters in a corresponding one of said headers and using a plurality of parameters from a previous header;"***

WMS implements a "continuation chunk," *i.e.*, a chunk requiring no new parameters and using a plurality of parameters from a previous header. *See* Alexander Decl. ¶¶ 10-17, App. A-1 at 78. Wowza does not dispute this. *See* Ex. 8 at 140. WMS generally indicates chunks having the purpose of a "continuation chunk" by writing a two bit value into the state assignment portion of the header. *See* Alexander Decl. ¶¶ 10-17, App. A-1 at 78. Wowza does not dispute that WMS implements such "continuation chunks," thereby satisfying this element.

        h.      ***"code for writing a corresponding one of said state assignments into a header of each of said plurality of associated chunks;"***

WMS has code that writes the "state assignments" into a header of each chunk. *See* Alexander Decl., App. A-1 at 78-79. Wowza does not dispute that this element is met. *See* Ex. 8

---

[35] All versions of WMS include the ability to receive "new time chunks," which infringes claims 22 and 27 of the '509 patent as further discussed in Section VI.B.3 and VI.B.4.

at 140.

i.    **"code for building a queue for said plurality of associated chunks waiting for transmission; and"**

WMS builds multiple queues for chunks waiting for transmission,     REDACTED

and queues which WMS uses to hold data, including data it may drop if the amount of queued data gets too large.  *See* Alexander Decl., App. A-1 at 79. Wowza does not dispute that this element is met.  *See* Ex. 8 at 140.

j.    **"code for transmitting ones of said plurality of associated chunks according to a scheduling algorithm."**

In accordance with Adobe's constructions, there is no dispute that WMS transmits ones of the plurality of chunks according to a scheduling algorithm.  *See* Alexander Decl., App. A-1 at 80-82.   For example, there is no dispute that     REDACTED

*See* Ex. 8 at 85, 120; Ex. 24 at 143:1-144:12. Wowza does not dispute that WMS has an algorithm for selecting data to transmit, according to Adobe's construction of "scheduling algorithm," or that WMS "transmits ones" of the plurality of chunks under Adobe's proposed plain meaning construction.  *See* Ex. 8 at 132.

## 2.    Wowza and WMS users perform the method of claim 12 of the '658 Patent

Claim 12 of the '658 Patent recites substantially the same limitations as claim 21 except that it covers a *method* for communicating multimedia streams using RTMP.   In addition, whereas claim 21 recites a "state machine," claim 12 omits this element and instead of "state assignments" simply recites "assigning states."   However, none of these differences introduce any new issues of material fact.

It is undisputed that WMS uses states, for the same reasons discussed above with regard to the "state machine" element of claim 12.   It is further undisputed that Wowza and its customers use WMS to transmit and receive content using RTMP.  *See* Alexander Decl., Ex. A at 88-91, 95-98.   For example,     REDACTED

1   REDACTED    *See, e.g.,* Ex. 19 at 2, 4-5; Ex. 20 at 1, 3; Ex. 21 at 2-3; Ex. 22 at 1-2; Ex. 23

2   at 3, 6.  Accordingly, the undisputed facts establish that Wowza and its customers directly and

3   literally infringe method claim 12 when, for example, using WMS to transmit RTMP content, for

4   the reasons discussed above with regard to claim 21.

5              **3.      WMS is a "computer program product" that meets the elements of**
               **claim 27 of the '509 Patent**
6

7         Claim 27 of the '509 Patent covers a computer program product for receiving media

8   content using RTMP.  The undisputed facts show that WMS literally meets each of the claim

9   elements:

10                  *a.*       ***"A computer program product having a computer readable***
                               ***medium with computer program logic recorded thereon, said***
11                             ***computer program product comprising:"***

12        Wowza does not dispute that WMS is a "computer program product" as recited in claim

13  27.  *See* Alexander Decl., App. A-2 at 56-57; Ex. 8 at 156-157.

