UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ADOBE SYSTEMS INCORPORATED,

       Plaintiff,

   v.

WOWZA MEDIA SYSTEMS, et al.,

       Defendants.

Case No. 11-cv-02243-JST

**ORDER (1) CONSTRUING CLAIMS; (2) DENYING MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT; (3) GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT; (4) GRANTING IN PART AND DENYING IN PART MOTION TO STRIKE**

Re: ECF Nos. 327, 340

     In this patent infringement action involving media-streaming technology, the parties seek the construction of eleven terms used in the four patents-in-suit. Additionally, Adobe moves for summary judgment of infringement and Wowza moves for summary judgment of noninfringement. In light of the Court's constructions, Adobe's motion for summary judgment of infringement is DENIED, and Wowza's motion for summary judgment of noninfringment is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

### A. Patents-in-Suit and Remaining Asserted Claims

     Adobe alleges that Wowza infringes four of its patents through the use and sale of the Wowza Media Server ("WMS"). WMS is a server that transmits content to clients, such as the Adobe Flash Player, by using various communication protocols, such as RTMP and RTMPe.

     The following chart identifies the four patents-in-suit and the remaining asserted claims:

//

//

| Patent | Claims |
|--------|--------|
| U.S. Patent No. 7,272,658 ("the '658 patent") | 12, 16, 21 |
| U.S. Patent No. 7,587,509 ("the '509 patent") | 1, 4, 6, 10, 22, 25, 27 |
| U.S. Patent No. 7,961,878 ("the '878 patent") | 1, 4, 15, 16, 17 |
| U.S. Patent No. 8,051,287 ("the '287 patent") | 1, 12, 13, 14, 16 |

### B.    The '658 and '509 Patents

The '658 patent, entitled "Real-time priority-based media communication," and the '509 patent, which is a continuation of the '658 patent, teach methods for streaming information in real time.[1]  The patents distinguish the invention from prior methods of streaming information, which focused on transmitting information over the internet by breaking down information into segments before transmission and attaching headers to such segments so that the receiving application could properly re-assemble the information.  These prior methods were inefficient because the header of each segment always contained the maximum amount of header data, which substantially reduced the available bandwidth, and because the information transmitted was not prioritized in any way.  The invention taught in these patents improves upon these prior methods by reducing the amount of repetitive data included in the headers, which increases the available bandwidth, and by breaking down the information into small segments called "chunks" and interleaving the chunks based on their time-sensitivy before transmission, which increases the efficiency of the streaming and results in better playback.

The patents contain detailed examples of how the invention works.  Any given media stream (i.e. program, movie, song, etc.) that is transmitted from one end of the connection to the other is broken up into multiple sub-streams, each of them containing one aspect of the stream, such as the video or audio.  Each of the subtreams is then broken up into chunks.  Each chunk contains both the payload, which is the segmented data, and "a chunk control byte," which contains header information that is used to re-assemble and play the media stream at the destination.  '658 patent col. 6 ll. 15-25.  The chunk control byte contains a chunk stream ID,

---

[1] Both of these patents share the same specification.

2

which indicates the media stream, and a chunk type ID, which is one of four "states/types" for classifying each chunk and that "identifies the purpose of the chunk." Id. col. 6 ll. 35-55; col. 7 ll. 33-45. Additionally, the chunk control byte "typically" includes four types of header information: (1) a message stream ID, which identifies the particular substream to which the chunk belongs; (2) a message type ID, which identifies the specific format of the chunk (i.e. audio such as .wav or MP3 or video such as MPEG-4 or .wma); (3) time, which "typically" is a "time stamp" that the destination application can use to properly synchronize the chunk with the other chunks it received; and (4) length, which indicates the length of the chunk and is used by the application to determine when the chunk has been fully received. Id. col. 4 ll. 59-68; col. 5 ll. 1-58.

### C.     The '878 Patent

The '878 patent, entitled "Imparting cryptographic information in network communications," teaches methods for establishing a secured network communication by embedding cryptographic information that can be used to establish such a communication within a pre-determined portion of the network communication. The communication session is established through a handshake that includes a pre-defined portion of the communication reserved for and known to contain random data. The cryptographic information is stored in this pre-defined portion, which allows the cryptographic information to appear random and thus be less susceptible to detection and reverse engineering. The receiving entity may identify the cryptographic information with the use of pre-determined modulo divisers, coded integers, or other methods. Once the receiving entity identifies and processes the cryptographic information, the interactions between the sending and receiving entities can be modified, including by initiating an encrypted session.

### D.     The '287 Patent

The '287 patent, entitled "Imparting real-time priority-based network communications in an encrypted communication session," teaches methods for establishing a communication session in real time to communicate a media stream that are based in part on the storage of cryptographic information in a pre-defined portion of the communication. This invention essentially combines the methods taught in the other patents-in-suit, namely the priority-based real-time communication

United States District Court
Northern District of California

3

method of the '658 and '509 patents, and the handshake authentication technology of the '878 patent. One of the described benefits of this combination is to improve the real-time streaming of media with some degree of security.

## II.     CLAIM CONSTRUCTION

### A.     Legal Standard

The construction of patent claim terms is a matter of law for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). A "bedrock principle" of patent law is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). The "objective baseline" for construing patent terms is to identify the "ordinary and customary meaning" of the term, which is "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Id. at 1313. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification" and the prosecution history. Id.

A patent's intrinsic evidence serves as the "primary basis for construing [a] claim" and "is the best source for understanding a technical term." Id. at 1314. The intrinsic evidence trumps any extrinsic evidence that would contradict it. Id. Intrinsic evidence includes the patent and its file history, including any reexaminations and reissues, related patents and their prosecution histories, and the prior art that is cited or incorporated by reference in the patent-in-suit and prosecution history. Id.

Extrinsic evidence refers to all other types of evidence, including inventor testimony, expert testimony, documentary evidence of how the patentee and alleged infringer have used the claim terms, dictionaries, treatises, and other similar sources. Id. at 1318.

//
//
//
//

4

United States District Court
Northern District of California

B.    **Analysis**

   1.    **"priority-based" — '658 patent claim 12; '287 Patent claims 1, 12**

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| "plain and ordinary meaning" or "order-based" | "[A communication system] that assigns different priority values to different media types and uses these priority values to determine what chunks to transmit." |

**The Court construes the term "priority-based" as "rank-based."**

"Priority-based" is a commonplace, non-technical word; as such, it requires no elaborate interpretation and its construction requires "little more than the application of the widely accepted meaning" of the word.  Phillips, 415 F.3d at 1314; see also Brown v. 3M, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (affirming construction of term "or" based on its plain meaning because the term is not a "technical term[] of art, and do[es] not require elaborate interpretation," as nothing in the specification or prosecution history requires adopting an alternative construction).

Wowza's proposed construction contains several concepts, including "assigns" and "uses," that fall outside of the plain meaning of the term "priority-based."  Wowza does not adequately explain why burdening the disputed term with these concepts is appropriate.  Wowza merely points to portions of the specification that discuss "certain embodiments of the present invention" as containing a "scheduling algorithm" that assigns a "specific priority value" to media segments. See Mot. at 6, ECF No. 409 (quoting '658 patent col. 11 ll. 56-49).  These embodiments merely teach how the prioritizing contemplated by the term "priority-based" can be accomplished. Descriptions of embodiments, even preferred embodiments, in the specification are insufficient to limit the scope of the term in the manner proposed by Wowza absent "words or expressions of manifest exclusion or restriction."  See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (holding that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction") (citation and internal quotation marks omitted).  Wowza points to no such words or expressions.

Moreover, given that several dependent claims of the '658 and '287 patents contain limitations such as "a priority assigned to" and "associating priority values," the Court is not persuaded that limiting the independent claims at issue in the manner proposed by Wowza would be appropriate in light of the doctrine of claim differentiation. Adobe Mot. at 12 (citing the '658 patent claim 9; '287 patent claims 8, 19, 31); see Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1342 (Fed. Cir. 2010) (noting that, under the doctrine of claim differentiation, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim").

In any event, during oral argument, both parties agreed that "rank-based" would be an appropriate construction of the term at issue.  See Tr. at 10, 19-20, ECF No. 439.

    2.    "consists of" — '658 patent claims 12, 21; '509 patent claims 1, 10, 22, 27

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| "includes only the following purposes but does not preclude purposes indicated by information other than the state or type identifier" | "include[s] the following, and only the following" |

**The Court adopts Wowza's proposed construction.**

To illustrate the context of the term at issue, the relevant portion of claim 21 of the '658 patent, which is representative of each of the claims that contains this term, is reproduced below:

> A computer program product having a computer readable medium with computer program logic recorded thereon, said computer program product comprising:
>
> > code for implementing a state machine that processes state assignments for each of said plurality of associated chunks representative of information regarding said media sub-streams and said message streams wherein said state assignments indicate possible purposes of a corresponding chunk, and wherein the possible **purposes indicated by said state assignments** <u>**consist of**</u>:
> >
> > > a new stream chunk associated with a new media message sub-stream wherein said new stream chunk includes a plurality of new parameters in a corresponding one of said headers and uses no parameters from a previous header,

United States District Court
Northern District of California

a new media chunk associated with a new media message sub-stream wherein said new media chunk includes a plurality of new parameters in a corresponding one of said headers and uses at least one other parameter from a previous header,

a new time chunk associated with said new media message sub-streams wherein said new time chunk includes at least one new parameter in a corresponding one of said headers and uses a plurality of other parameters from a previous header, and

a continuation chunk requiring no new parameters in a corresponding one of said headers and using a plurality of parameters from a previous header;

In this claim, the term "consist of" refers exclusively to, and modifies, the "purposes indicated by said state assignments."[2]  The four subparagraphs that follow the term each describe one such purpose.

