Diana Chang (Bar No. 287624)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

Brent P. Ray (*pro hac vice*)
Greg Polins (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Barry F. Irwin, P.C. (*pro hac vice*)
Irwin IP LLC
1333 Burr Ridge Pkwy, Suite 200
Burr Ridge, Illinois 60527
Telephone:    (630) 756-3101
Facsimile:    (630) 756-3100

Attorneys for Defendants
WOWZA MEDIA SYSTEMS, LLC, and
COFFEE CUP PARTNERS, INC.
(f/k/a WOWZA MEDIA SYSTEMS, INC.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ADOBE SYSTEMS INC., a Delaware Corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>WOWZA MEDIA SYSTEMS, LLC, and COFFEE CUP PARTNERS, INC. (f/k/a WOWZA MEDIA SYSTEMS, INC.)<br><br>                    Defendants. | CASE NO. 11-cv-02243-JST<br><br>**WOWZA'S SECOND SUMMARY JUDGMENT AND DAUBERT MOTIONS**<br><br>Judge:         Honorable Jon S. Tigar<br>Courtroom:   9 (19th Floor)<br>Date:          October 30, 2014<br>Time:          2:00 p.m. |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION.................................................................................................1

II.  LEGAL STANDARDS ..........................................................................................2

    A.   Summary Judgment .................................................................................2

    B.   Patent Infringement..................................................................................3

    C.   Indefiniteness ...........................................................................................4

    D.   Willful Infringement ................................................................................4

    E.   Lanham Act Claims ..................................................................................5

    F.   *Daubert* Motions ....................................................................................5

III. ARGUMENT ........................................................................................................6

    A.   Wowza Media Server Does Not Infringe Any Asserted Claims of the '878
        Patent When Engaging In The RTMPe Handshake................................6

        1.   The RTMPe Handshake ................................................................7

        2.   WMS Does Not Receive A Random Byte Section Used To
            Estimate Bandwidth .....................................................................8

        3.   WMS Does Not Transmit Random Byte Sections Used To
            Estimate Bandwidth .....................................................................9

        4.   Adobe Cannot Establish That Wowza Exercised Control Over
            Adobe or its Flash Player. ...........................................................10

    B.   The Claim Term "Reserved for Random Data in Accordance with a Real
        Time Messaging Protocol (RTMP) Random Byte Section" Is Indefinite ............11

    C.   Adobe Cannot Establish Willful Infringement .....................................12

    D.   Adobe Cannot Prove Its Section 1125(a) Lanham Act Claims ............14

        1.   According to Adobe's Own Witnesses, Adobe is Unaware of Any
            Customer Actually Misled By Wowza ......................................14

        2.   There is No Evidence That Any Allegedly Misleading Wowza
            Commercial Advertising Claim Regarding RTMPe Was Material
            to Consumers' Purchasing Decisions........................................15

3. The Klein Surveys Provide No Evidence That Consumers Were Misled or Deceived by—Nor That Adobe Was Damaged By—Any Commercial Advertising Statement of Wowza ..........................................17

E. Adobe's California Common Law and California Statutory Claims Do Not Survive Summary Judgment ..................................................................21

F. The Bakewell Reports Are Unreliable and Should be Excluded ...........................21

1. Bakewell Used an Unreliable Measure of RTMPe Usage .........................21

2. Mr. Bakewell Failed to Apportion the Claimed Inventions of the Handshake Patents ..................................................................................24

IV. CONCLUSION ..................................................................................................**25**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anascape, Ltd. v. Microsoft Corp.,*
2008 WL 7182476 (E.D. Tex. Apr. 25, 2008) ........................................................... 13

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...................................................................................................... 2

*Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.,*
2010 WL 668039 (N.D. Cal. Feb. 19, 2010) ............................................................ 13

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ...................................................................................................... 2

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,*
174 F.3d 1036 (9th Cir. 1999) ..................................................................................... 5

*Cairns v. Franklin Mint,*
292 F.3d 1139 (9th Cir. 2002) .................................................................................... 21

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...................................................................................................... 2

*Centillion Data Sys., LLC v. Qwest Comm'ns Int'l Inc.,*
631 F.3d 1279 (Fed. Cir. 2011) ................................................................................... 3

*Clearly v. News Corp.,*
30 F.3d 1255 (9th Cir. 1994) ..................................................................................... 21

*Cornell Univ. v. Hewlett-Packard Co,*
609 F. Supp.2d 279 (N.D.N.Y. 2009) ....................................................................... 25

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
424 F.3d 1293 (Fed. Cir. 2005) ................................................................................... 3

*DataQuill Ltd. v. High Tech Computer Corp.,*
887 F. Supp. 2d 999 (S.D. Cal. 2011) ...................................................................... 13

*Daubert v. Merrell Dow Pharms, Inc.,*
43 F.3d 1311 (9th Cir. 1995) ....................................................................................... 5

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ...................................................................................................... 5

*Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.,*
347 F.3d 1314 (Fed. Cir. 2003) ................................................................................... 3

*Digital Reg. of Tex. v. Adobe Sys.*,
    2014 U.S. Dist. LEXIS 115565 (N.D. Cal. Aug. 19, 2014)..............................................6

*DSU Med. Corp. v. JMS Co.*,
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) ..........................................................................6

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
    363 F.3d 1263 (Fed. Cir. 2004)......................................................................................3

*Emblaze Ltd. v. Apple Inc.*,
    2014 U.S. Dist. LEXIS 57893 (N.D. Cal. Apr. 24, 2014) ........................................4, 13

*Everyscape, Inc. v. Adobe Systems, Inc.*,
    2014 U.S. Dist. LEXIS 119467 (D. Mass. Aug. 27, 2014) ...........................................13

*Fractus, S.A. v. Samsung*,
    2011 WL 7563820 (E.D. Tex. April 29, 2011)..............................................................25

*Fujitsu Ltd. v. Belkin Int'l*,
    2012 U.S. Dist. LEXIS 174271 (N.D. Cal. Dec. 7, 2012).............................................22

*Hansen v. United States*,
    7 F.3d 137 (9th Cir. 1993) ..............................................................................................2

*HTC Corp. v. Tech. Props. Ltd.*,
    2013 WL 5225043 (N.D. Cal. Sep. 17, 2013) ..............................................................13

*In re Century 21-RE/MAX Real Estate Adver. Claims Litig.*,
    882 F. Supp 915 (C.D. Cal. 1994) ...................................................................................5

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007)........................................................................................4

*Intellect Wireless, Inc. v. Sharp Corp.*,
    2012 WL 787051 (N.D. Ill. Mar. 9, 2012)........................................................................3

*Intellectual Science v. Sony Elec.*,
    589 F.3d 1179 (Fed. Cir. 2009)........................................................................................3

*Inv. Tech. Grp., Inc. v. Liquidnet Holdings, Inc.*,
    759 F. Supp. 2d 387 (S.D.N.Y. 2010).............................................................................13