14                  *b.*       ***"code for receiving a multimedia stream including a plurality***
                               ***of media message chunks, said chunks each having a control***
15                             ***header and data payload associated therewith;"***

16        The WMS code base contains code for receiving a multimedia stream including a

17  plurality of media message chunks.  *See* Alexander Decl., App. A-2 at 57-58.  Wowza does not

18  dispute this.  *See* Ex. 8 at 156-157.  The received chunks processed by WMS contain a header

19  and data payload, which Wowza also does not dispute.  *See* Alexander Decl., App. A-2 at 58-59;

20  Ex. 8 at 156-157.

21                  *c.*       ***"code for reading a chunk type identifier of each said control***
                               ***header, wherein said chunk type identifiers indicate a purpose***
22                             ***of a plurality of possible purposes for said chunk, and wherein***
                               ***the possible purposes indicated by said chunk type identifiers***
23                             ***consist of:"***

24        The WMS code base contains code for reading a chunk type identifier of each chunk

25  header.  *See* Alexander Decl., App. A-2, at 59-61.  These chunk type identifiers in the WMS

26  code indicate the possible purposes consisting of the four recited chunks, and therefore meet this

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ADOBE'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. C 11-02243 JST

claim element.[36]  *See id*.  In particular, the                    REDACTED

, and as
discussed further below in Sections VI.B.3.d through VI.B.3.g.  See Alexander Decl. ¶¶ 10-17,
Ex. A. at 46, App. A-2 at 61-64.

> d.      ***"a new stream chunk, wherein said control header of said new stream chunk includes a plurality of new parameters and uses no parameters from a control header of a previous chunk,"***

WMS receives a "new stream chunk," *i.e.*, a chunk with a plurality of new parameters and no parameters from a previous header.  *See* Alexander Decl. ¶¶ 10-17, App. A-2 at 64-65.
Notably, Wowza does *not* dispute this.                    REDACTED

> *Id.*  Wowza does not dispute this either.  *See* Ex. 8 at 156-157, 145-149.

> e.      ***"a new media chunk, wherein said control header of said new media chunk includes a plurality of new parameters and uses at least one other parameter from a control header of a previous chunk,"***

Similarly, WMS receives a "new media chunk," *i.e.*, a chunk with a plurality of new
parameters and at least one other parameter from a previous header.  *See* Alexander Decl. ¶¶ 10-17, App. A-2 at 65-66.                    REDACTED

> .  *See* Ex. 8 at 157.

> f.      ***"a new time chunk, wherein said control header of said new time chunk includes at least one new parameter and uses a plurality of other parameters from a control header of a previous chunk,"***

WMS also receives a "new time chunk," *i.e.*, a chunk with at least one new parameter and
using a plurality of other parameters from a previous header.  *See* Alexander Decl. ¶¶ 10-17,
App. A-2 at 66.                    REDACTED

---

[36] *See supra* note 34.

1   <center>REDACTED</center>   [37] *Id.*  Wowza does

2   not dispute this.  *See* Ex. 8 at 145-149, 156-157.

3           g.   ***"and a continuation chunk, wherein said control header of said continuation chunk includes no new parameters and uses a plurality of parameters from a control header of a previous chunk."***

4

5

6       WMS implements a "continuation chunk," *i.e.*, a chunk requiring no new parameters and

7   using a plurality of parameters from a previous header.  *See* Alexander Decl. ¶¶ 10-17, App. A-2

8   at 66-67. Wowza does not dispute this. *See* Ex. 8 at 156-157.   <center>REDACTED</center>

9

10       *See* Alexander Decl., App. A-2 at 66-67.  Wowza does not

11   dispute that WMS receives such "continuation chunks," thereby satisfying this element.

12       **4.**   **Wowza and WMS users perform the method of claim 22 of the '509 Patent**

13

14       Claim 22 of the '509 Patent recites substantially the same limitations as claim 27, except

15   that claim 22 covers a *method* for receiving a multimedia stream using RTMP.  This difference

16   does not introduce any new issues of material fact.  It is undisputed that Wowza and its

17   customers use WMS to transmit and receive content using RTMP.  *See* Alexander Decl., Ex. A at

18   88-91, 95-98.  Indeed, several of Wowza's customers have admitted in response to subpoenas

19   that they use WMS to stream content using RTMP, and thus they perform the infringing

20   method. *See supra* Section VI.B.2.  Accordingly, the undisputed facts establish that Wowza and

21   its customers directly and literally infringe method claim 22 when, for example, using WMS to

22   receive RTMP content, for the reasons discussed above with regard to claim 27.