It is well-settled, and the parties do not dispute that, the term "consisting of" means that "the claimed invention contains only what is expressly set forth in the claim," but it "does not limit aspects unrelated to the invention."  <u>Norian Corp. v. Stryker Corp.</u>, 363 F.3d 1321, 1331 (Fed. Cir. 2004).  In light of this authority, both parties agree that "consists of" limits the claim to the four purposes listed after the term.  They also agree that any purposes that are indicated by something other than the state assignments are not affected by the term, as they fall outside of the scope of the claims at issue.

The Court agrees with the parties that the term "consists of" must be construed to limit the purposes indicated by the state assignments to the four purposes listed after the term, and that purposes unrelated to the state assignments are not affected by the term.  The Court concludes that Wowza's proposed construction adequately conveys this meaning.  Indeed, when one substitutes Wowza's proposed construction for the term "consists of," the relevant portion of the claim reads "wherein the possible purposes indicated by said state assignments include the following and only the following[.]"  Because the term at issue modifies only "the possible purposes indicated by said

---

[2] The other claims at issue that contain the term "consist of" use other words for "state assignments," such as "states," "state association," and "chunk type identifiers."  The parties agree that all of these terms are used interchangeably in the patents.

United States District Court
Northern District of California

state assignments," by definition, any purpose that is not indicated by the state assignments is not affected by the term.

Contrary to Adobe's contention, Wowza's construction would be less confusing to the jury than the one Adobe proposes. Adobe's construction uses the term "state or type identifier," which is not used in the patents-in-suit. Accordingly, Adobe's proposed construction is more likely to confuse than to clarify.

### 3. "new media chunk" — '658 patent claims 12, 21; '509 patent claims 1, 10, 22, 27

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| "A chunk having a plurality of new parameters in its header and using at least one other parameter from a previous header" | "A chunk of a media message sub-stream that is of a different media type than the media type of the immediately preceding chunk with the same chunk stream ID" |

**The Court adopts the following version of Wowza's proposed construction: "a chunk of a media message sub-stream that is of a different media format than the media format of the immediately preceding chunk with the same chunk stream ID."**

Because the context of the term is critical to its construction, claim 21 of the '658 patent, which is representative of the claims containing the term, is reproduced here:

> A computer program product having a computer readable medium with computer program logic recorded thereon, said computer program product comprising:
>
> > code for implementing a state machine that processes state assignments for each of said plurality of associated chunks representative of information regarding said media sub-streams and said message streams wherein said state assignments indicate possible purposes of a corresponding chunk, and wherein the possible purposes indicated by said state assignments consist of:
> >
> > > a **new stream chunk** associated with a new media message sub-stream wherein said new stream chunk includes a plurality of new parameters in a corresponding one of said headers and uses no parameters from a previous header,
> > >
> > > a **new media chunk** associated with a new media message sub-stream wherein said new media

United States District Court
Northern District of California

United States District Court
Northern District of California

chunk includes a plurality of new parameters in a corresponding one of said headers and uses at least one other parameter from a previous header,

a **new time chunk** associated with said new media message sub-streams wherein said new time chunk includes at least one new parameter in a corresponding one of said headers and uses a plurality of other parameters from a previous header, and

a **continuation chunk** requiring no new parameters in a corresponding one of said headers and using a plurality of parameters from a previous header;

Adobe argues that the term "new media chunk" is "self-defined" by the language of the claims, specifically, by the language after the word "includes" in the subparagraph where the term appears. Adobe's proposed construction must be rejected for two reasons. First, it renders the words "new media" superfluous. See Mangosoft, Inc. v. Oracle Corp., 525 F.3d 1327, 1330 (Fed. Cir. 2008) (rejecting construction of "local memory device" that renders the term "local" superfluous). Adobe argues that the words "new media" are a mere "label or designator" for a chunk that "includes a plurality of new parameters" in its header and "uses at least one parameter from a previous header." Adobe Opp'n at 12. Adobe, however, does not support this assertion with evidence showing that the patentee intended these words to be "labels or designators" without any meaning of their own.

Second, Adobe's proposed construction is inconsistent with the language surrounding the term at issue, because it ignores the inclusion and meaning of the word "includes" in the claim. The word "includes" is open-ended. See SanDisk Corp. v. Memorex Products, Inc., 415 F.3d 1278, 1284 (Fed. Cir. 2005) ("As a patent law term of art, 'includes' means 'comprising.'") (citation omitted). Accordingly, the use of the word "includes" in the claims at issue means that a "new media chunk" must include, *but is not limited to*, "a plurality of new parameters in a corresponding one of said headers and uses at least one other parameter from a previous header." See id. (holding that term "includes" does not "foreclose[] additional elements that need not satisfy the stated claim limitations"). Adobe's proposed construction unjustifiably limits the meaning of new media chunk exclusively to "a plurality of new parameters in a corresponding one of said headers and uses at least one other parameter from a previous header," and therefore

cannot be correct.

Wowza's proposed construction properly gives meaning to the words "new media" in light of the specification.  See Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); see also  Mask Co. Ltd. v. Ambu, 618 F.3d 1367, 1371 (Fed. Cir. 2010) ("[T]he specification is the single best guide to the meaning of a disputed term.").

The language of the claims containing the term at issue directly track the specification's description of certain embodiments, in which "the type or purpose of the chunk" is identified by the chunk type ID, which in turn "provides four states/types for classifying each chunk message." '658 patent col. 7 ll. 33-44 (emphasis added).  The four possible values of the chunk type ID are described as follows: value 0 "indicates a new stream"; value 1 "is a new media indicator of a specified new time change/time delta, length, and any new message type ID"; value 2 refers to "a new message defined only by a single piece of header information" such as "the new time delta"; and value 3 "is a continuation indicator" that "preferably uses the same message stream ID, the same message type ID, the same time change/time delta, and the same length of the previous chunks." Id. col. 7 ll. 45-68; col. 8 ll. 1-47 (emphasis added).

Adobe's criticism of Wowza's construction centers on Wowza's purported importation of extraneous limitations from these embodiments into the claims.  Adobe argues that such importation "has no textual basis with the claims whatsoever."  Adobe Mot. at 18.  Here, however, the claims explicitly reference the embodiments discussed above by including the terms "new stream," "new media," "new time," and "continuation" when referring to the four possible chunk purposes.  The use of these terms constitutes the requisite clear language required to limit the scope of the claims to these embodiments.  See Abbot Laboratories v. Sandoz, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (holding that a court may limit the construction of a term to the embodiments disclosed in the specification "when the claims themselves, the specification, or the prosecution history clearly indicate that the invention encompasses no more than the confined structure or method"); see also Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed.Cir. 2004) (holding that a court may limit broad claim language to an embodiment in the specification when "the patentee has demonstrated a clear intention to limit the claim scope using 'words or

10

1    expressions of manifest exclusion or restriction'") (citation omitted).

2        Additionally, the terms that Wowza uses to define "new media chunk" are fully in line

3    with what is described in the specification.  The specification uses the word "media" in the context

4    of chunks to refer to the "format of the data payload." '658 patent col. 7 ll. 35-45.  It follows that a

5    "new media" chunk should be one that has a "new" or different media format or type than the

6    prior chunk.[3]  The specification also teaches that a "new media" chunk of value 1 belongs to the

7    same chunk stream ID as the prior chunk.  See id. col. 8 ll. 3-13.  Otherwise, that chunk would not

8    be a "new media" chunk of value 1 but rather would be a "new stream" chunk of value 0.

9        During oral argument, Adobe argued that Wowza's proposed construction improperly

10   excludes the preferred embodiment depicted in Figure 9, which illustrates a chunk of value 1

11   (chunk 909 with header 910) as having a media format that is *not* different from the media format

12   of the preceding chunk.  As the Court pointed out during oral argument, and as Adobe admitted,

13   Figure 9 is unreliable, because its depiction of chunk 909 as a value 1 chunk conflicts with the

14   specification's description of that chunk as a value 0 chunk that "resets" all of the states, including

15   the media type.  See id. col. 15 ll. 25-31.  Given Figure 9's discrepancy with the specification, the

16   Court declines to take it into account in construing the term at issue.

17       Finally, Adobe argues that Wowza's proposed construction violates the doctrine of claim

18   differentiation because certain dependent claims include the limitation "media type."[4]  See

19   Phillips, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation

20   gives rise to a presumption that the limitation in question is not present in the independent

21   claim.").  Though Adobe is correct that "media type" is found in certain dependent claims, the

22   Court finds that the doctrine of claim differentiation does not undermine the Court's construction

23   of "new media type" because the dependent claims at issue are not rendered superfluous by that

24   construction.

     / / /

25   / / /

26

27   ---

     [3] The specification uses the words type and format interchangeably when referring to media.  See

28   '658 patent col 8 ll. 1-10 ("type/format").

     [4] These are claims 4, 5, 6, and 16 of the '658 patent, and claim 4 of the '509 patent.