*Joao Control & Monitoring Sys. of California, LLC v. Sling Media, Inc.*,
    2012 WL 3249510 (N.D. Cal. August 7, 2012)................................................................3

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).........................................................................................................5

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
    2014 WL 572290 (N.D. Cal. Feb. 11, 2014) .........................................................passim

*Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*,
    2014 WL 683827 (C.D. Cal. Feb. 20, 2014)................................................................. 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014)............................................................................................... 5, 14

*LML Holdings, Inc. v. Pac. Coast Distrib. Inc.*,
    2012 WL 1965878 (N.D. Cal. May 30, 2012) ................................................................ 12

*Minitube of Am., Inc. v. Reprod. Provisions, LLC*,
    2014 WL 1761317 (E.D. Wis. May 1, 2014)................................................................. 14

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008)...................................................................................... 3

*Nautilus v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ................................................................................ 1, 4, 11, 12

*Pixion, Inc. v. Citrix Sys., Inc.*,
    887 F. Supp. 2d 881 (N.D. Cal. 2012) ........................................................................... 3

*Procter & Gamble Co. v. Ultreo, Inc.*,
    574 F. Supp. 2d 339 (S.D.N.Y. 2008) .......................................................................... 20

*Procter & Gamble, Co. v. McNeil-PPC, Inc.*,
    615 F. Supp. 2d 832 (W.D. Wis. 2009) ........................................................................ 22

*Reinsdorf v. Skechers U.S.A.*,
    922 F. Supp. 2d 866 (C.D. Cal. 2013) ............................................................. 6, 18, 20, 24

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)..................................................................................... 24

*Robocast, Inc., v. Microsoft Corp.*,
    2014 WL 688644 (D. Del. Feb. 21, 2014) .................................................................... 13

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)...................................................................... 5, 6, 24, 25

*Zelinski v. Brunswick Corp.*,
    185 F.3d 1311 (Fed. Cir. 1999).................................................................................... 3

**STATUTES**

35 U.S.C. § 112 ............................................................................................................. 4

35 U.S.C. § 285 ............................................................................................................. 2

California Business and Professions Code Section 17200 ....................................................... 21

California Business and Professions Code Section 17500 ......................................................... 21

**OTHER AUTHORITIES**

*Reference Guide on Survey Research*,
      (3rd ed. 2011) ........................................................................................................... 18

**RULES**

Fed R. Evid. 702 ...................................................................................................................... 5

Fed. R. Civ. P. 56(c) ................................................................................................................. 2

Fed. R. Evid. 703 ...................................................................................................................... 23

# I.    INTRODUCTION

On February 23, 2014, this Court issued its Order construing claim terms and deciding summary judgment motions related to Adobe's claims of infringement.  *See* Dkt. No. 442 ("the Order").  In the Order, this Court construed the phrase "reserved for random data in accordance with a Real Time Messaging Protocol (RTMP) random byte section" ("RTMP Term") of U.S. Patent No. 7,961,878 ("the '878 patent") to mean "a section reserved for random data in RTMP that is **used in estimating the available bandwidth** for the session between the client and the server and is larger than said cryptographic information." *Id.* at 22.  The Court construed the RTMP Term in a manner proposed by neither Adobe, Wowza, nor their experts, and prior to the Supreme Court's decision in *Nautilus v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).  *See* Dkt. No. 449 at 3; Dkt. No. 462 at 3.  As such, in the July 1, 2014 Case Management Order ("CMO"), *see* Dkt. No. 464, the Court authorized Wowza to renew its motions for summary judgment that the '878 patent is not infringed and that it is indefinite.

Regarding non-infringement, a careful analysis of Adobe's own expert report establishes that there is no evidence that the Wowza Media Server ("WMS") transmits or receives a random data section containing cryptographic information that is used to estimate bandwidth.  As such, the '878 patent is not infringed.

Regarding indefiniteness, there is no evidence in the record that a person of ordinary skill in the art would have, with reasonable certainty, construed the RTMP Term to mean "a section reserved for random data in RTMP that is used in estimating the available bandwidth for the session between the client and the server and is larger than said cryptographic information."  To the contrary, the only evidence in the record is that persons of ordinary skill in the art would not have known how to construe the term, or concluded it had some other amorphous, non-sensical meaning.  As such, the '878 patent is indefinite.

The CMO also set the deadline for the parties to file a combined summary judgment and *Daubert* motion as to issues other than infringement.  *Id.*  Wowza hereby moves for summary

judgment on Adobe's willful infringement claim,[1] and Adobe's false advertising and unfair competition claims. Regarding willfulness, Wowza learned of the '878 and '287 patents when Adobe sought leave to amend its Complaint to assert those patents. As such, Wowza cannot be liable for willful infringement. Regarding Adobe's false advertising and unfair competition claims, Adobe has no evidence that any Wowza customer relied upon any allegedly false or deceptive Wowza statement to purchase a Wowza product to the exclusion of Adobe's product.

Wowza also moves to preclude proffered testimony of Adobe's experts Robert Klein ("Klein") and Christopher Bakewell ("Bakewell") as inadmissible under *Daubert*. Klein presents two inadmissible surveys. One surveys the wrong people, and fails to properly replicate market conditions. The other also surveys the wrong people, and asks the wrong questions. Bakewell purports to calculate Adobe's damages, but he relies upon fundamentally flawed inputs, rendering his methodology unreliable and his results irrelevant.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when the record demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). After the moving party demonstrates the basis for its motion and the absence of a genuine issue of material fact, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A failure by the nonmoving party to carry the burden on an essential element of a claim mandates summary judgment in favor of the moving party. *Celotex*, 477 U.S. at 325.

"When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993). Further, a naked opinion from an expert does not create a genuine dispute of fact. *See* Order at 30 (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco*

---

[1] Upon a finding of willfulness, the Court has discretion under 35 U.S.C. § 285 to enhance damages up to three times the amount awarded or assessed.

*Corp.*, 509 U.S. 209, 242 (1993) (granting judgment as a matter of law because an opposing expert's opinion was "not supported by sufficient facts to validate it")); *see also Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) (granting summary judgment where plaintiff "simply [framed] the expert's conclusion as an assertion that a particular critical claim limitation [was] found in the accused device."); *Intellectual Science v. Sony Elec.,* 589 F.3d 1179, 1184-86 (Fed. Cir. 2009) (granting summary judgment where expert's statement "does not pinpoint where elements are found in the accused devices"); *Pixion, Inc. v. Citrix Sys., Inc.*, 887 F. Supp. 2d 881 (N.D. Cal. 2012) (similar).

## B.     Patent Infringement

Determination of infringement requires a two-step analysis: (1) claim construction to determine the scope and meaning of the asserted claims, and (2) a determination of whether the properly construed claims encompass the accused device.  *See Zelinski v. Brunswick Corp.*, 185 F.3d 1311 (Fed. Cir. 1999).  "To prove infringement, the patentee must show that *the accused device* meets each claim limitation."  *See Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003).