23       **C.**   <u>**Undisputed facts show that WMS infringes Adobe's '878 and '287 Patents**</u>

24

25       As discussed previously, the asserted claims of '878 and '287 Patents generally cover the

26   steps necessary to stream content using RTMPe, an "enhanced" version of RTMP.  As set forth

27   ---
[37] *See supra* note 7.

28

below, the operation of WMS is undisputed and establishes that, by making, using, selling, and offering WMS for sale with the functionality to implement RTMPe communications, Wowza infringes exemplary claims 15 and 17 of the '878 Patent, and claims 1 and 12 of the '287 Patent.[38]

### 1. WMS is a "computer program product" that meets the elements of claim 17 of the '878 Patent

Wowza directly infringes claim 17 of the '878 Patent, which covers a computer program product coded to implement an RTMPe "handshake" process. The undisputed facts establish that WMS literally meets each of the elements of claim 17:

> *a.* ***"A non-transitory computer-readable medium having a computer program product encoded therein, the computer program product operable to cause data processing apparatus to perform operations comprising:"***

Wowza does not dispute that WMS is provided on a "non-transitory computer-readable medium having a computer program product encoded therein" as recited in claim 17. *See* Alexander Decl., App. A-3 at 44; Ex. 8 at 201. As discussed below, WMS is operable to cause data processing apparatuses to perform the claimed operations.

> *b.* ***"identifying a variable location in a pre-defined portion of a network communication to be sent in a client-server environment, wherein the pre-defined portion of the network communication is reserved for random data in accordance with a Real Time Messaging Protocol (RTMP) random byte section;"***

The source code shows that WMS is operable to cause "identifying a variable location in a pre-defined portion" of the handshake message, which is a "network communication," that WMS generates and sends to the client. *See* Alexander Decl., App. A-3 at 44 and 32-35. Wowza does not dispute this. *See* Ex. 8 at 201.                    REDACTED
.

*Id.* at 35-39.                                        REDACTED
.

---

[38] *See supra* note 32.

For example, Wowza does not dispute that                    REDACTED

                                                                    . *See*

Ex. 8 at 160-173.   Thus, Wowza does not raise any material issue of fact regarding the

functionality of the accused WMS product.

                c.       **"inserting cryptographic information into the pre-defined portion of the network communication at the location;"**

The source code establishes that                    REDACTED

         *See* Alexander Decl., App. A-3 at 45 and 39.  Wowza does

not dispute that this element is met.  *See* Ex. 8 at 201.

                d.       **"and sending the network communication in the client-server environment to facilitate modifying interactions in the client-server environment based at least in part on a result of processing of the cryptographic information; wherein processing the cryptographic information comprises establishing a cryptographic key or authenticating the network communication,"**

The Wowza source code further demonstrates that                    REDACTED

                                                                    . *See*

Alexander Decl., App. A-3 at 45 and 40-42.  Wowza does not dispute this.  The source code also

demonstrates that                    REDACTED

      . *See* Alexander Decl., Ex. A at App. A-3, at 45 and 42-43.

                e.       **"and wherein modifying interactions in the client-server environment comprises initiating an encrypted session using the cryptographic key or turning on or off a feature of a program operating in the client-server environment."**

The source code also demonstrates that                    REDACTED

1    REDACTED    *See* Alexander Decl., App. A-3 at 45 and 43.   For

2    example, there is no dispute that the    REDACTED

3    . *See* Ex. 8 at 47;

4    Ex. 24 at 226:15-228:25.[39]   Nor is there any dispute that the    REDACTED

5    *See, e.g.*, Ex. 24 at 230:25-231:12.[40]

### 2.    Wowza and WMS users perform the "handshake" steps of claim 15 of the '878 Patent

8    Claim 15 of the '878 Patent recites substantially the same limitations as claim 17, except

9    that claim 15 covers a *method* for performing an RTMPe "handshake."  This difference does not

10   raise any issues of material fact, since it is undisputed that Wowza and its customers use WMS to

11   establish RTMPe sessions and transmit and receive content via RTMPe, which involves

12   performing an RTMPe handshake.  *See* Alexander Decl., Ex. A at 88-91, 95-98.  Several of

13   Wowza's customers have admitted in response to subpoenas issued in this case that they use

14   WMS to stream content using RTMPe, and thus they perform the infringing method.  *See, e.g.*,

15   Ex. 19 at 5; Ex. 21 at 2-3.  Accordingly, the undisputed facts establish that Wowza and its

16   customers directly and literally infringe method claim 15, for the reasons discussed above with

17   regard to claim 17.