United States District Court
Northern District of California

**4.**     **"new time chunk" — '658 patent claims 12, 21; '509 patent claims 1, 10, 22, 27**

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| "a chunk having at least one new parameter in its header and using a plurality of other parameters from a previous header" | "a chunk having a different time than the time of the immediately preceding chunk of that stream."[5] |

**The Court adopts a variation of Wowza's proposed construction, as follows: "a chunk of a media message sub-stream that is of a different time than the time of the immediately preceding chunk with the same chunk stream ID."**

Much of the same reasoning discussed in the previous section with respect to "new media chunk" applies to the term "new time chunk" and therefore is incorporated here by reference. The only difference between this and the previous term is that the inclusion of "new time" in the claims at issue is a direct reference to a chunk with value 2 as opposed to a chunk with a value of 1 as described in the specification. This direct reference is sufficient to limit the claims at issue to the embodiments to which they refer. See Liebel-Flarsheim, 358 F.3d at 906 (holding that a court may limit broad claim language to an embodiment in the specification when "the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'") (citation omitted)

Adobe's proposed construction suffers from deficiencies similar to the ones discussed in the previous section, namely a failure to give meaning to the words "new time" and a failure to read the word "including" as open-ended.

Wowza's proposed construction, unlike Adobe's, gives meaning to the words "new time," and it does so in a manner that is consistent with the specification. Value 2 chunks are described in the specification as "ha[ving] all of the same information from the previous chunk except possibly for a change in the time delta." '678 patent col. 8 ll. 14-23. Wowza's proposed construction properly defines a "new time chunk" as one that differs from the prior chunk in terms of the time parameter.

---

[5] Wowza offered this proposed construction during oral argument.

Adobe raises the same objections to Wowza's proposed construction of "new time chunk" that it raised with respect to the previous term, namely those based on the notion that limiting the claims in light of the embodiments they reference is unjustified, as well as those based on the doctrine of claim differentiation. The former objection is flawed in light of the explicit reference to the embodiments in the claims, as discussed above. The latter also is not well-taken. Though dependent claims include terms such as "new time delta parameter," <u>see</u> '658 patent claim 6, the doctrine of claim differentiation is not applicable here for the same reasons articulated with respect to the previous term.

### 5. "communicating" – '658 patent claim 12; '509 patent claims 1, 10

| Adobe's proposed construction | Wowza's proposed construction |
| --- | --- |
| "transmitting or receiving" | "transmitting" |

The parties dispute whether "communicating" can mean "receiving." Adobe argues that it can. Wowza argues that "communicating" cannot be defined as "receiving" without additional clarification.

The Court adopts Wowza's proposed construction. "Communicating," when read in the context of the claims in which it appears and of the specification, can only mean transmitting.

The language of claim 12 of the '658 patent expressly restricts the scope of "communicating" to the "transmitting" of chunks. This interpretation of the claim is supported by the language of dependent claim 13, which contains the additional limitation of "receiving said transmitted plurality of chunks." Construing independent claim 12 as including "receiving" would render claim 13 superfluous.

By contrast, the language of claims 1 and 10 of the '509 patent do not expressly restrict the meaning of the term "communicating" to encompass only "transmitting," but they do so implicitly. These independent claims tie "communicating" with the *dividing* of streams into chunks, which is a function associated with the transmission of chunks, and not with the receiving of chunks, according to the specification. The embodiments in the specification describe "communication systems" in which transmitting always involves slicing data streams into chunks

and interleaving such chunks before transmission, whereas receiving is always described as involving processing and reassembling of chunks into the original data stream.  In light of these teachings, defining "communicating" as "transmitting" would make sense, but defining it as "receiving" would not.  Notably, nothing in the specification describes a receiving entity as dividing streams into chunks; to the contrary, receiving entities always are described in the specification as doing the opposite of dividing, namely re-assembling chunks.

Adobe's proposed construction is also undermined by the language of dependent claims 3 and 13 of the '509 patent, which contain the additional limitation of "receiving" transmitted chunks.  This strongly suggests that the independent claims should not be interpreted as including the "receiving" limitation, as this interpretation would render dependent claims 3 and 13 superfluous.

Adobe's arguments in support of its proposed construction are unpersuasive.  First, they fail to refute the notion that the dependent claims discussed above would be rendered superflouos if the Court adopts its proposed construction.  Second, they fail to recognize that the embodiments described in the specification, including Figure 7A, which Adobe specifically cited in support of its position, expressly tie the act of receiving chunks to the act of "assembl[ing] the received chunks into the resulting message stream," which is the opposite of the dividing of chunks that is described in the independent claims at issue, as discussed above.  See '658 patent col 12 ll. 54-57.  Finally, Adobe points to dependent claim 5 of the '509 patent to support its argument that "communicating" sometimes but not always signifies transmitting.  The Court finds that nothing in the language of claim 5 suggests that "communicating" in the independent claims at issue can be defined as "receiving."  Claim 5 describes a specific form of transmission, namely one that is performed "according to a scheduling algorithm," and this description has no bearing on the question of whether "communicating" can mean receiving.

//
//
//
//

14

1

### 6. "scheduling algorithm" — '658 patent claims 12 and 21

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| "an algorithm for selecting data to transmit" | "an algorithm that prioritizes some media chunk types over other media chunk types, and directs which chunk to transmit next in order to achieve good playback and minimize jitter" |

**The Court construes the term as "an algorithm for prioritizing data to transmit."**

Adobe's proposed construction is too broad, because it fails to capture the essence of the invention, which is its ability to transmit chunks in a prioritized order. See, e.g., '658 patent col. 13 l. 27 ("Scheduler executes a scheduling algorithm to determine which chunks should be transmitted in which order.").

The Court's construction is consistent with the language of the claims, which cover a "priority-based communication protocol." It also is consistent with the specification, which distinguishes the claimed invention from the prior art based on the former's capacity to interleave and prioritize chunks based on a variety of factors. Finally, this construction does not allow Adobe to recapture the scope that it disclaimed during prosecution. Wowza cites excerpts of the prosecution history that show that Adobe distinguished the present invention from the prior art by noting that the prior art did not disclose any system for prioritizing the data transmitted, whereas the invention discloses a "scheduling algorithm." See Irwin Decl., Ex. G at 15 & ADOBEWOW_0000275. Because the Court's construction incorporates the prioritizing aspect that Adobe used to distinguish its invention from the prior art, no prosecution history estoppel issues are raised by the construction. See Trading Technologies Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1355 (Fed. Cir. 2010) ("Under prosecution history estoppel, a patentee may not seek to recapture as an equivalent subject matter surrendered during prosecution.").

Wowza's proposed construction improperly injects into the claims concepts and terms from the embodiments described in the specification, namely "prioritiz[ing . . . ] media chunk types" and "achieve good playback and minimize jitter." See, e.g. '658 patent col. 11 l. 21, col. 15 ll. 59-62 (discussing benefits of interleaving of chunks); col. 11 ll. 42-52 (describing scheduling

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

algorithm that directs which stream or sub-stream to send next).  Nothing in the language of the claims, the specification, or the prosecution history, however, suggests that the patentee intended to limit the scope of the claims to these embodiments.

Additionally, to the extent that Wowza argues that its proposed construction is based on the specification's description of the goals of the present invention, namely to achieve "good playback that minimizes the audio or video jitter," the argument is unpersuasive, because it is unsupported by clear evidence showing that the patentee intended to narrow the scope of the claims in this manner.  See Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346, 1355 (Fed. Cir. 2003) (holding that statements in the specification pertaining to the "objectives" of the invention or descriptions of the preferred embodiment are insufficient to limit the scope of the claims "[a]bsent a clear disclaimer of particular subject matter[.]").

Finally, several dependent claims contain limitations relating to specific priority values, which suggests that a reading of these limitations into the independent claims at issue would be improper.  See, e.g., '658 patent claims 9-11, 27-28.

In any event, during oral argument, both parties agreed that the Court's proposed construction of "scheduling algorithm" was appropriate.  Tr. at 50-51.

### 7.   "transmitting ones of said plurality of [. . .] chunks" — '658 Patent claims 12 and 21

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| Plain and ordinary meaning | "individually transmitting chunks" |

**The Court construes the term as "transmitting whole individual or multiple whole chunks of said plurality of [. . .] chunks."**

The dispute over this term centers on whether the phrase "transmitting ones of said plurality of [. . .] chunks" requires the transmission of whole chunks one at a time.

Adobe argues that Wowza's proposed construction is improper because the transmission of a single chunk at a time has no textual basis in the patent because the use of the word "ones" suggests that the claim encompasses the transmission of multiple chunks.  The Court agrees. While it is true that at least one embodiment in the specification describes "a scheduling algorithm

United States District Court
Northern District of California

that directs <u>which chunk</u> [i.e. a single chunk] of which stream or sub-stream to send next," <u>see, e.g.</u>, '658 patent col. 11 ll. 42-45, other embodiments describe the transmission of multiple chunks at a time.  <u>See, e.g.</u>, '658 patent col. 12 ll. 45-50 ("The chunks are then queued in chunk queue 709 awaiting the determination of which *chunks* to send.").  Moreover, nothing in the language of the claims suggests that the patentee intended to limit the scope of the claims to transmitting a single chunk at a time.  An intent to limit the invention in this manner could easily have been expressed by using the words "each" or "individual" to describe the chunks.