The actions or products of multiple parties cannot be combined to establish the existence of every element unless "one party exercises 'control or direction' over the entire process such that *every step is attributable to the controlling party*."  *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d 1318, 1329 (Fed. Cir. 2008) (citation omitted) (emphasis added); *see also Centillion Data Sys., LLC v. Qwest Comm'ns Int'l Inc.,* 631 F.3d 1279, 1286–87 (Fed. Cir. 2011) (no infringement of a system where accused infringer did not direct" or "control the customers' personal computer); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310–11 (Fed. Cir. 2005) (no infringement where accused infringer did not direct or control completion of claimed system by its customers); *Joao Control & Monitoring Sys. of California, LLC v. Sling Media, Inc.*, 2012 WL 3249510 at *6-8 (N.D. Cal. August 7, 2012) (no infringement of a claimed system where accused infringer did not direct or control its customer's use of personal computers); *Intellect Wireless, Inc. v. Sharp Corp.*, 2012 WL 787051 at *9 (N.D.

1    Ill. Mar. 9, 2012) (no infringement where the accused infringer "only suppl[ied] devices capable

2    of being coupled to a message center," and did "not supply, control, or use the message center").

3         **C.**      **Indefiniteness**

4       Under 35 U.S.C. § 112, claims are indefinite if they do not, when read in light of the

5    specification, reasonably apprise a person of ordinary skill in the art of the patent applicant's

6    intended scope of the invention. "[A] patent must be precise enough to afford *clear notice* of

7    what is claimed, thereby 'apprising the public of what is still open to them.'" *Nautilus*, 134 S.

8    Ct. at 2129 (emphasis added) (citation omitted). "[T]he definiteness inquiry trains on the

9    understanding of the skilled artisan at the time of the patent application." *Id.* at 2130.

10        **D.**      **Willful Infringement**

11       "[T]o establish willful infringement, a patentee must show by clear and convincing evidence

12    that the infringer acted despite an objectively high likelihood that its actions constituted

13    infringement of a valid patent." *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007).

14    "Objective recklessness . . . is a purely legal question to be determined by the judge." *Emblaze*

15    *Ltd. v. Apple Inc.,* 2014 U.S. Dist. LEXIS 57893 at *55 (N.D. Cal. Apr. 24, 2014) (granting

16    summary judgment on the issue of willfulness).[2]   Willfulness is evaluated in light of

17    "objectively-defined risk" of infringement. *Emblaze*, 2014 U.S. Dist. LEXIS 57893 at *17.

18       "[I]n ordinary circumstances, willfulness will depend on an infringer's prelitigation conduct."

19    *Seagate,* 497 F.3d at 1374. "[W]hen an accused infringer's post-filing conduct is reckless, a

20    patentee can move for a preliminary injunction, which generally provides an adequate remedy

21    for combating post-filing willful infringement." *Id.* "A patentee who does not attempt to stop an

22    accused infringer's activities in this manner should not be allowed to accrue enhanced damages

23    based solely on the infringer's post-filing conduct." *Id.*

24

25

26

27    ――――――――――
     [2] If the patentee shows objective recklessness by clear and convincing evidence, the patentee must also show that the alleged infringer either knew, or should have known, there was a high likelihood its actions constituted

28      infringement. *Seagate,* 497 F.3d at 1371.

1

### E.    Lanham Act Claims

2     False advertising[3] under Section 1125(a) of the Lanham Act requires a plaintiff to prove:

3 (1) the defendant made a false or misleading statement of fact in a commercial advertisement

4 about a product; (2) the statement either deceived or had capacity to deceive the potential

5 consumer; (3) **the deception is material or likely to influence purchase**; (4) the product is in

6 interstate commerce; and (5) the **plaintiff has been injured as result of that statement**.

7 *In re Century 21-RE/MAX Real Estate Adver. Claims Litig.*, 882 F. Supp 915, 924-25 (C.D. Cal.

8 1994) (granting summary judgment for one defendant when no evidence of injury or likelihood

9 of injury).

10     The United States Supreme Court recently clarified in *Lexmark Int'l, Inc. v. Static Control*

11 *Components, Inc.* that in a false advertising action, "a plaintiff must plead (***and ultimately prove***)

12 an injury to a commercial interest in sales or business reputation proximately **caused by the**

13 **defendant's misrepresentations**." 134 S. Ct. 1377, 1395 (2014) (emphasis added).

14

### F.    *Daubert* Motions

15     Federal Rule of Evidence 702 requires that expert testimony be relevant and reliable.  To be

16 reliable, it must (1) be based upon sufficient facts or data; (2) the product of reliable principles

17 and methods; and (3) apply the principles and methods reliably to the facts. FED R. EVID. 702.

18 The Court has a basic "gatekeeping" obligation to ensure that expert testimony is reliable and

19 "tied to the relevant facts and circumstances of the particular case."  *Daubert v. Merrell Dow*

20 *Pharms., Inc.*, 509 U.S. 579, 589, 591 (1993); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d

21 1292, 1318 (Fed. Cir. 2011); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)

22 (extending *Daubert* to all expert testimony).  The proponent of expert testimony bears the burden

23 of showing reliability and relevance.  *Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311, 1319

24 (9th Cir. 1995).

25

26
---
[3] Section 1125(a) creates two distinct bases of liability: (1) false association and (2) false advertising.  A false
27 association claim requires proof that the defendant's use of a mark, which is similar to a valid and protectable
trademark of plaintiff, confuses customers as to the sponsorship or approval of the product.  *Brookfield*
28 *Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 and n.6 (9th Cir. 1999).  Adobe has not
alleged or shown that Wowza has used a mark in a manner that is likely to cause consumer confusion.

1   Regarding survey evidence, this Court has applied the following factors to determine
2   admissibility: "whether: (1) the proper universe was examined and the representative sample was
3   drawn from that universe; (2) the survey's methodology and execution were in accordance with
4   generally accepted standards of objective procedure and statistics in the field of such surveys;
5   (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and
6   (5) persons conducting the survey were recognized experts." *Kwan Software Eng'g, Inc. v.*
7   *Foray Techs., LLC*, 2014 WL 572290 at *11–12 (N.D. Cal. Feb. 11, 2014) (citations omitted)
8   (granting summary judgment for defendant where survey excluded for failure to survey proper
9   universe of potential purchasers and replicate marketplace conditions). When the proffered
10  survey evidence is irrelevant, fails to survey the proper universe, or fails to replicate actual
11  marketplace conditions, that burden is not met and the survey report and testimony are
12  inadmissible. *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013)
13  (excluding survey evidence as unreliable and irrelevant when improper universe of respondents
14  surveyed).