### 3.    WMS is a "computer program product" that meets the elements of claim 12 of the '278 Patent

20   Wowza directly infringes claim 12 of the '287 Patent, which covers a computer program

21   product that receives  content via RTMPe.  The undisputed facts demonstrate that WMS literally

22   meets each of the elements of claim 12:

23   a.    ***"A non-transitory computer-readable medium having a computer program product encoded therein, the computer***

---

25   [39]  Dr. Strawn testified that    REDACTED

26   ." Ex. 24 (Feb. 14, 2013 J. Strawn Dep. at 227:14-228:1).

[40]  Dr. Strawn testified that "    REDACTED

27   ." Ex.

24 at 230:25-231:12 (emphasis added).

> **program product operable to cause data processing apparatus to perform operations comprising:"**

Wowza does not dispute that WMS is provided on a "non-transitory computer readable medium having a computer program product encoded therein" as recited in claim 12.  *See* Alexander Decl., App. A-4 at 31; Ex. 8 at 230-231.  As discussed below, WMS is operable to cause data processing apparatuses to perform the claimed operations.

         b.     ***"establishing, based at least in part on cryptographic information in a pre-defined portion of a handshake network communication, a communication session to communicate a media stream,"***

The WMS source code demonstrates that WMS is operable to establish a communication session to communicate a media stream.  *See* Alexander Decl., App. A-4 at 32 and 4-6.  For example, there is no dispute that the                    REDACTED

        .  *See* Ex. 8 at 47; Ex. 24 at 226:15-228:25.[41]  Nor is there any dispute that the WMS server is operable to cause establishing (*i.e.*, "setting up") a communications session, once the handshake is done.  *See, e.g.*, Ex. 24 at 230:25-231:12.[42]  Additionally, there is no dispute that                    REDACTED

   .  *See* Alexander Decl., App. A-4 at 32 and 6-13.

         c.     ***"wherein the pre-defined portion of the handshake network communication is reserved for random data;"***

The source code establishes that the pre-defined portion of the handshake network communication is reserved for random data.  *See* Alexander Decl., App. A-4 at 32 and 13-16; *see supra* Section VI.C.1.b.

---

[41] *See supra* note 39.

[42] *See supra* note 40.

        d.      **"receiving through the communication session, as part of the media stream, values of parameters relating to a sub media stream, included in a first header portion of a first real-time, priority-based network communication;"**

The source code establishes that                         REDACTED

                                                            *See*

Alexander Decl., App. A-4 at 32 and 16-24.  Wowza contends that it does not receive chunks as "network communications" – which the parties agree mean a "communication that is sent across a network" – because Wowza argues that it includes the added step of    REDACTED

           *See* Ex. 8 at 232, 218-220.  TCP/IP packets are commonly used for transmitting any video, audio or data over the Internet. '287 Patent at 7:52-63 (teaching that the communication session can be established using TCP).  TCP/IP packets are merely a means for transport and do not change the underlying protocol (or chunks) used to encode the video, audio or data. *Id.* (teaching that the session could be TCP/IP, but could also be an RTCP or RTP-based session).  Wowza's argument does not raise any dispute of fact, since nothing in the agreed construction or the claim itself precludes the additional step of inserting chunks into TCP/IP packets (or any other communications packets for that matter) to be sent as network communications.  Wowza does not dispute that the remaining limitations of this element are met. *See* Ex. 8 at 231-232.

        e.      **"storing the values of the parameters;"**

The source code establishes that                         REDACTED

           *See* Alexander Decl., App. A-4 at 32 and 24.  Wowza does not dispute that this element is met.  *See* Ex. 8 at 231.

        f.      **"obtaining through the communication session, as part of the media stream, state information included in a control portion of a second real-time, priority-based network communication and a data payload included in the second network communication;"**

The source code establishes that                         REDACTED

1    REDACTED                .  *See* Alexander Decl., App. A-4 at 32 and 24-26.  Wowza

2  does not dispute that this element is met.  *See* Ex. 8 at 231.