On the other hand, the Court is not persuaded by Adobe's argument that nothing in the patent precludes the term at issue from covering the transmission of fragments of chunks.  First, neither the claims nor the specification describe chunk fragments.  Indeed, the smallest data fragments described in the specification are chunks or "packets."  <u>See, e.g.</u>, '658 patent col. 4 ll. 55-65 (defining a "data packet" as synonymous to a "chunk," namely as being comprised of a data payload and header information).  Second, the specification repeatedly emphasizes the importance of header information to the proper re-assembly of chunks by the receiving entity.  The concept of a chunk fragment would be inconsistent with this teaching, because a chunk fragment probably would have an incomplete header.  If a chunk fragment had a complete header, then the chunk fragment would not be a fragment at all; rather, it would be a chunk, albeit one with a shorter length.

8. **"reserved for random data" — '878 patent claims 1, 15, 17; '287 patent claims 1, 12, 33**

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| plain and ordinary meaning | "reserved for data produced in a manner where there was an equal probability for each possible value" |

The dispute with respect to this term centers on the meaning of the word "random."

Wowza's proposed construction flies in the face of the specification.  It requires that the random data claimed in the patent have an "equal probability for each possible value"—in other words, that the random data be truly random—even though the specification provides that "the

random data *need not be* truly random data, but rather can be pseudo random data." '878 patent col. 11 ll. 31-32; '287 patent col. 25 ll. 63-64 (emphasis added).  Because the language of the claims does not contain any indication that the patentee intended to limit the scope of the claims to data that is truly random, Wowza's proposed construction is incorrect.

Adobe has submitted extrinsic evidence showing that persons of ordinary skill in the art at the time of the invention did not equate "random data" with data having an "equal probability for each possible value."  A published article authored by Piet Van Mieghem describes at least eight different types of random data distributions applicable to the field of communications networks and systems, including a uniform distribution (the one referenced in Wowza's proposed construction), an exponential distribution, a Gaussian distribution, a Gamma distribution, a Cauchy distribution, a Weibull distribution, a Pareto distribution, and a Lognormal distribution. See Adobe Mot., Ex. 15 at 43-57; Alexander Decl., Ex. B at 179.  This supports the notion that a person of ordinary skill in the art would not have necessarily interpreted the term at issue as being limited to truly random data.

Wowza is correct in noting, however, that Adobe disclaimed one type of pseudo random data during prosecution when it distinguished "random data" from "dummy data" that employed "all zeros as the dummy data bits."  See Wowza Mot. at 30 (citing Irwin Decl., Ex. J, '878 File History at ADOBEWOW_0000627).  The construction of the term "random data" must be narrowed accordingly.

**The Court thus construes the term at issue as "reserved for data that is random or pseudo random, where pseudo random data is not composed of all zeros."**

During oral argument, both parties agreed that the Court's construction was appropriate. Tr. at 53.

//

//

//

9.      **"reserved for random data in accordance with a Real Time Messaging Protocol (RTMP) random byte section"  — '878 patent claims 1, 15, 17**

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| plain and ordinary meaning<br><br>or<br><br>"a section reserved for random data in RTMP" | indefinite and inadequately supported by '878 Patent<br><br>or<br><br>"Real Time Messaging Protocol (RTMP) random byte section is the portion of a RTMP handshake that contains 1528 bytes of random Data" |

Wowza argues that each of the claims of the '878 patent are indefinite because the patent "never" describes what it means for random data to be in accordance with a Real Time Messaging Protocol (RTMP) random byte section.  Wowza contends that the only time the terms "RTMP" or "Real Time Messaging Protocol" are used in the patent is in reference to a random byte section, as follows:

> Adobe Systems Incorporated has promulgated a communication protocol for the FLASH® Media Server in which a communication session is established through handshake communications between the server and the client. As part of this handshake, **the Real Time Messaging Protocol (RTMP) included a random byte section** in the communications for use in estimating the available bandwidth for the session between the client and the server.

'878 patent col. 1 ll. 33-40 (emphasis added).

Wowza argues that this reference "provides no detail or description" of a "random byte section in accordance with a Real Time Messaging Protocol (RTMP)," and that, at best, a person having ordinary skill in the art might interpret the reference to mean that the random byte section is in accordance with the "communication protocol for the FLASH® Media Server" promulgated by Adobe.  Wowza Mot. at 25.  According to Wowza, the problem with this interpretation is that the communication protocol for the FLASH Media Server was first publicly announced as the

"RTMP Specification" on June 15, 2009, a year after the '878 patent was filed.  But, even if the RTMP Specification had been available at the time of filing, Wowza argues that the existence of the document, which is extrinsic to the specification, cannot be used to avoid a determination of indefiniteness.

Adobe responds that the claims are not indefinite.  First, Adobe argues that the specification adequately defines an RTMP random byte section as "a random byte section in the [RTMP] communications for use in estimating the available bandwidth for the session between the client and the server."  See Adobe Reply at 12 (citing '878 patent col. 1 ll. 33-40).  Second, Adobe contends that the RTMP Specification is irrelevant, because the plain language of the term at issue refers to "a" Real Time Messaging Protocol, and not to "the" RTMP Specification.  Third, Adobe notes that the specification expressly teaches the general boundaries of the random byte section, namely that the random byte section must be larger than the cryptographic key that is embedded in it.  See, e.g., '878 patent col. 8 ll. 30-40 ("[I]t will be appreciated that the random data section needs to be larger than the total length of the message authentication code and the encryption parameters[.]").  Finally, Adobe argues that the prosecution history shows that when the examiner amended the claims to add the limitation "in accordance with a Real Time Messaging Protocol (RTMP) random byte section," the examiner concluded that the addition of the limitation was supported "at least in paragraphs 17, 19, 23-27, 31, 32, 35, 41, and 42 of the specification," which correspond to the '878 patent col. 3 ll. 38-51 (¶ 17); col. 3 l. 62 (¶ 19); col. 4 l. 63 (¶¶ 23-27); col. 6 ll. 47-68 (¶ 31); col. 7 ll. 5-20 (¶ 32); col. 7 ll. 47-59 (¶ 35); col. 8 ll. 66-68 (¶ 41); and col. 9 ll. 9-21 (¶ 42).  See Hatch Decl., Ex. 17 at 3, ECF No. 332.

"Pursuant to § 112 of the Patent Act, to be sufficiently definite, a patent specification must conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  Power-One, Inc. v. Artesyn Technologies, Inc., 599 F.3d 1343, 1350 (Fed. Cir. 2010) (citing 35 U.S.C. § 112, ¶ 2).  "The definiteness requirement of § 112, ¶ 2 focuses on whether the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the [scope of the] patentee's right to exclude."  Honeywell Int'l, Inc. v. Int'l Trade Comm'n, 341 F.3d 1332, 1338 (Fed. Cir. 2003) (citation and internal quotation marks omitted).

1    "To comport with § 112's definiteness requirement, the boundaries of the claim, as

2    construed by the court, must be discernible to a skilled artisan based on the language of the claim,

3    the specification, and the prosecution history, as well as her knowledge of the relevant field of

4    art." Id. (citation omitted).  A claim is indefinite when it is "not amenable to construction or [is]

5    insolubly ambiguous." Datamize LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir.

6    2005).  "A claim is not indefinite merely because it poses a difficult issue of claim construction."

7    Power-One, 599 F.3d at 1350 (citation omitted).  "Rather, if the meaning of the claim is

8    discernible, even though the task may be formidable and the conclusions may be one over which

9    reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on

10   indefiniteness grounds." Id. (citation and internal quotation marks omitted).  "An accused

11   infringer must thus demonstrate by clear and convincing evidence that one of ordinary skill in the

12   relevant art could not discern the boundaries of the claim based on the claim language, the

13   specification, the prosecution history, and the knowledge in the relevant art." Haemonetics Corp.

14   v. Baxter Healthcare Corp., 607 F.3d 776, 783 (Fed. Cir. 2010).  "[C]lose questions of

15   indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee."

16   Bancorp Servs., L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367, 1371 (Fed. Cir. 2004) (citation

17   and internal quotation marks omitted).

18       The Court concludes that Wowza has not established by clear and convincing evidence that

19   the term at issue is not amenable to construction or is insolubly ambiguous.  To "accord respect to

20   the statutory presumption of patent validity," a claim can be found to be indefinite "only if

21   reasonable efforts at claim construction prove futile." Id.  Here, in light of the specification, the

22   term at issue can be construed as "a section reserved for random data in RTMP that is used in

23   estimating the available bandwidth for the session between the client and the server and is larger

24   than said cryptographic information."  This construction is based on the specification's teachings

25   with respect to the parameters of the random byte section, see, e.g., '878 patent col. 8 ll. 30-40, as

26   well the random byte section's functionality and purpose, see, e.g., id. col. 1 ll. 33-40 ("As part of

27   this handshake, RTMP included a random byte section in the communications for use in

28   estimating the available bandwidth for the session between the client and the server.").  These

United States District Court
Northern District of California

1  teachings provide sufficient information as to what portion of an RTMP network communication

2  is claimed by '878 patent, and they squarely answer the question that Wowza raised during oral

3  argument in support of its indefiniteness argument, namely "What does it mean to be reserved for

4  random data in RTMP?"  Tr. at 59-60.[6]  Additionally, the Court finds that its construction is

5  supported by the paragraphs in the specification that the examiner cited when he added the

6  limitation "in accordance with a Real Time Messaging Protocol (RTMP) random byte section" to

7  the claims.