15      An expert's damages report may be excluded if that report is based on a flawed foundational
16  assumption. *See, e.g., Uniloc,* 632 F.3d at 1317 (rejecting opinion based upon unsupported Rule
17  of Thumb); *DSU Med. Corp. v. JMS Co.,* 296 F. Supp. 2d 1140, 1156–59 (N.D. Cal. 2003)
18  (rejecting testimony where expert improperly assumed a hypothetical contract between the
19  parties); *Digital Reg. of Tex. v. Adobe Sys.*, 2014 U.S. Dist. LEXIS 115565 at *4-15 (N.D. Cal.
20  Aug. 19, 2014) (excluding testimony because expert improperly assumed a fifty-fifty share of
21  saved profits and used the entire value of the profits as the royalty base).

22  **III.      ARGUMENT**

23          **A.    Wowza Media Server Does Not Infringe Any Asserted Claims of the '878
                    Patent When Engaging In The RTMPe Handshake**

24      Adobe alleges WMS infringed independent claims 1, 15, and 17 of the '878 patent. Dkt. No.
25  324. All three asserted claims require interacting with a pre-defined portion of a network
26  communication "reserved for random data in accordance with a Real Time Message Protocol
27  (RTMP) random byte section." *See* Irwin Dec., Ex. A, '878 Patent at 11:38–43, 13:42–14:4, and

28

14:23–35.[4] But the nature of interaction in claim 1 differs from claims 15/17. Claim 1 requires "**receiving** cryptographic information inserted into" the pre-defined portion. *Id.* at 11:38–43. Claims 15/17 requires "**inserting** cryptographic information into" the pre-defined portion. *Id.* at 13:42–14:4, 14:23–35.

The Court construed the phrase "reserved for random data in accordance with a Real Time Message Protocol (RTMP) random byte section" to mean "a section reserved for random data in RTMP **that is used in estimating the available bandwidth** for the session between the client and the server and is larger than said cryptographic information." Order at 22 (emphasis added). To infringe claim 1, then, WMS must *receive* cryptographic information in a random data section used to estimate bandwidth.[5] *See id.*; Ex. A at 11:38-43. And to infringe claims 15 and 17, WMS must *insert* cryptographic information in a random data section used to estimate bandwidth. *See* Order at 22; Ex. A at 13:43-48, 14:23-28. But Adobe's expert fails to provide any factual support for his conclusory allegations that WMS meets these limitations. In fact, WMS does not. Strawn Dec., Ex. A, Strawn Supp. Rpt. at 10-13 (claim 1), 13-16 (claims 15 and 17).

### 1. The RTMPe Handshake



---

[4] Unless otherwise indicated, exhibits are hereinafter from the Irwin Declaration.

[5] For ease of reading, throughout this brief Wowza uses the phrase "estimate bandwidth" to mean "estimate the available bandwidth between the server and the client."

[6] In its Order, this Court precluded Adobe from asserting infringement based upon the so-called RTMP Enhanced handshake. *See* Order at 24–27. No cryptographic information is exchanged in the RTMP handshake. Therefore, the only handshake that is relevant to this analysis is the RTMPe handshake. Nevertheless, Adobe's expert, in his supplemental report, does not describe the RTMPe handshake. (Strawn Dec., Ex. A, Strawn Supp. Rpt. at 7-8). Even accepting the description provided by Adobe's expert, however, there is no infringement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18         **2.**      **WMS Does Not Receive A Random Byte Section Used To Estimate**
                      **Bandwidth**

19       For claim 1 (receiving cryptographic information in a random byte section used to estimate

20 bandwidth), Adobe's expert asserts that WMS infringes because the Adobe Flash Player

21 allegedly

22

23

24

25

26

27                                      In essence, Adobe's expert asserts that

28



Therefore, WMS does not receive cryptographic information in a random byte section that is used for bandwidth estimation, and does not infringe claim 1 of the '878 patent. *Id*. at 13.

**3. WMS Does Not Transmit Random Byte Sections Used To Estimate Bandwidth**

For claims 15 and 17 (inserting cryptographic information in a random byte section used for bandwidth estimation), Adobe's expert asserts the

1 ███████████████████████████ Ex. B at ¶¶ 26–27. Further, Adobe's expert asserts

2 ████████████████████████████████████████████

3 ██████████████████████ █████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████ ███████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ██████████

12     The Court's construction requires Adobe to show WMS inserts cryptographic information

13 into "a section reserved for random data in RTMP **that is used** in estimating" bandwidth, not

14 merely "available" for estimating bandwidth. Because Adobe never shows WMS uses the

15 "available" value to estimate bandwidth, there is no genuine dispute that WMS does not infringe

16 claim 15 or 17 of the '878 patent. *Id.* at 16.

17             **4.**      **Adobe Cannot Establish That Wowza Exercised Control Over Adobe or its Flash Player.**

18     As is evident from above, even Adobe's meritless infringement contentions rely *exclusively*

19 upon the Adobe Flash Player performing bandwidth estimation calculations. In fact, Adobe's

20 expert fails to cite a single line of WMS source code to allege WMS meets the "bandwidth

21 estimation" portion of this Court's construction. Ex. B at 13–19 (alleging WMS infringes the

22 ████████████████████████████████████████████

23 ███████████████████████ However, Wowza does not exercise control over Adobe or the Adobe

24 Flash Player, nor does it provide direction to Adobe or the Adobe Flash Player █████████

25 ████████████████████████ Strawn Dec., Ex. A, Strawn Supp. Rpt. at 16-17.

26 Having failed to show that Wowza itself performs all the steps of the '878 Patent, and given that

27 Wowza does not control or provide direction over the entire process, Wowza cannot be found

28

1    liable for infringement. *See supra, Section II.B.*

2           **B.    The Claim Term "Reserved for Random Data in Accordance with a Real
                    Time Messaging Protocol (RTMP) Random Byte Section" Is Indefinite**

3           In *Nautilus*, the Supreme Court found that, to be definite, patent claims, when read in light of

4    the patent specification and prosecution history, must "inform, with **reasonable certainty**, those

5    skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124 (emphasis

6    added). It "cannot be sufficient that a court can ascribe *some* meaning to a patent's claims" and

7    the "reasonable certainty" standard ensures patents are precise enough "to afford **clear notice** of

8    what is claimed." *Id.* at 2129-30.

9           The claim construction history of the RTMP Term illustrates that it fails to inform, with

10   reasonable certainty, those skilled in the art about the scope of the invention. No less than *six*

11   constructions have been proposed for this term – at least *four different constructions by Adobe*

12   and its experts, as shown in the following table:

13

| Construction | Source |
| --- | --- |
| a section reserved for random data in RTMP | Adobe's Proposed Construction. *See* Order at 19. |
| a section with random data large enough to hold cryptographic information | Adobe's Expert's First Construction. *See* Dkt. No. 341-6 at 181. |
| the algorithmic structure used to locate cryptographic information as disclosed in the '878 patent[7] | Adobe's Expert's Deposition Construction. *See* Dkt. No. 341-5, A-3 at 11. |
| indefinite or Real Time Messaging Protocol (RTMP) random byte section is the portion of a RTMP handshake that contains 1528 bytes of random data | Wowza's Proposed Construction. *See* Order at 19. |
| a section reserved for random data in RTMP that is used in estimating that available bandwidth for the session between the client and the server and is larger than said cryptographic information | The Court's Construction. *See* Order at 22. |
| a section reserved for random data in RTMP for use in estimating the available bandwidth for the session between the client and the server | Adobe's Reconsideration Construction. *See* Dkt. No. 447 at 7-8. |

25   This history of construction is persuasive evidence that there is no reasonably certain meaning

26   for this claim term.