3              g.    **"identifying, from the state information, a purpose of the**
                    **second network communication in relation to the media**
4                   **stream, and whether a second header portion of the second**
                    **network communication includes one or more new values**
5                   **corresponding to one or more of the parameters;"**

6        The source code establishes that WMS is operable to cause identifying a purpose of the

7  chunks from the state information.  *See* Alexander Decl., App. A-4 at 32 and 26-28.  REDACTED

8

9                                          *See* Ex. 8 at 231.

10             h.    **"updating, when the second header portion includes the one or**
                    **more new values, one or more of the stored values based at**
11                  **least in part on the one or more new values;"**

12       The source code establishes that            REDACTED

13                        .  *See* Alexander Decl., App. A-4 at 33 and

14  29-30.  Wowza does not dispute that this element is met.  *See* Ex. 8 at 231.

15             i.    **"and processing the data payload based at least in part on the**
                    **identified purpose and the stored values of the parameters."**
16

17       The source code establishes that            REDACTED

18                        *See* Alexander Decl., App. A-4 at 33 and 30-31.  The processing

19  of the data payload may occur, for example, in the WMS server when it receives RTMPe data.

20  *Id.*

21       **4.    Wowza and WMS users perform the steps of claim 1 of the '278**
             **Patent**
22

23       Claim 1 of the '287 Patent recites substantially the same limitations as claim 12, except

24  that claim 1 covers a *method* for receiving RTMPe communications.  This difference does not

25  raise any new issues of material fact.  Moreover, it is undisputed that Wowza and its customers

26  use WMS to receive content using RTMPe, and thereby practice the claimed method.  *See*

27  Alexander Decl., Ex. A at 88-91, 95-98.            REDACTED

28

REDACTED                          .  *See supra* Section VI.C.2.  Accordingly, it is

undisputed that Wowza and its customers directly and literally infringe method claim 1, for the

reasons discussed above with regard to claim 12.

### D.   Undisputed facts show that Wowza Induces Infringement of Adobe's Asserted Patents

#### 1.   Legal Standards

"[W]hoever actively induces infringement of a patent" is liable as an indirect infringer.

35 U.S.C. § 271(b).  Liability for induced infringement under Section 271(b) exists where the

indirect infringer "knowingly induce[s]" infringement and has "an affirmative intent to cause

direct infringement."  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306, 1308 (Fed. Cir. 2006);

*Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012).  This

occurs where the indirect infringer (1) has "knowledge of the existence of the patent that is

infringed," *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011); *SynQor, Inc.

v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1379 (Fed. Cir. 2013), and (2) takes "active steps … to

encourage direct infringement."  *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005).

If a party offers a product with the object of promoting its use to infringe, as shown by a "clear

expression" or other "affirmative steps taken to foster infringement," it is then liable for the

induced infringement.  *DSU Med.*, 471 F.3d at 1305-1306.  This includes "advertising an

infringing use" to customers and "instructing [direct infringers] how to engage in an infringing

use." *Id.* at 1305; *see also Univ. of Cal. v. Hansen*, 54 U.S.P.Q.2D (BNA) 1473, 1999 U.S. Dist.

LEXIS 21833, at *23-24 (E.D. Cal. Nov. 8, 1999) ("giving a direct infringer instructions on how

to use a patented process or designing a product to infringe" constitutes "intent to induce")

(citing *Apple Computer, Inc. v. Articulate Sys., Inc.*, 991 F. Supp. 1189 (N.D. Cal. 1997)).

#### 2.   Wowza Actively Induced Infringement of the Asserted Patents

The undisputed facts also show that Wowza is liable for inducing infringement of each of

the aforementioned method claims of the asserted patents ('658 Patent claim 12, '509 Patent

claim 22, '878 Patent claim 15, '287 Patent claim 1).  As set forth above, Wowza's customers

and partners use WMS for RTMP and RTMPe streaming, and thereby directly infringe those

1  claims. *See supra* Sections VI.B.2, VI.B.4, VI.C.2, and VI.C.4. Wowza does not contest its

2  customers' use of WMS for this purpose.                    REDACTED

3                                                              . *See* Ex. 30 at

4  312:17-23, 317:12-14; Ex. 31 at WOWZA0239552-554; Ex. 33 at 9-10    REDACTED

5

6           .