8       The Court rejects Wowza's proposed construction, which requires that the length of the

9  random byte section be limited to a specific length of 1528 bytes, because nothing in the language

10  of the claims or in the specification limits the length of random byte section to any particular size.

11       **Thus, the Court construes the term at issue as "a section reserved for random data in**

12  **RTMP that is used in estimating the available bandwidth for the session between the client**

13  **and the server and is larger than said cryptographic information."**

14          **10.     "processing the data payload" — '287 patent claims 12, 23**

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| plain and ordinary meaning | "assembling and playing, in a player, a media presentation from the payload" |

18       **The Court construes the term as "translating, assembling, and playing the data**

19  **payload."**

20       Contrary to Adobe's argument that "nothing in the claims or specification" requires

21  limiting the term "processing" to any particular type of processing activity, the only type of

22  processing taught in the specification is the translation, assembly, and playing of received data

23  payloads.  See, e.g., '287 patent col. 2 ll. 35-50; col. 4 ll. 35-45.  "Processing" must be defined

24  based on this context.

25       That certain dependent claims recite limitations relating to "assembling" and "playing"

---

[6] During oral argument, Wowza contended that the "phrase that needs to be construed" is "reserved for random data in RTMP."  Tr. at 59-60 ("We have no clue what that means, and that's why the claim is indefinite.")

22

does not undermine this conclusion, because those dependent claims contain additional limitations that do not fall within the scope of the independent claims, such as "decrypting" the data payloads. Thus, the dependent claims are not rendered superfluous by the Court's construction.  See, e.g., '287 patent claim 17; see also SRAM Corp. v. ADII Eng'g, Inc., 465 F.3d 1351, 1358 (Fed. Cir. 2006) (restricting independent claim to use of "precision index downshifting" even though this term was present in dependent claim because additional differences existed between the independent and dependent claims).

Wowza's proposed construction imports extraneous limitations into the claim, such as "in a player'" and "a media presentation."  Wowza attempts to justify these extraneous limitations with a description of an embodiment in the specification. Wowza Mot. at 48.  Because there is no clear indication in the language of the claims that the patentee intended to limit the scope of the claims to this embodiment, Wowza's attempt to limit the claims in this manner is inappropriate. See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004)  (holding that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction") (citation and internal quotation marks omitted).

### 11.    "new media type" — '287 patent claim 13

| Adobe's proposed construction | Wowza's proposed construction |
|---|---|
| "a type associated with a new media chunk" | "a change in media type within a stream having the same chunk stream ID" |

**The Court adopts Adobe's proposed construction.**

The claims and the specification of the '287 patent make references to the "types" or "purposes" discussed above with respect to the term "new media chunk."  See, e.g., '287 patent col. 12 ll. 9-29.  These references justify Adobe's proposed construction.

During oral argument, both parties agreed that the Court's construction of this term is appropriate.  Tr. at 67-68.

United States District Court
Northern District of California

23

III.     **MOTION TO STRIKE**

Wowza moves to strike portions of the expert report of Peter Alexander ("the Alexander Report") on the ground that the report, which was served after the close of discovery, introduces three new theories of infringement that were not disclosed in Adobe's infringement contentions: (1) that WMS infringes the '878 and '287 patents when performing the RTMP Enhanced handshake in connection with h.264 streaming; (2) that WMS's infringement of the '878 and '287 patents can be established based in part on the code for Adobe's Flash Player; and (3) that WMS allegedly meets the queues limitation of the '658 patent through the use of previously undisclosed functions.

Adobe opposes the motion, arguing that each of the theories at issue was disclosed in its infringement contentions of March 15, 2012.

A.     **Standard of Review**

This district's Patent Local Rules require a party asserting infringement to disclose:

Separately for each asserted claim, *each accused apparatus*, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. *This identification shall be as specific as possible.*  Each product, device, and apparatus shall be identified by name or model number, if known.  *Each method or process shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process*

*A chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality*, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.

Whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality.

If a party claiming patent infringement wishes to preserve the right to rely, for any purpose, on the assertion that its own apparatus, product, device, process, method, act, or other instrumentality practices the claimed invention, the party shall identify, separately for each asserted claim, each such apparatus, product, device, process, method, act, or other instrumentality that incorporates or reflects that particular claim.

See Patent L.R. 3-1(b), (c), (e), and (g) (emphasis added).

The purpose of these disclosures is "to further the goal of full, timely discovery and provide all parties with adequate notice of and information with which to litigate their cases."

24

1    Genentech, Inc. v. Trustees of Univ. of Pennsylvania, Case No. 10-cv-2037, 2012 WL 424985, at

2    *2 (N.D. Cal. Feb. 9, 2012) (citation and internal quotation marks omitted).  Once served, the

3    infringement contentions constitute the universe of infringement theories.  The contentions may be

4    amended only by order of the court and upon a showing of good cause.  Patent L.R. 3-6.

5           While an expert report may rely on an "evidentiary example or complementary proof" to

6    support an infringement theory advanced in a party's infringement contentions, an expert report

7    may not advance "a new or alternate" theory of infringement.  See Genentech., 2012 WL 424985,

8    at *2.  In the context of patent infringement cases involving software, an expert cannot theorize

9    that certain functions satisfy a claim limitation, unless those functions were previously identified

10   in the party's infringement contentions. See Oracle America, Inc. v. Google, Inc., Case No. 10-cv-

11   3561, 2011 WL 4802535, at *2 (N.D. Cal. Oct. 11, 2011).

12          A district court has wide discretion in enforcing the Patent Local Rules.  See SanDisk

13   Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1292 (Fed. Cir. 2005) ("The district court's

14   application of the local rules are within its sound discretion[.]"); see also O2 Micro Int'l Ltd. V.

15   Monolithic Power Systems, Inc., 467 F.3d 1355, 1365-66 (Fed. Cir. 2006) ("Decisions enforcing

16   local rules in patent cases will be affirmed unless clearly unreasonable, arbitrary, or fanciful; based

17   on erroneous conclusions of law; clearly erroneous; or unsupported by any evidence.").

18          **B.      Analysis**

19                 **1.      RTMP Enhanced Handshake and '878 and '287 Patents**

20          Wowza argues that Adobe limited its infringement contentions with respect to the '878 and

21   '287 patents to the WMS's use of the handshake associated with RTMPe, which invoves

22   encryption.  Adobe contends that the Alexander Report allegedly "introduced into this litigation a

23   never-before-seen variation of the RTMP handshake" called "RTMP Enhanced," which does not

24   use encryption as a method of authentication, and it accused WMS of infringing these two patents

25   through the use of this handshake in connection with the authentication of h.264 communications.

26   See Wowza Mot. at 31 (citing Irwin Decl., Ex. E, Alexander Rep. ¶ 200).  Wowza contends that it

27   woud be prejudiced if the court permits this theory to go forward, because it never had an

28   opportunity to explore several defenses relating to this theory during discovery.  Accordingly,

United States District Court
Northern District of California

1   Wowza moves to strike the portions of the Alexander Report that assert this theory of

2   infringement.

3           Adobe opposes the motion, arguing that it sufficiently disclosed this theory in its

4   infringement contentions.  First, Adobe argues in a footnote in its brief that RTMPe and RTMP

5   Enhanced are actually the same thing, but it does provide any support for this statement other than

6   noting that these terms were, at times, used interchangeably by the experts who have worked on

7   the case.  Second, Adobe argues that the  "notes" section of the claim charts sufficiently informs

8   Wowza of the theory at issue, because these notes provide that: "[t]he following claim chart

9   contains exemplary references to the implementations of RTMP (including variants) in WMS,

10  including: . . . c) support for RTMP in connection with video formats, *including H.264*[.]"  See

11  Irwin Dec. Ex. K, App. A-4 at 2, A-5 at 2 (emphasis added).  Finally, Adobe also notes that

12  Wowza had sufficient notice of this theory because Wowza responded to several interrogatories

13  and deposed several witnesses about H.264 authentication.

14          The Court concludes that the theory at issue was not disclosed in the infringement

15  contentions.  The charts for the '878 and '287 patents accuse WMS of infringing these patents

16  through the "RTMPe protocol."  The contentions do not define RTMPe.  They also do not use the

17  word "enhanced" to describe any feature of WMS or the protocols that it uses.  Yet, the Alexander

18  Report states that WMS infringes the '878 and '287 patents through the use of handshakes in each

19  of the following protocols: "(1) RTMP v. 03 Legacy (corresponding to the original version); (2)

20  *RTMP* v. 03 Enhanced allowing for communication of client and server version numbers; (3)

21  *RTMPE* version 06 Encrypted."  Irwin Decl., Ex. E ¶ 189 (emphasis added).  The report describes

22  RTMP v. 03 Enhanced as the "RTMP enhanced handshake."  Id., Ex. A-3 at 1 n.1

23          Because the contentions do not mention or define RTMP v.03 Enhanced or RTMPe

24  version 06 Encrypted, it is impossible to tell whether the references to RTMPe in the contentions

25  are to RTMPe version 06 Encrypted, or RTMP v.03 Enhanced, or both.  It is reasonable to

26  assume, however, that references to RTMPe are to RTMPe version 06 Encrypted, as the claim

27  charts for the '878 patent state that WMS infringes that patent in part by "supporting an encrypted

28  session."  See id., A-4 at 7 (emphasis added).  Additionally, the WMS user guides that Adobe

United States District Court
Northern District of California

1    attached to its infringement contentions define RTMPe as "*encrypted* RTMP" or as an "*encrypted*

2    variant[] of RTMP." <u>See</u> Irwin Decl., Ex. K at WOWZA0003451 (emphasis added).