27

28   ───────────────
     [7] This assertion is highly illogical because the method for detecting where cryptographic information was inserted
          into a preexisting section cannot defined the preexisting section.

1    Further there is no evidence establishing that a person of ordinary skill in the art would have

2    been reasonably certain that the RTMP Term had the meaning ascribed to it by the Court.

3    Indeed, because neither party anticipated the Court's construction, new expert reports on

4    infringement and validity were requested by both parties and allowed by the Court. Dkt. Nos.

5    449 at 3, 462 at 3, 464.  There is also significant evidence in the record establishing that a person

6    of ordinary skill in the art would not have been reasonably certain that the RTMP Term had the

7    meaning ascribed to it by this Court.  Wowza's experts each stated that they were uncertain as to

8    what the RTMP term meant.  Dkt. No. 342, June 21, 2013 Strawn Dec. at ¶ 3.6 and Ex. B,

9    Strawn Rpt. at 170–72; Sherman Dec., Ex. A, Sherman Rpt. at 10; Ex. C, Strawn Dep. Tr., Aug.

10    20, 2012, at 205–06.  Similarly, Adobe and its experts have insisted that the RTMP Term has had

11    several meanings, but none of them align with the construction set forth by the Court.  Dkt. No.

12    341-6, Alexander Dep. Tr. at 181; Dkt. No. 341-5, Alexander Infringement Rpt. at A-3 at 11.

13    The only inference that can be drawn from the evidence in the record is that a person of

14    ordinary skill in the art would not have been reasonably certain that the RTMP Term had the

15    meaning ascribed to it by the Court. Even if there is "*some* meaning" to the term, that is not

16    enough to meet the definiteness requirement.  *Nautilus*, 134 S. Ct. at 2130.  Because the RTMP

17    term did not "inform, with reasonable certainty, those skilled in the art about the scope of the

18    invention," the '878 patent is indefinite.  *Id* at 2123.

19        **C.**    **Adobe Cannot Establish Willful Infringement**

20    It is undisputed that Wowza had no knowledge of the '878 or '287 patents prior to Adobe

21    informing Wowza that it intended to interject the patents into this litigation.  Ex. D, Good Rule

22    30(b)(6) Dep. Tr. at 137.  Because Adobe never moved for injunctive relief, and Adobe only

23    alleges willful infringement based on post-filing conduct, Adobe is not entitled to enhanced

24    damages. *LML Holdings, Inc. v. Pac. Coast Distrib. Inc.*, 2012 WL 1965878 at *6 (N.D. Cal.

25    May 30, 2012) (granting motion to dismiss willfulness complaint because  "[k]nowledge of the

26    [p]atents at [i]ssue . . . does not warrant imposition of enhanced damages for willful conduct

27    based solely upon post-filing conduct"); *Baxter Healthcare Corp. v. Fresenius Med. Care*

28

1  *Holdings, Inc.*, 2010 WL 668039 at *19 (N.D. Cal. Feb. 19, 2010) (granting summary judgment

2  of no willful infringement "[a]s [plaintiffs] did not seek injunctive relief to stop the alleged

3  infringement, the court finds that they should not be entitled to seek enhanced damages for any

4  post-filing infringement"); *Robocast, Inc., v. Microsoft Corp.*, 2014 WL 688644 at *11 (D. Del.

5  Feb. 21, 2014) (similarly granting summary judgment); *Inv. Tech. Grp., Inc. v. Liquidnet*

6  *Holdings, Inc.,* 759 F. Supp. 2d 387, 411 (S.D.N.Y. 2010) (similarly granting summary

7  judgment); *see also Anascape, Ltd. v. Microsoft Corp.*, 2008 WL 7182476 at *3 (E.D. Tex. Apr.

8  25, 2008) (similarly granting summary judgment).[8]

9       Further, objective recklessness requires "clear and convincing evidence that the infringer

10  acted despite an objectively high likelihood that its actions constituted infringement. . . ."

11  *Emblaze*, 2014 U.S. Dist. LEXIS 57893 at *17.  The Court has had an opportunity to evaluate

12  Wowza's motions for summary judgment of no infringement as to the '878 and '287 patents, as

13  well as Adobe's cross motion for infringement.  While Wowza was initially unsuccessful as to its

14  '878 and '287 motions, those motions presented reasonable defense, as Adobe's cross motions

15  were denied. Order at 37–38.  At a minimum, this motion seriously calls into question Adobe's

16  '878 claim, and Adobe's '287 claim hinges entirely upon the doctrine of equivalents and its

17  argument that re-streaming video is equivalent to playing video.  *Id.* at 38.  This argument is far-

18  fetched.  Dkt. No. 342; Ex. B, Strawn Rpt. at 223–29.  As such, it cannot be said that Wowza's

19  non-infringement positions (without even considering Wowza's other defenses) were objectively

20  reckless.  *Everyscape, Inc. v. Adobe Systems, Inc.*, 2014 U.S. Dist. LEXIS 119467 at *3-4 (D.

21  Mass. Aug. 27, 2014) (granting summary judgment on the issue of willfulness where "[e]ven a

22  cursory examination of the . . . Order, ultimately denying Adobe's motion for summary judgment

23  of noninfringement . . . is more than sufficient to show the objective reasonableness of Adobe's

24  asserted defenses").

25

26  [8] "Patentees who *neither practice the invention nor directly compete with the accused infringer* are 'excused from
*Seagate's* rule that a patentee must seek an injunction to sustain a claim for post-filing willful infringement.'"

27  *HTC Corp. v. Tech. Props. Ltd.*, 2013 WL 5225043 at *12 (N.D. Cal. Sep. 17, 2013) (emphasis added) (quoting
*DataQuill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1015 (S.D. Cal. 2011). These exceptions do

28  not apply. Adobe practices the invention and directly competes with Wowza.  *See* Ex. K, Bakewell Supp. Rpt.
and select exhibits at 21-22.