7           Nor is Wowza's knowledge of the asserted patents disputed.[43] Yet, in the face of that

8  knowledge, Wowza has consistently taken affirmative steps to encourage its customers to

9  infringe, for example by advertising the ability of WMS to stream digital content using RTMP

10 and RTMPe. *See, e.g.*, Ex. 34 at WOWZA0000447 (advertising that WMS "implements all

11 aspects of the Real-Time Messaging Protocol");[44] Ex. 35 at ADOBEWOW0002450 (advertising

12 Wowza's RTMP support in connection with its Amazon EC2 cloud service); Ex. 36 at

13 WOWZA0000399-400 (touting Wowza's implementation of "RTMPE (encrypted RTMP)" to

14 "secure the data being transmitted between the Flash player and [WMS]"); Ex. 37 at

15 WOWZA0042373 (WMS marketing presentation advertising "[c]omplete RTMP support (incl.

16 RTMPE[])"). In its most recent version of WMS, for example, Wowza has specifically

17 advertised an "RTMPE AddOn feature" for its customers to use in connection with WMS to

18 "provide[] RTMP network encryption security."[45] *See* Ex. 38; Ex. 43.

19         Moreover, Wowza supplies its WMS customers with documentation instructing them

20 how to configure WMS to "stream to the Adobe Flash player" using "the Real-Time Messaging

21 Protocol (RTMP)," as well as how to use RTMPe. Ex. 41 at WOWZA0002911-12, -918, -923;

---

22  [43] The undisputed facts show that Wowza was aware of the '658 Patent no later than March 2008. Ex. 30
23  at 130:16-24. Wowza was aware of the '509 Patent no later than December 18, 2009, when it
    received correspondence from Adobe asserting the '509 Patent against Wowza. *See* Ex. 32 at
24  WOWZA0000035; Ex. 28 at 308:3-16. Wowza was aware of the '878 Patent as of filing of the First
    Amended Complaint ("FAC") on June 20, 2011, and was aware of the '287 Patent as of the filing of
25  the Stipulation and Proposed Order ("Stip.") to Allow Filing of Second Amended Complaint on
    November 30, 2011. *See* Dkt. 15 (FAC) ¶¶ 14, 74- 79 (accusing infringement of '878 Patent); Dkt. 29
    (Stip.) at 2 (accusing infringement of '287 Patent).
26  [44] *See also, e.g.*, Ex. 39 at WOWZA0000433 (Aug. 2007 WMS Overview) (same); Ex. 40 at
27  WOWZA00004219 (Oct. 2011 WMS Overview) (same).
    [45] *See supra*, note 10.
28

1   Ex. 42 at WOWZA0009941 (teaching how to "secur[e] … the media you plan to stream" using

2   "secure streaming (RTMPE, RTMPTE and RTMPS)").  Such advertising and instructions for

3   streaming RTMP and RTMPe constitute active inducement as a matter of law.  *See DSU Med.*,

4   471 F.3d at 1305 ("active steps" to induce include "advertising an infringing use or instructing

5   how to engage in an infringing use"); *Insituform Techs., Inc. v. Cat Contr., Inc.,* 385 F.3d 1360,

6   1378 (Fed. Cir. 2004) (affirming finding of inducement of licensee's direct infringement by

7   licensor who taught the infringing process to licensees).

8       **E.**    **Undisputed facts show that Wowza Contributorily Infringes Adobe's**

9                **Asserted Patents**

             **1.**    **Legal Standards**

10

11       A party is liable for contributory infringement if it "offers to sell or sells within the

12   United States" a component used in the claimed method or system that: (1) is a "material part" of

13   the invention; (2) where the indirect infringer knows that the component is "especially made or []

14   adapted for use in an infringement"; and (3) where the component is not a "staple article" of

15   commerce "suitable for substantial noninfringing use."  *See* 35 U.S.C. § 271(c).  With respect to

16   method claims, a party is liable for contributory infringement if that party sells, or offers to sell, a

17   material or apparatus for use in practicing a patented process.  *See i4i Ltd. P'ship v. Microsoft*

18   *Corp.*, 598 F.3d 831, 850 (Fed. Cir. 2010); *see also Arris Group, Inc. v. British Telecomms PLC*,

19   639 F.3d 1368, 1376 (Fed. Cir. 2011); *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1337

20   (Fed. Cir. 2008).