3          To the extent that Adobe sought to accuse Wowza of infringing the patents at issue through

4    the use of the RTMP Enhanced protocol, this theory should have been disclosed in its contentions,

5    either by specifically identifying RTMP Enhanced in the charts, or by stating in the contentions

6    that RTMP Enhanced is the same thing as RTMPe.  It is insufficient for Adobe to argue at this

7    stage of the litigation, particularly without pointing to any evidence, that RTMP Enhanced is

8    equivalent to RTMPe.  Adobe was required by the local rules to make that notion clear in the

9    contentions.  These rules require the patentee to describe with specificity where each limitation of

10   each asserted claim is found within each accused instrumentality.  Adobe's contentions are

11   ambiguous as to whether they accuse RTMP Enhanced of meeting any of the limitations at issue.

12   This ambiguity must be construed against Adobe in light of the purpose of the patent local rules,

13   which is to establish the universe of infringement theories that will be litigated in any given case.

14         Accordingly, Wowza's motion to strike the RTMP Enhanced theory of infringement from

15   the Alexander Report is GRANTED.[7]  <u>See</u> <u>SanDisk Corp. v. Memorex Prods., Inc.</u>, 415 F.3d

16   1278, 1292 (Fed.Cir. 2005) (finding no abuse of discretion in exclusion of evidence pertaining to

17   theories of infringement not disclosed as required by the local patent rules and the court's

18   scheduling order).

19                    **2.      Code in Adobe's Flash Player and '878 and '287 Patents**

20         Wowza argues that Adobe's infringement contentions accuse WMS of infringing the '878

21   and '287 patents by pointing exclusively to WMS source code.  Wowza contents that the

22   Alexander Report discloses a new theory of infringement with respect these patents because the

23   report relies on the code for Adobe's Flash Player to establish that WMS infringes the patents. <u>See</u>

24   _____

25   [7] Some courts in this district require a showing of prejudice as a condition to striking an expert
     report that discloses new theories in a patent case.  <u>See, e.g.</u>, <u>Genentech, Inc. v. Trustees of Univ.</u>
26   <u>of Pennsylvania</u>, Case No. 10-cv-2037, 2012 WL 424985, *3 (N.D. Cal. Feb. 9, 2012).  This Court
     declines to require a showing of prejudice in the context of motions to strike evidence based on a
27   failure to comply with the Patent Local Rules, because prejudice is inherent in the assertion of a
     new theory after discovery has closed, and because to impose such a burden would create an
28   incentive for late disclosure.

United States District Court
Northern District of California

27

1   Irwin Decl., Ex. E ¶¶ 231, 232, 243, 245, 247.

2       Adobe responds that its contentions are not deficient because they reference the

3   transmission of data between the Flash Player and WMS.  To support its argument, Adobe points

4   to language in the charts stating that WMS is configured to communicate streams in RTMPe as

5   defined in "WMS client applications."  Adobe also points to the WMS user guides that it attached

6   to its contentions, which state that data can be transmitted "between the Flash player and Wowza

7   Media Server."  Adobe Opp'n at 24 (citing Irwin Dec. Ex. K, App. A-4 at 3).  Adobe also argues

8   the Patent Local Rules do not require the party claiming patent infringement to identify every

9   piece of evidence, including source code, establishing that the accused instrumentality practices a

10  certain limitation.

11      Patent Local Rule 3-1 permits a party asserting infringement to rely on its own

12  instrumentality to prove that the accused product practices the claimed invention, so long as that

13  party identifies separately for each asserted claim any such instrumentality that incorporates or

14  reflects that particular claim.  See Patent L.R. 3-1(g).

15      Here, Adobe did not identify the Flash Player in the charts as incorporating or reflecting

16  any of the claims at issue as required by Rule 3-1(g).  In fact, the Flash Player is not mentioned at

17  all in the contentions.  Adobe argues that its contentions sufficiently disclose the Flash Player

18  because they include language stating that WMS has the capability to communicate streams to

19  "WMS client applications" and because the WMS user guides that are attached to the contentions

20  show that WMS is capable of communicating with the Flash Player.  The Court concludes that

21  neither the language nor the user guides upon which Adobe relies satisfy its obligations under

22  Patent Local Rule 3-1(g) with respect to the Flash Player.  Accordingly, Wowza's motion to strike

23  the theory at issue from the Alexander is GRANTED.[8]

24              **3.    Queues Limitation in the '658 Patent**

25      Wowza contends that the Alexander Report advances two new theories of infringement

---

[8] Because this theory was not adequately disclosed, Adobe's reliance on Oracle Am., Inc. v. Google, Inc., Case No. 10-3561, 2011 WL 4479305 (N.D. Cal. Sept. 26, 2011), is misplaced. That case holds that a party asserting infringement is not required to list in its contentions every "item of proof" supporting a particular theory of infringement if that party adequately disclosed that theory of infringement.  Id.

United States District Court
Northern District of California

1   with respect to the queue limitation of the '658 patent, namely (1) that "MediaReader

2   implementations include file reader objects which inherently use buffers to hold pieces of the

3   message stream read from the file;" and (2) that "socket implementations on the TCP protocol

4   stack implement data queues."  Wowza Mot. at 36 (citing Irwin Decl., Ex. E, A-1 at 52-53, 79-80).

5   Wowza argues that neither theory is supported by Adobe's infringement contentions because the

6   contentions do not identify the source code supporting the first theory and because they do not

7   mention the "TCP protocol stack" supporting the second theory.

8        Adobe responds that it adequately disclosed these theories in its infringement contentions

9   because the contentions expressly reference WMS's "queues for holding chunk data," "queues

10  such as the buffers associated" with particular objects, and "audio, video and data queues," among

11  others.  Adobe Opp'n at 25 (citing Irwin Decl., Ex. K at 18).

12       The Court concludes that the first theory at issue was adequately disclosed in the

13  infringement contentions, because they identify the MediaReader functionality as meeting the

14  queues limitations of the '658 patent.  See Irwin Decl., Ex. K, A-1 at 8-9, 30-31.  Because Adobe

15  adequately disclosed this theory, Adobe was not required to list every bit of WMS source code

16  that supports it.  See Oracle Am., Inc. v. Google, Inc., Case No. 10-3561, 2011 WL 4479305, at *3

17  (N.D. Cal. Sept. 26, 2011) (holding that a party that adequately discloses a theory of infringement

18  is not required to list in its contentions every "item of proof" that supports that theory).  Wowza's

19  motion to strike is DENIED with respect to this theory.

20       The Court GRANTS Wowza's motion to strike portions of the Alexander Report that

21  disclose the second theory, however, as the contentions do not identify the "TCP protocol stack"

22  as meeting the queues limitation of the '658 patent.  See, Irwin Decl., Ex. K, A-1 at 8-9, 30-31.

23  **IV.   CROSS-MOTIONS FOR SUMMARY JUDGMENT**

24       **A.   Legal Standard**

25       Summary judgment is proper when the "pleadings, depositions, answers to interrogatories,

26  and admissions on file, together with the affidavits, show that there is no genuine issue as to any

27  material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.

28  56(c).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find

United States District Court
Northern District of California

29

1   for the non-moving party, and "material" only if the fact may affect the outcome of the case.

2   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  All reasonable inferences must be

3   drawn in the light most favorable to the non-moving party.  Olsen v. Idaho State Bd. of Med., 363

4   F.3d 916, 922 (9th Cir. 2004).  These standards apply with full force to summary judgment

5   motions involving patent infringement claims.  See Union Carbide Corp. v. American Can Co.,

6   724 F.2d 1567, 1571 (Fed. Cir. 1984).

7        "A determination of patent infringement consists of two steps: (1) the court must first

8   interpret the claim, and (2) it must then compare the properly construed claims to the allegedly

9   infringing device."  Playtex Products, Inc. v. Procter & Gamble Co., 400 F.3d 901, 905-06 (Fed.

10  Cir. 2005) (citation omitted).  "To prove infringement, the patentee must show that the accused

11  device meets each claim limitation, either literally or under the doctrine of equivalents."  Playtex

12  Products, Inc. v. Procter & Gamble Co., 400 F.3d 901, 906 (Fed. Cir. 2005) (citation omitted).

13       "To support a summary judgment of noninfringement it must be shown that, on the correct

14  claim construction, no reasonable jury could have found infringement on the undisputed facts or

15  when all reasonable factual inferences are drawn in favor of the patentee."  Netword, LLC v.

16  Centraal Corp., 242 F.3d 1347, 1353 (Fed. Cir. 2001).  To survive a motion for summary

17  judgment of noninfringement, a patentee must set forth competent evidence that "features of the

18  accused product would support a finding of infringement under the claim construction adopted by

19  the court, with all reasonable inferences drawn in favor of the non-movant."  Intellectual Science

20  and Technology, Inc. v. Sony Electronics, Inc., 589 F.3d 1179, 1183 (Fed. Cir. 2009) (citations

21  omitted).  "Summary judgment of noninfringement under the doctrine of equivalents is

22  appropriate if no reasonable jury could determine two elements to be equivalent."  Goldenberg v.