**D.      Adobe Cannot Prove Its Section 1125(a) Lanham Act Claims**

Adobe's false advertising claim fails as a matter of law because Adobe lacks any proof that any Wowza commercial advertisement misled or deceived consumers or proximately caused Adobe any damages.   In the absence of such evidence, Adobe attempts to rescue its case by presenting two surveys.  Ex. E, Klein Rpt. and Appendix D.  In particular, Adobe purports to rely upon one survey to show that Wowza misled customers as to whether Wowza's version of RTMPe was the same, as secure and as frequently updated as Adobe's version, the "Klein Advertising Survey."  Ex. E at 5.  But, the Klein Advertising survey is so defective it should be excluded.  Even if it is not excluded, taken at face value, Adobe's other survey, the "Klein Materiality Survey" fails to establish Adobe was damaged by any allegedly false or deceptive commercial advertising claim.  *Id.*

**1.      According to Adobe's Own Witnesses, Adobe is Unaware of Any Customer Actually Misled By Wowza**

The Supreme Court in *Lexmark* recently clarified that to prevail on a Lanham Act claim under Section 1125(a), the "plaintiff must plead (and ultimately prove) an **injury** to a commercial interest in sales or business reputation **proximately caused by the defendant's misrepresentations**."  *Lexmark*, 134 S. Ct. at 1395 (emphasis added).  There is no evidence in the record that any allegedly false or deceptive Wowza statement was the proximate cause of Adobe's injuries.  Adobe's Lanham Act claims fail for this reason alone.  *See Minitube of Am., Inc. v. Reprod. Provisions*, *LLC*, 2014 WL 1761317, at *24-25 (E.D. Wis. May 1, 2014) (granting defendant's summary judgment motion where plaintiff failed to establish injury proximately caused by violation under *Lexmark* in Lanham Act claim).

1

2

3

          **2.**      **There is No Evidence That Any Allegedly Misleading Wowza Commercial Advertising Claim Regarding RTMPe Was Material to Consumers' Purchasing Decisions**

Adobe has not and cannot prove that any Wowza commercial advertising claim regarding RTMPe was material to consumers' purchasing decisions.   Adobe sent written deposition questions—selected by Adobe—to ten Wowza customers, also selected by Adobe.[9] Dkt. No. 217 at 1; Dkt. No. 237; Dkt. No. 281; Ex. H, 11/19/2012 L. Nyugen Email; Ex. I, 1/30/2013 L. Nyugen Email; Ex. J, 2/11/2013 Notice of Subpoenas.

To be sure, the question of whether RTMPe was even considered at all during the purchase of WMS is itself separate from

---

[9] Prior to serving these written questions upon Wowza's customers, Adobe was permitted to serve and served subpoena duces tecum on nine of Wowza's most significant customers (also selected by Adobe) for documents sufficient to show the importance of RTMP and RTMPe to the customers purchase decision. *See* Dkt. No. 138. Adobe served those subpoenas, but does not rely upon any documents it received to support its contentions regarding that RTMPe usage.

the underlying issue of whether these customers were misled to believe that Wowza's versions of RTMPe were the same or updated simultaneously with Adobe's version.

As further evidence that RTMPe was not material to consumer purchasing decisions, WMS servers after Version 3.0.5 have reported to the Wowza licensing system the protocol(s) that server used during a reporting period. Stubenvoll Dec. at ¶ 3. Beginning in June 2012, Wowza periodically analyzed that data. In June 2012, 9.5% of the WMS servers that could report which protocols were used, reported using RTMPe at some point on that sample day. *Id.* at ¶ 5. That usage percentage has steadily declined as the number of servers that could report protocol usage increased, and around 2014 only 4% of the WMS servers that could report protocols used, reported using RTMPe at some point on that sample day. *Id.*

Furthermore, in November 2012, Wowza removed RTMPe from its base product, and requires anyone that wants to use RTMPe to request a separate "RTMPe Add-On." *Id.* at ¶ 7-9. Since that date through January 2014, there were 398 customers that requested the "RTMPe AddOn" (including prior customers upgrading to a new version of WMS), which consisted of 146 perpetual license customers and 252 subscription license customers. *Id.* at ¶ 11-12. These requests include customers that were upgrading from a prior version of WMS where the "RTMPe AddOn" was not required, and new customers. *Id.* There were (at most) 89 requests from new perpetual customers, and 73 requests from new subscription customers. *Id.* In that same time frame, there were 5058 **new** perpetual licenses, and 3401 **new** subscription licenses. *Id.* at ¶ 11-12. In other words, only 1.8% of new perpetual customers and 2.1% of new subscription customers requested the "RTMPe AddOn," **which Wowza provided for free**. *Id.*

Additionally, for cloud-based use of the Wowza Media Server, Wowza is able to determine whether the RTMPe protocol is used during a session. *Id.* at ¶ 14. For two-week time-periods in January, June and December 2013, Wowza analyzed every Amazon EC2 session initiated with WMS and whether those sessions used RTMPe at any point in time. The percent of sessions that used RTMPe at any point during the session was 4.4%, 3.4% and 1.6%, respectively. *Id.* at ¶

13.[10]

In sum, if Wowza's customers rarely even use RTMPe, it can hardly be said that an unproven inference about Wowza's level of RTMPe security or the frequency in which it was updated, was material to customer's purchasing decision.[11]

### 3. The Klein Surveys Provide No Evidence That Consumers Were Misled or Deceived by—Nor That Adobe Was Damaged By—Any Commercial Advertising Statement of Wowza

Adobe attempts to rescue its false advertising claims with the Klein Advertising Survey, which, again, purported to show that certain Wowza statements led a percentage of qualified respondents to believe that Wowza's RTMPe streaming was the same, as secure, or updated as frequently as Adobe's, and with the Klein Materiality Survey, which purported to show that certain RTMP-variant streaming protocols were important to some qualified respondents (Klein Advertising Survey and Klein Materiality Survey, collectively referred to as "Klein Surveys").

The Klein Advertising Survey is fatally defective and should be excluded. Even accepting the Klein Advertising Survey as true, however, and taking the Klein Materiality Survey at face value, Adobe still has not shown it was injured by any allegedly false or deceptive statement, *i.e.*, that Wowza's RTMP protocol security being the same as Adobe's influenced any customer's purchasing decision.

### i. The Klein Advertising Survey Should Be Excluded

According to the Klein Advertising Survey, it was designed to "measure the extent to which a comparison chart on the Wowza website comparing Wowza Media Server and Adobe Flash Media Server causes potential customers to mistakenly believe that the Wowza Media Server

---

[10] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[11] Adobe's Materiality Survey is relied upon by Adobe to argue that 42% of Wowza's customers used RTMPe. But, the 42% relied upon by Adobe does not purport to indicate the percentage of Wowza customers that used RTMPe. Rather, the 42% relied upon by Adobe purports to be the percentage of those participants that stream in one of the RTMP variants, and indicated that one of those variants was RTMPe. Participants that did not stream in RTMP were excluded from the survey. Ex. E at 20. Further, there were only 14 participants that indicated that they used the WMS at this point in the survey. Ostberg Dec., Ex. A at 16.

offers streaming protocols with the same level of content protection." Ex. E at 5, *see also id.* at 3, 9. Among the many fatal defects in the Klein Advertising Survey, one is that it surveyed the wrong population, and another is that it failed to replicate market conditions.