21            **2.**    **Wowza Contributed to the Infringement of the Asserted Patents.**

22       The undisputed facts establish that Wowza is also liable for contributory infringement of

23   each of the aforementioned claims of the asserted patents (claims 12 and 21 of the '658 Patent,

24   claims 22 and 27 of the '509 Patent, claims 15 and 17 of the '878 Patent, and claims 1 and 12 of

25   the '287 Patent).  Wowza currently provides WMS components in three configurations: 1) the

26   WMS "base" product having components for RTMP and the RTMPe handshake; 2) the RTMPe

27

28

1  "AddOn" component for RTMPe streaming; and 3) the aforementioned base and RTMPe AddOn

2  components combined.[46]  Wowza is liable for contributory infringement for all three

3  configurations.

4         As already described above, it is undisputed that Wowza's customers and partners use

5  WMS for RTMP and RTMPe streaming, and thereby directly infringe those claims.  *See supra*

6  Sections VI.B.2, VI.B.4, VI.C.2, and VI.C.4.  Moreover, the WMS components, in the form of

7  any of the three configurations, are indisputably a "material part" of the claimed invention.  Nor

8  can Wowza contest its knowledge of the patents, *see Global-Tech*, 131 S. Ct. at 2067 (Sections

9  271(b) and 271(c) require the "same knowledge for liability"), or that it sells and supports the

10  WMS components specifically for use in streaming digital media content using RTMP and

11  RTMPe.

12         The only additional element the Court must consider is whether the relevant features and

13  components have no "substantial noninfringing use."[47]  They do not.  Wowza has adduced no

14  evidence that these components – in any of the three configurations – serve any purpose other

15  than to enable WMS customers to utilize RTMP and RTMPe, which, as detailed above, practice

16  the asserted claims.  *See supra* Sections VI.B and VI.C.  The deliberately infringing nature of the

17  RTMPe AddOn component, for example, is especially clear.  Indeed, in a misguided effort to

18  avoid infringement of the '878 and '278 Patents, Wowza's CTO suggested to its CEO that[REDACTED]

19                                                                                      Ex. 45 at

20  WOWZA0002204.  However, whether Wowza sells the infringing RTMPe functionality separate

21  from the base WMS product or integrated into that base product is of no consequence.  *See, e.g.,*

22  *i4i Ltd. P'ship*, 598 F.3d at 849 (contributory infringement analysis focuses on "separate and

23

---

[46]  *See supra* note 45.

24
[47]  Wowza's argument that WMS can stream in other formats, and therefore is capable of noninfringing
25  uses, misses the point.  *See, e.g.,* Ex. 44 at 32.  For purposes of Section 271(c), the proper focus is on
the RTMP and RTMPe features and components, *not* WMS as a whole.  *See i4i Ltd. P'ship*, 598 F.3d
26  at 849 (Fed. Cir. 2010) (custom XML editor within Microsoft Word, not Word as a whole, was
relevant feature to consider); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009)
(date-picker tool within Microsoft Outlook, not Outlook as a whole, was the relevant feature to
27  consider).  Here, the relevant RTMP and RTMPe components have no substantial non-infringing uses,
and Wowza cannot escape liability by adding support for other streaming formats.

28

distinct feature" whether or not part of "a larger software package"). Because the RTMP and RTMPe features and components are "suitable only for an infringing use," Wowza is liable as a contributory infringer for selling these components within WMS to customers who use them to infringe. *Lucent*, 580 F.3d at 1321 ("[i]nclusion of the [infringing] feature within a larger program does not change the [feature's] ability to infringe").

**VII.   CONCLUSION**

In sum, the Court should adopt Adobe's proposed claim constructions, which are consistent with the plain meanings of the construed terms and otherwise amply supported by the contextual language of the claims themselves, the patent specifications, and the file wrappers. By contrast, nothing in that intrinsic evidence requires limiting the disputed terms as Wowza argues. Wowza cannot genuinely dispute infringement by its WMS software product. The Court should grant summary judgment of direct and indirect infringement accordingly.

Dated: June 21, 2013                          Respectfully submitted,

LATHAM & WATKINS LLP

By _____*/s/ Alexander E. Long*_____
       Alexander E. Long
       Attorneys for Plaintiff
       ADOBE SYSTEMS INCORPORATED