23  Cytogen, Inc., 373 F.3d 1158, 1164 (Fed. Cir. 2004) (citation and internal quotation marks

24  omitted).  If expert testimony is provided by the patentee in an attempt to defeat summary

25  judgment, the testimony proffered must be supported by sufficient facts and be reasonable in light

26  of the undisputed factual record.  See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,

27  509 U.S. 209 (1993).

28

1

**B.** **Analysis**

2

**1.** **Jurisdiction Over "Dot Versions"**

3

The parties dispute whether the Court has jurisdiction over WMS version 3.0.3 (patch 12)

4

and all subsequent dot versions.  Wowza contends that the Court does have jurisdiction over these

5

products, because the infringement contentions explicitly accuse WMS version 3.0 and any of its

6

"dot versions" of infringement.  Adobe argues that the Court lacks jurisdiction because it "has

7

never asserted specific allegations of infringement against WMS v. 3.0.3 (patch 12) and all

8

subsequent versions."  Adobe Opp'n at 28.

9

The Court concludes that it has jurisdiction over the versions in question.  Adobe's

10

infringement contentions specifically accuse WMS version 3.0. "and any 'dot' versions thereof" of

11

infringing all of the patents-in-suit.[9]  See Irwin Decl., Ex. K at 4-6.  This is sufficient under our

12

Patent Local Rules to accuse of infringement all dot versions of WMS 3.0. that exist or will exist

13

until judgment is entered in this action.[10]

14

**2.** **'658 and '509 Patents (All Asserted Claims)**

15

Wowza moves for summary judgment of noninfringement with respect to each of the

16

asserted claims of the '658 and '509 patents on the ground that WMS transmits and receives

17

chunks with state-association purposes other than the four purposes claimed in the patents.  In

18

other words, rather than transmitting or receiving chunks with the four state-association purposes

19

claimed in the patents—namely "new stream" (value 0), "new media" (value 1), "new time"

20

(value 2), and "continuation" (value 3)—WMS transmits or receives chunks that have the

21

following purposes:

22

//

23

//

24

//

25

_____

26

[9] Though the charts in the contentions do not specifically map each of the claims at issue onto each

27

of the accused dot versions, Adobe explicitly stated in the contentions that source code and
materials relating to WMS 3.0.0 are representative of each of the accused WMS versions.  See
Irwin Decl., Ex. K at 7.

28

[10] This does not include versions such as 3.1 and its dot versions, 3.2 and its dot versions, etc.

| Type ID | Chunk Purpose | Description |
|---------|---------------|-------------|
| 0 | reset time | indicates a reset of the time within an old stream using an absolute time |
| 0 | new sub-stream | indicates the first chunk of a sub-stream of a stream but not the first chunk of a stream |
| 0 | adaptive bit rate switch | indicates a switch to a different bit-rate version of a stream |
| 1 | new length | indicates a new frame length without indicating a new stream, a new media type, or a new time |
| 3 | extended timestamp | includes an extended timestamp parameter rather than having no associated parameters |

See Strawn Decl. ¶ 6 and Ex. B, Strawn Rep. at 95-102 and 112.

Adobe does not dispute that WMS transmits and receives chunks with state-association purposes other than the four claimed in the patents.  Instead, it argues that the labels that Wowza has given to such purposes are "distinctions without a difference," because the purposes "reset time," "new sub-stream," and "adaptive bit rate switch" satisfy the limitations of the claimed "new stream chunk"—i.e. a chunk with value 0—as each of these chunk purposes includes "a plurality of new parameters in a corresponding one of said headers and use[] no parameters from a previous header."  See Op. Alexander Decl. ¶¶ 10-14.26.  Adobe also argues that the "new length chunk" purpose features a "plurality of new parameters in its header and us[es] at least one other parameter from a previous header," and therefore satisfies the limitations of the claimed "new media chunk"—i.e. a chunk with value 1.

Adobe's argument is unpersuasive because it assumes incorrectly that the Court has adopted its proposed constructions for the terms "new media chunk" and "new stream chunk."[11] Under the Court's constructions with respect to the relevant terms, no reasonable jury could

[11] The term "new stream" was not a disputed term and thus was not a part of the Court's claim construction order.

United States District Court
Northern District of California

1   conclude that WMS literally infringes the '658 and '509 patents, because WMS does not use the

2   four state-association purposes limitation recited in the claims.

3           Adobe contends that the "new media chunk" limitation is met by the "new length chunk,"

4   because it features a "plurality of new parameters in its header and us[es] at least one other

5   parameter from a previous header." Adobe Opp'n at 30. This argument is unpersuasive because,

6   as discussed above, a "new media" chunk requires a change in media type or format, and WMS's

7   "new length chunk" does not involve such a change.

8           Adobe also argues that WMS meets the "new media chunk" limitation because WMS

9   source code is capable of transmitting new media chunks under Wowza's construction the term.

10   This is insufficient to show that any reasonable jury would find infringement. Indeed, "[t]hat a

11   device is capable of being modified to operate in an infringing manner is not sufficient, by itself,

12   to support a finding of infringement." Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d

13   1316, 1330 (Fed. Cir. 2001). Rather, "in order to prove direct infringement, a patentee must either

14   point to specific instances of direct infringement or show that the accused device necessarily

15   infringes the patent in suit." ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd., 501 F.3d 1307,

16   1313 (Fed. Cir. 2007). Here, Adobe has not shown that that WMS necessarily transmits new

17   media chunks under the Court's construction of the term.

18           Finally, Adobe argues that WMS infringes under the doctrine of equivalents because

19   WMS's "reset time," "new substream," and "adaptive bitrate switch" purposes are value 0 chunks

20   that are not substantially different from the claimed "new stream chunk." Similarly, Adobe argues

21   that WMS's "new length" chunk is a type 1 chunk and not substantially different from the claimed

22   "new media chunk."

23           "Under this doctrine [of equivalents], a product or process that does not literally infringe

24   upon the express terms of a patent claim may nonetheless be found to infringe if there is

25   'equivalence' between the elements of the accused product or process and the claimed elements of

26   the patented invention." Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 21

27   (1997). The doctrine exists because "[t]he language in the patent claims may not capture every

28   nuance of the invention or describe with complete precision the range of its novelty. If patents

United States District Court
Northern District of California

1   were always interpreted by their literal terms, their value would be greatly diminished." Festo

2   Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 731 (2002).

3         The doctrine is not without limits, however.  One such limit is derived from prosecution

4   history estoppel, which "is a rule of patent construction that ensures that claims are interpreted by

5   reference to those that have been cancelled or rejected." Id. at 733 (citation and internal quotation

6   marks omitted).  This means that, when "the patentee originally claimed the subject matter alleged

7   to infringe but then narrowed the claim in response to a rejection, he may not argue that the

8   surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the

9   literal claims of the issued patent." Id. at 733-34 (citations omitted).  In other words, "[w]here the

10  original application once embraced the purported equivalent but the patentee narrowed his claims

11  to obtain the patent or to protect its validity, the patentee cannot assert that he lacked the words to

12  describe the subject matter in question." Id. at 734.

13        Wowza argues that prosecution history estoppel bars infringement under the doctrine of

14  equivalents because "[t]he listed four purposes and the 'consist of' language was added during

15  prosecution to gain allowance of the claim." See Wowza Mot. at 21 (citing BI Dec., Ex. G, '658

16  File History at ADOBEWOW_0000066).  The prosecution history cited by Wowza, however,

17  shows that, prior to the addition of the language at issue, the application did not "embrace" the

18  equivalent at issue, namely state-association purposes equivalent to a "new stream chunk" and a

19  "new media chunk."  Indeed, the pre-amendment application did not reference any state-

20  association purposes at all.  As such, prosecution history estoppel does not preclude the

21  application of the doctrine of equivalents to the state-association purposes at issue.

22        Thus, the determination of Wowza's motion for summary judgment of noninfringement

23  turns on whether the state-association purposes used by WMS are equivalent to any of the four

24  claimed purposes.

25        Citing the opinion of its expert, Wowza argues that the WMS state-association purposes

26  are not equivalent to the claimed purposes because "the operation of WMS is substantially

27  different than the claimed invention," as "the additional purposes provide for added flexibility . . .

28  [that] adds additional processing and complexity in WMS"  Wowza Mot. at 20 (citing Strawn

34

1    Decl.¶ 6 & Ex. B, Strawn Rep. at 106-07).  This is sufficient to meet Wowza's burden of

2    production.

3           Thus, to survive the motion for summary judgment of noninfringement, Adobe "must set

4    forth competent evidence that 'features of the accused product would support a finding of

5    infringement under the claim construction adopted by the court, with all reasonable inferences

6    drawn in favor of the non-movant.'"  Intellectual Science and Technology, Inc. v. Sony

7    Electronics, Inc., 589 F.3d 1179, 1183 (Fed. Cir. 2009) (citations omitted).  The only evidence that

8    Adobe offers to support a finding of infringement based on the doctrine of equivalents is a second

9    declaration its expert.  Dr. Alexander states, without citing any to support, that he does "not find

10   any basis for Wowza's claim that the 'other' chunk purposes are substantially different from those

11   set forth in the claims.  To the contrary, in [his] opinion, Wowza's so-called 'other' chunk

12   purposes provide no more benefit than the chunk purposes claimed in the '858 and '509 patents

13   and are not substantially different."  Alexander Decl. ¶ 9, ECF No. 405.  This conclusory

14   testimony is insufficient to defeat summary judgment.  See Telemac Cellular Corp. v. Topp

15   Telecom, Inc., 247 F.3d 1316 (Fed. Cir. 2001) ("broad conclusory statements offered by

16   Telemac's experts are not evidence and are not sufficient to establish a genuine issue of material

17   fact").