*The Klein Advertising Survey Included the Wrong Universe.* It is an accepted scientific principle that a survey must test the proper universe of respondents, or it is not reliable. *Id.*; *see also Reference Guide on Survey Research*, (3rd ed. 2011) at 376, n.76 ("Identification of the proper target population or universe is recognized uniformly as a key element in the development of a survey."). For surveys testing whether accused statements deceived or had the tendency to deceive customers, potential or actual purchasers must be surveyed to offer reliable results. *Kwan*, 2014 WL 572290 at *4-5; *Reinsdorf*, 922 F. Supp. 2d at 878. Mr. Klein himself recognized, in both his report and deposition, that the "appropriate universe" for his survey was "current and prospective purchasers of media streaming software." Ex. E at 6; Ex. L, Klein Dep. Tr. at 52:25-53:5.

The Klein Advertising Survey invited people that make and/or influence information technology **or marketing decisions** to participate in the survey. Ex. E at 7. It purported to exclude participants if they were not responsible for or "actively involved" in the decision to acquire media streaming software. However, this screening question allowed those that "actively contribute to the decision to acquire a particular streaming solution **by gathering information** about streaming needs and evaluating software and services" to participate. *Id.* More than half (59%) of the respondents were included on the basis that they contributed by "gathering information." Ostberg Dec., Ex. A, Ostberg Rpt. at ¶ 14. Participants who make or influence marketing decisions, or who gather information about streaming needs, are not the proper universe of participants from which to conclude whether Wowza's marketing material creates a false inference as to the technical capabilities of WMS. Ostberg Dec., Ex. A, Ostberg Rpt. at ¶¶ 14-15; *Kwan*, 2014 WL 572290 at *5 (finding that plaintiff failed to meet burden without showing that respondents surveyed would see and purchase due to accused statements). Additionally, the Klein Advertising Survey excluded individuals working for companies that

1  were streaming media content, unless they streamed Flash media content or expected their

2  companies to stream Flash media content within the next year. Ex. E at 10-11. Excluding those

3  that streamed media—just not Flash media—was inappropriate. These participants are just as

4  much potential Wowza customers as those streaming Flash, and just as qualified to reach an

5  opinion as to the technical capabilities of Wowza's media server as those that were streaming

6  Flash media. By excluding them, the survey over emphasizes Flash and improperly increases the

7  likelihood that the participant will infer capabilities as to Wowza's Flash streaming.

8  *The Klein Advertising Survey Failed to Replicate Market Conditions.* The Klein Advertising

9  Survey did not approximate real marketplace conditions. Instead of showing the actual Wowza

10 comparison chart at issue, Klein added extraneous elements to the chart, thereby creating an

11 artificial purchasing experience distinct from reality. Ex. E, Appendix D at D-16; Ex. M,

12 Comparison Chart. First, the survey added a red arrow pointing to "Flash (RTMP, RTMPT,

13 RTMPS, RTMPE and RTMPTE)." Ex. E at 16. In doing so, respondents were forced to focus

14 on only one of the fourteen items listed on the chart, and then asked about that specific feature.

15 In addition, Adobe added a description of RTMPe that did not exist on Wowza's comparison

16 chart, stating:

17        RTMPE is an authentication and encryption protocol that prevents
          unauthorized access to copying, and downloading content streamed over
18        the Internet using the Flash platform. It authenticates and encrypts a Flash
          media streaming session in a way that is light weight and easy for a
19        programmer to implement, and requires less bandwidth and processing
          power than other security protocols.[12]
20

21 *Id.* at 17.

22 These changes create an artificial experience that would cause respondents to focus on or

23 prioritize the Flash feature, when in the marketplace, it might not be noticed or even considered

24 by actual or potential purchasers. Ostberg Dec., Ex. A, Ostberg Rpt. at ¶¶ 20–23. At best, this

25 artificial experience and resulting findings can only show what these respondents think about

26

27 [12] At this point in the survey the only participants were those working at a company that was streamlining media, or
     planned to in the next year, and who were "actively involved" in the process. No legitimate basis could exist
28   for provided this information to the participants.

1    Flash, when it is singled out, but it does not reflect any representative data from the marketplace.

2    *Kwan*, 2014 WL 572290 at *4; *see also Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d

3    339, 351 (S.D.N.Y. 2008) (court rejected survey where respondents shown substantially altered

4    ad: "Court cannot conclude from this study how consumers would react to actual live ad….").

5        Since the Klein Advertising Surveys failed to capture the appropriate universe and failed to

6    replicate marketplace conditions, it is unreliable and should be excluded.  *Reinsdorf*, 922 F.

7    Supp. 2d at 878 (excluding survey evidence, holding generally that "unless survey evidence is

8    conducted according to accepted principles, it is not admissible").

9            **ii.    The Klein Materiality Survey Does Not Show That Customers Relied
                     Upon Any, or That Adobe Was Damaged By Any, Allegedly False or**
10                   **Deceptive Wowza Statement**

11        Even if the Klein Advertising Survey is not excluded, Adobe still has no evidence that any

12   allegedly misleading or deceptive Wowza statement was the proximate cause of Adobe's

13   damages.  According to the Klein Materiality Survey, it was designed to determine "whether the

14   ability to support Adobe's proprietary protocols, including RTMPE, is material to customers'

15   purchase behavior."  Ex. E at 3, 5, 18.  By its own terms, it never tested materiality of any

16   allegedly false or deceptive statement to any purchase decision and is irrelevant to plaintiff's

17   claims of false advertising.  *Id.*; *See also* Ostberg Dec., Ex. A at ¶¶ 53-56.  ███████

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ██████████████    Rather, the survey's purpose was to "measure the level of importance attributed

21   to each of Adobe's proprietary protocols by those who use them and to measure customers'

22   willingness to use and pay for streaming products or services that do not support these Adobe

23   protocols."  Ex. E at 5.  Thus, the Klein Report never established any link between Wowza's

24   statements and any customer's purchase, and thus never tested materiality.  As such, again,

25   Adobe has no evidence that any false or deceptive Wowza statement was the proximate cause of

26   Adobe's damages.

27

28

### E. Adobe's California Common Law and California Statutory Claims Do Not Survive Summary Judgment

In addition to its Lanham Act claim for false advertising, Adobe tacks on claims under California state and common law regarding the same factual allegations—specifically, California common law unfair competition, unfair competition under California Business and Professions Code Section 17200, and false advertising under California Business and Professions Code Section 17500. 3rd Am. Compl., at ¶¶ 62-75.

The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code Section 17200 are 'substantially congruent' to claims made under the Lanham Act" because likelihood of confusion is the test for these claims. *Clearly v. News Corp.*, 30 F.3d 1255, 1262-63 (9th. Cir. 1994); *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 2014 WL 683827, at *3 (C.D. Cal. Feb. 20, 2014) (citations omitted). False advertising claims under Section 17500 also rise and fall with Lanham Act claims, particularly where is there no proof of a false statement. *Cairns v. Franklin Mint*, 292 F.3d 1139, 1145 and n.5 (9th Cir. 2002) (explaining district court grant of summary judgment on Lanham Act and California state law claims when there was no evidence of any false statement in advertising). *See also Kwan*, 2014 WL 572290, at *3.