18          Accordingly, because no genuine issue of material fact exists with respect to whether

19   WMS's state-association purposes meet the state-association purposes limitation in the '658 and

20   '509 patents, either literally or under the doctrine of equivalents, Wowza's motion for summary

21   judgment of noninfringement with respect to each of the asserted claims in these patents is GRANTED, and

22   Adobe's motion for summary judgment of infringement is DENIED.

23                    **3.     The '878 Patent**

24                          **a.      Infringement through the RTMP Enhanced Handshake**

25          Wowza moves for summary judgment of noninfringement with respect to each of the

26   asserted claims of the '878 patent based on the theory that WMS infringes those claims when

27   engaging in the RTMP Enhanced Handshake.  Because the Court has striken this theory of

28   infringement, as discussed above, Wowza's motion is DENIED AS MOOT.

United States District Court
Northern District of California

35

b.      **Infringement through the RTMPe Encrypted Handshake**

i.      **Claim 1**

Claim 1 covers a method that comprises:

> *modifying interactions* in the client-server environment based at least in part on a result of the processing of the cryptographic information . . . wherein modifying interactions in the client-server environment comprises *initiating an encrypted session* using the cryptographic key *or turning on or off a feature* of a program operating in the client-server environment . . .

Wowza moves for summary judgment with respect to claim 1 on the ground that WMS does not "modif[y] interactions in the client-server environment" when performing the RTMP handshake.  First, Wowza contends that WMS does not modify interactions by "initiating an encrypted session limitation" because WMS never initiates a session, encrypted or otherwise, and because it has no control over whether a session is encrypted.  Wowza contends that the client, not WMS, must initiate a session and must determine whether that session is encrypted. Second, Wowza contends that WMS does not turn any features on or off, either literally or under the doctrine of equivalents. Mot. at 41, 45 (citing Strawn Dec. at ¶ 6 & Strawn Report at 175-85).

Adobe opposes the motion, arguing that genuine issues of material fact exist as to whether WMS meets the limitation at issue because (1) WMS initiates the encrypted session after the handshake is complete, which is what the claim language requires, Adobe Opp'n at 37 (citing Op. Alexander Dec., Ex. A, A-3 at 31); and (2) WMS turns a feature on or off when it ceases to stream data to the client after the client terminates the communication (citing Alexander Opposition Decl. ¶ 13).

The Court concludes that Wowza has not shown that no reasonable jury could find that WMS meets the "initiating an encrypted session" limitation.  See Netword, LLC v. Centraal Corp., 242 F.3d 1347, 1353 (Fed. Cir. 2001) ("To support a summary judgment of noninfringement it must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee.").

The parties dispute whether "initiating an encrypted session" refers to the act that begins a client-server communication, as Wowza contends, or whether it refers to the act that is performed

during the course of the client-server communication and only after the cryptographic information has been processed, as Adobe argues.  The Court concludes that "initiating an encrypted session" constitutes establishing an encrypted session during the course of an established client-server communication, but only after processing the cryptographic information and determining that the client seeks to establish an encrypted session.  See '878 patent col. 9 ll 1-5 & Fig. 5.  Here, Wowza's expert has admitted that WMS "set[s] up" an encrypted session with the client once it has completed the handshake.  See Hatch Decl., Strawn Dep. at 230-31, ECF No. 409 (testifying that "the server does its best to set up an encrypted session with the client, and if that is successful, then it's my understanding that the *stream sent by the server will be encrypted*") (emphasis added); see also Strawn Report at 175, 180 ("WMS checks to see if the version sent by the client is set to 0x06.  If the version number is set to 0x06, the session is an encrypted session and the "isEncrypted" variable is set to true.").  In light of this evidence, a genuine issue of material fact exists with respect to whether WMS initiates an encrypted session as construed by the Court.

The Court need not reach the parties' dispute with respect to the second phrase, because Adobe never accused WMS of meeting the "modifying interactions" limitation in claim 1 by "turning on or off a feature of a program."  See Irwin Decl., Ex. K, A-4 at 7 (stating that WMS meets the "modifying interactions" limitation because "WMS implements a method for initiating an encrypted session using the cryptographic key").  As such, this theory is not at issue in this action.

Wowza's summary judgment motion of noninfringement is therefore DENIED.

### ii.      Claims 15 and 17

Wowza moves for summary judgment of noninfringement, and Adoe moves for summary judgment of infringement, with respect to claims 15 and 17 of the '878 patent.  Wowza's motion is based on the same arguments it raised with respect to claim 1, namely that WMS does not "initiate a session" or "turn on or off a feature."

Because the Court has concluded that a genuine issue of material fact exists with respect to whether WMS initiates an encrypted session, the cross-motions for summary judgment are DENIED.

1    The Court need not reach the parties' dispute with respect to whether WMS turns on or off

2    a feature, because Adobe never accused WMS of meeting the "modifying interactions" limitation

3    in claims 15 or 17 by "turning on or off a feature of a program."  See Irwin Decl., Ex. K, A-4 at

4    32, 36-37 (stating that WMS meets the "modifying interactions" limitation because "WMS

5    implements a method for initiating an encrypted session using the cryptographic key").  This

6    theory is not at issue in this action.

7                    **4.      The '287 Patent (All Asserted Claims)**

8    Wowza moves for summary judgment of noninfringement with respect to each of the

9    asserted claims in the '287 patent on the grounds that (1) WMS does not meet the "processing the

10   data payload" limitation because the WMS is a server, not a player, and (2) WMS does not initiate

11   an encrypted session.

12   Adobe opposes the motion and also moves for summary judgment on all of the asserted

13   claims of the '287 patent.  It argues that WMS meets the "processing the data payload" limitation

14   under the doctrine of equivalents by "acting as a player" and receiving media streams,

15   reformatting those streams, and delivering them in viewable formats to other, downstream players.

16   Adobe Opp'n at 39.

17   Under the Court's construction of "processing the data payload," namely "translating,

18   assembling, and playing the data payload," a genuine issue of material fact exists with respect to

19   whether WMS satisfies that limitation, as the supported testimony of Adobe's expert shows that

20   WMS "can act as a client" by "reformatting RTMP media streams and delivering the reformatted

21   streams . . . in viewable formats" to downstream clients.  Irwin Decl., Ex. E, Alexander Report,

22   Ex. A, A-4 at 31.  Additionally, as discussed in the previous section, a genuine issue of material

23   fact exists with respect to whether WMS initiates an encrypted session.  Accordingly, the cross-

24   motions for summary judgment with respect to the '287 patent are DENIED.[12]

25   //

26

27   _____
     [12] To the extent that Adobe's theory of infringement with respect to the ''287 patent is based on
     RTMP Enhanced, the cross-motions are DENIED AS MOOT, as the Court has stricken this theory
28   of infringement.

United States District Court
Northern District of California

V.    **CONCLUSION**

1.    The Court construes the eleven disputed terms as follows:

| Disputed term | Construction |
|---|---|
| "priority-based" | "rank-based" |
| "consists of" | "includes the following, and only the following" |
| "new media chunk" | "a chunk of a media message sub-stream that is of a different media format than the media format of the immediately preceding chunk with the same chunk stream ID" |
| "new time chunk" | "a chunk of a media message sub-stream that is of a different time than the time of the immediately preceding chunk with the same chunk stream ID" |
| "communicating" | "transmitting" |
| "scheduling algorithm" | "an algorithm for prioritizing data to transmit" |
| "transmitting ones of said plurality of [. . .] chunks" | "transmitting whole individual or multiple whole chunks of said plurality of [. . .] chunks" |
| "reserved for random data" | "reserved for data that is random or pseudo random, where pseudo random data is not composed of all zeros" |

| Disputed term | Construction |
|---|---|
| "reserved for random data in accordance with a Real Time Messaging Protocol (RTMP) random byte section" | "a section reserved for random data in RTMP that is used in estimating the available bandwidth for the session between the client and the server and is larger than said cryptographic information" |
| "processing the data payload" | "translating, assembling, and playing the data payload" |
| "new media type" | "a type associated with a new media chunk" |

2. Wowza's motion for summary judgment of noninfringement with respect to each of the asserted claims of the '658 patent and the '509 patent is GRANTED, and Adobe's cross-motion for summary judgment of infringement is DENIED.

3. Wowza's motion for summary judgment of noninfringement with respect to claim 1 of the '878 patent is DENIED.

4. The parties' cross-motions for summary judgment with respect to claims 15 and 17 of the '878 patent are DENIED.

5. The parties' cross-motions for summary judgment with respect the '287 patent are DENIED.

6. Because Adobe's motions for summary judgment of direct infringement have been denied, its motions for summary judgment of inducement of infringement and contributory infringement with respect to the patents-in-suit also are DENIED.

7. Wowza's motion to strike portions of the Alexander Report is GRANTED IN PART and DENIED IN PART, as described above.

**IT IS SO ORDERED.**

Dated: February 22, 2014



_____
JON S. TIGAR
United States District Judge