### F. The Bakewell Reports Are Unreliable and Should be Excluded

Adobe's expert's opinions on unjust enrichment and patent infringement damages both hinge upon a critical underlying assumption so divorced from the facts of this case that they should be excluded. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ For these reasons, his opinions should be excluded.

#### 1. Bakewell Used an Unreliable Measure of RTMPe Usage

████████████████████████████████████████████████████████████



As an initial matter, this new 2008/2009 RTMPe Usage Percent theory introduced in Bakewell's Supplemental Report violates the Court's order, *see* Dkt. No. 464, and should be precluded. *Fujitsu Ltd. v. Belkin Int'l*, 2012 U.S. Dist. LEXIS 174271 at * 10 (N.D. Cal. Dec. 7, 2012) (striking new evidence not related to permissible supplementation); *Procter & Gamble, Co. v. McNeil-PPC, Inc.*, 615 F. Supp. 2d 832, 837 (W.D. Wis. 2009) (same).  Even if maintained, this 2008/2009 RTMP Usage Theory is entirely unreliable and should be excluded.

---

[13] Essentially, Bakewell attempts to determine the amount of incremental profit flowing to Wowza as a result of its customers using RTMPe, and assumes that 100% of the amount is due Adobe as a reasonable royalty.

10    As for the 2012 usage percentage that Bakewell borrows from Klein's report, it is no more

11  reliable.  As an initial matter, the Klein Materiality Survey doesn't actually measure Wowza's

12  customers.  **Only fourteen** of the respondents were Wowza customers.  Ostberg Dec., Ex. A at

13  ¶¶ 47-48.

19    Even if we were to pretend that the Klein Materiality Survey was actually a survey of

20  Wowza's customers, it is not a proper reflection of Wowza's customers because it excluded

21  anyone that was not streaming in Flash.  Ex. E at 20-21.  Wowza streams in protocols other than

22  variants of RTMP.  Stubenvoll Dec. at ¶ 2.  By excluding everyone who did not stream with a

23  variant of RTMP, Klein grossly overstated the amount of Wowza users that use RTMPe.  This

24  Court has recently held that a consumer survey that does not examine the proper universe of

25  customers is unreliable because it does not conform to accepted methods or principles, and

26  ultimately, is inadmissible.  *Kwan*, 2014 WL 572290 at *2, *5 (granting summary judgment for

27  defendant when plaintiff's consumer survey evidence excluded for failure to survey proper

1    universe of consumers); *see also Reinsdorf*, 922 F. Supp. 2d at 878 (granting defendant's motion

2    to exclude survey expert testimony where unrepresentative population surveyed).   Therefore,

3    Adobe should be precluded from relying upon the Klein Materiality Survey to prove the

4    percentage of Wowza's customers that use RTMPe, and since the Bakewell opinion relies upon

5    that survey as a pillar of his analysis, it should be excluded as well.  *See Uniloc*, 632 F.3d at 1318

6    ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate

7    considerations specific to the facts of the case nevertheless results in a fundamentally flawed

8    conclusion.").

9              **2.     Mr. Bakewell Failed to Apportion the Claimed Inventions of the
                        Handshake Patents**

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████    This assumption fails as the result of two fundamental flaws.

14   First, it assumes that the '878 and '287 patents have the same value as RTMPe (that they are one

15   in the same thing).  Second, it allocates 100% of the incremental profit to Adobe, without any

16   basis.

17       Bakewell should have analyzed the "footprint" of the patent claims as compared to the

18   RTMPe protocol.  *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

19   Instead, Bakewell assumed streaming in RTMPe alone is covered by the patents.  But, this Court

20   has construed the '878 patent to require not just RTMPe, but bandwidth estimation.  Order at 22.

21   The proper reasonable royalty analysis for the '878 patent should begin with how much

22   customers that use RTMPe are willing to pay for the ability to do both RTMPe and bandwidth

23   estimation.  Similarly, the '287 patent has been construed to require transmitting, assembling and

24   playing a payload. Order at 22-23.  While Adobe's original expert report on infringement (which

25   assumed Adobe's construction of "processing the data payload") asserted infringement as WMS

26   streaming RTMPe, *see* Dkt. No. 341-5, Alexander Infringement Rpt. at A-4 at 30-31, the Court's

27   Order (based on the Court's construction of "processing the data payload") only found there was

28

a material dispute of fact as to whether WMS' receipt and re-streaming of RTMPe streams was allegedly infringing. Order at 38.  Thereafter, Adobe only claimed that WMS only infringes claims of the '287 patent by virtue of WMS receiving and re-streaming streams, *not* transmitting streams.  Ex. B at 27-32.  Here again, the damages analysis should not focus on how much customers are willing to pay to stream RTMPe, but how much more are they are willing to pay for an RTMPe streaming server that receives and re-streams RTMPe streams.

Failure to apportion the asserted patents based upon the scope of the claims is justification itself to strike Mr. Bakewell's opinion regarding patent damages in full.  *Fractus, S.A. v. Samsung*, 2011 WL 7563820 (E.D. Tex. April 29, 2011); *Cornell Univ. v. Hewlett-Packard Co*, 609 F. Supp.2d 279 (N.D.N.Y. 2009).

While it is a fundamental proposition that the parties will agree to some share of the incremental profits attributable to the invention in a reasonable royalty analysis, a reliable damages calculation must undertake a detailed analysis of where the line should be drawn.  *See Uniloc*, 632 F.3d at 1317.  Adobe's expert assumes, without any basis or analysis whatsoever, that the entirety of the incremental profit attributable to RTMPe would be the proper measure of a reasonable royalty.  As such an assumption has no basis in fact, it must be rejected.  And, Adobe's damages expert opinion, which relies upon such a fundamentally flawed premise should be excluded.  *See Uniloc*, 632 F.3d at 1318 ("If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded.").

## IV.     CONCLUSION

Wowza respectfully requests that this Court grant Wowza's motions for summary judgment of noninfringement and of indefiniteness as to the '878 patent; grant summary judgment on Adobe's Lanham Act and unfair competition claims; and exclude the Advertising and Materiality Surveys of Klein (and the report and testimony based thereon) and the report and testimony of Bakewell.

1    Dated:  September 3, 2014            Respectfully submitted,

2

3                                        KIRKLAND & ELLIS LLP
                                             Brent P. Ray (pro hac vice)
4                                            Greg Polins (pro hac vice)
                                             Diana Chang
5
                                         Irwin IP LLC
6                                            Barry F. Irwin (pro hac vice)

7

8                                        By _____/s/___Barry F. Irwin_____

9

10                                       Attorneys for Defendant and
                                         Counterclaimant
11                                       WOWZA MEDIA SYSTEMS, LLC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28