Diana Chang (Bar No. 287624)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Brent P. Ray (*pro hac vice*)
Greg Polins (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Barry F. Irwin, P.C. (*pro hac vice*)
IRWIN IP LLC
1333 Burr Ridge Pkwy, Suite 200
Burr Ridge, Illinois 60527
Telephone: (630) 756-3101
Facsimile: (630) 756-3100

Attorneys for Defendants
WOWZA MEDIA SYSTEMS, LLC, and
COFFEE CUP PARTNERS, INC.
(f/k/a WOWZA MEDIA SYSTEMS, INC.)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ADOBE SYSTEMS INCORPORATED, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>WOWZA MEDIA SYSTEMS, LLC, and COFFEE CUP PARTNERS, INC. (f/k/a WOWZA MEDIA SYSTEMS, INC.)<br><br>Defendants. | CASE NO. 11-cv-02243-JST<br><br>**WOWZA MEDIA SYSTEMS, LLC'S OPPOSITION TO ADOBE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DAUBERT MOTIONS TO EXCLUDE EXPERT REPORTS**<br><br>Judge:      Honorable Jon S. Tigar<br>Courtroom:  9 (19th Floor)<br>Date:       October 30, 2014<br>Time:       2:00 PM |

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................................... 1

II.  ADOBE'S PARTIAL SUMMARY JUDGMENT MOTIONS SHOULD BE
     DENIED ................................................................................................................... 1

     A.   Summary Judgment of No Anticipation of the '287 Patent Is Improper ................ 1

     B.   A Reasonable Jury Could Conclude The '878 and '287 Patents Are
          Obvious. ........................................................................................................ 1

     C.   A Reasonable Jury Could Conclude The '287 Patent Is Anticipated. ................... 5

          1.   Adobe Undisputedly Distributed FMS 3 and FP9u3 To Third
               Parties After The '287 Claims Were Reduced To Practice And
               Prior To The Critical Date ......................................................................... 7

          2.   FMS 3 Use After Reduction to Practice Invalidates the '287 Patent ........... 8

          3.   A Reasonably Jury Could Conclude FMS Use Invalidates the '287 ........... 9

          4.   A Reasonable Jury Could Conclude That The Public Use Or Sale
               Of FP9u3 Invalidates the '287 Patent. ..................................................... 11

               a.   FP9u3 Was Publically Accessible Prior To The Critical
                    Date ................................................................................................ 11

               b.   Adobe Commercially Exploited FP9u3 Prior To The
                    Critical Date ................................................................................... 13

     D.   Substantive Evidence Establishes Adobe Granted Wowza a License To
          RTMP ............................................................................................................. 13

          1.   Adobe Has No Evidence That Any Customer Relied Upon Any
               Allegedly False or Deceptive Commercial Advertisement ......................... 14

          2.   Adobe Must Show Wowza's Activities Are Inconsistent With
               What A Reasonable Licensee Would Expect ............................................. 15

          3.   Adobe Has Not and Cannot Show That Wowza's Activities Were
               Inconsistent with Reasonable Expectations of What Was
               Prohibited. ............................................................................................... 15

          4.   Adobe's Breach Theory Relies Upon Activity Prior To The RTMP
               Open License. ........................................................................................... 17

          5.   Adobe Does Not Allege That Wowza Ever Used The RTMP
               Specification To Commit "Interception" Or "Circumvention. .................. 17

          6.   Summary Judgment For Wowza On The RTMP Open License Is
               Appropriate ............................................................................................... 18

7.    Whether RTMPe Is Covered By The RTMP Open License Is Irrelevant. ............................................................... 18

III.   ADOBE'S *DAUBERT* MOTIONS SHOULD BE DENIED ........................................... 18

A.   Dr. Sherman's Obviousness Opinion is Reliable ..................................................... 18

B.   Dr. Medoff's Reduction to Practice Opinion is Reliable ...................................... 18

C.   Dr. Leonard's Damages Opinion Is Reliable ......................................................... 20

1.    Dr. Leonard's Reliance Upon Statements From Wowza Customers, Other Experts, and Wowza Co-Founder David Stubenvoll Is Appropriate................................................................................ 20

2.    Dr. Leonard Did Assume Wowza Is Liable For False Advertising And Accurately Rebutted Mr. Bakewell's Damages Opinions Presented In Mr. Bakewell's Original And Supplemental Reports. ........... 22

3.    Adobe Misinterpreted Dr. Leonard's Analysis Of The Hypothetical Negotiation And The Parties' Respective Bargaining Power. ................... 23

D.   Dr. Ostberg's Survey Opinion is Reliable ............................................................ 24

IV.   CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*3M Co. v. Chemque, Inc.*,
303 F.3d 1294 (Fed. Cir. 2002) ................................................................................. 12

*Abaxis, Inc. v. Cepheid*,
2012 WL 3255602 (N.D. Cal. August 8, 2012) ................................................... 11, 12

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ................................................................................... 3

*Am. Seating Co. v. USSC Grp., Inc.*,
514 F.3d 1262 (Fed. Cir. 2008) ................................................................................... 7

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*,
516 F.3d 1361 (Fed. Cir. 2008) ................................................................................... 6

*Auction Mgm. Solutions, Inc. v. Manheim Auctions, Inc.*,
2009 WL 801800 (N.D. Ga. March 24, 2009) ......................................................... 11

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) ..................................................................................... 25

*Bristol-Meyers Squibb Co. v. Teva Pharms. USA, Inc.*,
752 F.3d 967 (Fed. Cir. 2014) ..................................................................................... 3

*Brown-Spaulding & Assocs. v. Int'l Surplus Lines Ins. Co.*,
254 Cal. Rptr. 192 (Cal. Ct. App. 1988) .................................................................. 15

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ................................................................................... 5

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
270 F.3d 863 (9th Cir. 2001) ..................................................................................... 20

*E & J Gallo v. Proximo Spirits, Inc.*,
2012 WL 273076 (E.D. Cal. 2012) ........................................................................... 24

*Egbert v. Lippman*,
104 U.S. 333 (1881) ................................................................................................... 11

*Emergency Fuel, LLC v. Penzoil-Quaker State Co.*,
71 Fed. Appx. 826 (Fed. Cir. 2003) ............................................................................ 8

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
2006 WL 1329999 (N.D. Cal. 2006) ......................................................................... 24

*Graham Webb Int'l v. Helene Curtis Inc.*,
17 F.Supp.2d 919 (D. Minn. 1998) ........................................................................... 24

*Gray v. Zurich Ins. Co.*,
   65 Cal. 2d 263 (Cal. Sup. Ct. 1966) ........................................................ 15

*Gross v. Symantec Corp.*,
   2012 WL 3116158 (N.D. Cal. 2012) ........................................................ 17

*Hansen Beverage Co. v. Vital Pharm., Inc.*,
   2010 WL 3069690 (S.D. Cal. 2010) ........................................................ 22

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*,
   258 F.Supp.2d 1197 (D. Kan. 2003) ........................................................ 24

*In re Cygnus Telecomm's. Tech., LLC, Patent Litig.*,
   536 F.3d 1343 (Fed. Cir. 2008) ........................................................ 6

*In re Omeprazole Patent Lit.*,
   536 F.3d 1361 (Fed. Cir. 2008) ........................................................ 19

*In re Smith*,
   714 F.2d 1127 (Fed. Cir. 1983) ........................................................ 6

*Innogenetics, N.V. v. Abbott Labs*,
   512 F.3d 1363 (Fed. Cir. 2008) ........................................................ 3

*InterDigital Commc'ns Inc. v. Nokia, Corp.*,
   Case No. 1:13-cv-00010, Dkt. 339 at n.3 (D. Del. Aug. 28, 2014) ........................................................ 4, 5

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   424 F.3d 1374 (Fed. Cir. 2005) ........................................................ 6

*Kinzenbaw v. Deere & Co.*,
   741 F.2d 383 (Fed. Cir. 1984) ........................................................ 12

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ........................................................ 2, 3

*LaBounty Mfg., Inc v. U.S. Int'l Trade Comm'n*,
   958 F.2d 1066 (Fed. Cir. 1992) ........................................................ 6

*Leader Techs., Inc. v. Facebook, Inc.*,
   770 F. Supp. 2d 686 (D. Del. 2011) *aff'd*, 678 F.3d 1300 (Fed. Cir. 2012) ........................................................ 10

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
   734 F.3d 1361 (Fed. Cir. 2013) ........................................................ 13

*Minitube of Am., Inc. v. Reprod. Provisions, LLC*,
   2014 WL 1761317 (E.D. Wis. May 1, 2014) ........................................................ 14

*Moleculon Research Corp. v. CBS, Inc.*,
   793 F.2d 1261 (Fed. Cir. 1986) ........................................................ 10

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*,
   298 F.3d 1290 (Fed. Cir. 2002) ........................................................ 6, 7

*Personalized Media Commc'ns, LLC v. Zynga, Inc.*,
    No. 12-cv-0068-JRG, Dkt. 213 (E.D. Tex. Oct. 30, 2013) ................................. 5

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998) .................................................................................................. 6

*Procter & Gamble Co. v. Team Techs., Inc.*,
    Case No. 1:12-cv-552, Dkt. No. 130 at 22 (S.D. Ohio July 3, 2014) .................. 4

*RCA Corp. v. Data Gen. Corp.*,
    887 F.2d 1056 (Fed. Cir. 1989) ......................................................................... 6, 8

*Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
    272 F.3d 1335 (Fed. Cir. 2001) ............................................................................ 3

*Riles v. Shell Exploration and Prod., Co.*,
    298 F.3d 1302 (Fed. Cir. 2002) .......................................................................... 21

*S.O.S., Inc. v. Payday, Inc.*,
    886 F.2d 1081 (9th Cir. 1989) ............................................................................ 15

*Seed Research Equip. Solutions v. Gary W. Clem, Inc.*,
    2012 WL 6650873 (D. Kan. Dec. 20, 2012) ........................................................ 6

*Spears v. Cooper*,
    2008 WL 5552336 (E.D. Tenn. Nov. 17, 2008) .................................................. 25

*Speedtrack, Inc. v. Wal-Mart Stores, Inc.*,
    2012 WL 581338 (N.D. Cal. Feb 22, 2012) .......................................................... 8

*Zenith Elecs. Corp v. PDI Comm'n Sys., Inc.*,
    522 F.3d 1348 (Fed. Cir. 2008) .......................................................................... 11

**Statutes**

17 U.S.C. § 1201 ............................................................................................................ 16

35 U.S.C. § 102 ..................................................................................................... passim

35 U.S.C. § 103 .............................................................................................................. 5

**Rules**

FED. R. EVID. 702 .......................................................................................................... 20

I.      **INTRODUCTION**

As explained below, Adobe's summary judgment and *Daubert* motions should be denied.

II.     **ADOBE'S PARTIAL SUMMARY JUDGMENT MOTIONS SHOULD BE DENIED**

   A.     **Summary Judgment of No Anticipation of the '287 Patent Is Improper**

Adobe asserts that Wowza has "not offered *any* evidence or expert testimony that the '878 and '287 Patents are anticipated." Adobe SJM[1] at 1. But Adobe mistakenly assumes that *only* Dr. Sherman's opinion relates to invalidity by anticipation. *Id.* at 1-2. As demonstrated below, there is abundant evidence that the alleged invention of the '287 patent was "used by others in this country" before the critical date.[2] 35 U.S.C. § 102(a); *see* Section II.C, *infra*. Thus, at a minimum, there is a genuine issue as to whether that the claims of the '287 patent were anticipated.

   B.     **A Reasonable Jury Could Conclude The '878 and '287 Patents Are Obvious.**

Wowza's obviousness defense is very straight-forward, and begins with the pre-existing RTMP protocol. As this Court is aware, long prior to the critical date of the '878 and '287 patents:

   1.   The RTMP protocol was publicly known prior art. Ex. 1 at ¶¶ 47-51; Ex. 2 at 80:13-15; Ex. 3 at 71-72.

   2.   In RTMP, to establish a communication session between the server and a client, there is an exchange of messages including random data between the server and the client. Ex. 1 at ¶ 50; Ex. 2 at 80:13-15; Ex. 3 at 71-72; Ex. 4 at 533; Ex. 5 at 66-69, 107-108.

   3.   After this exchange of messages, in RTMP, the server streams unencrypted content to the player. Ex. 1 at ¶¶ 48-49.

Also, long prior to the critical dates, the prior art taught:

   1.   Encrypting content being transmitted from a server to a client for content protection, Ex. 1 at ¶¶ 52-54; Ex. 2 at 13:17-23:25; Ex. 3 at 81:8-11, particularly wherein the server sends the client a Diffie-Hellman encryption key, and the client sends the server a Diffie Hellman encryption key. Ex. 6, Alexander Validity Rpt. at 262-63; Ex. 1 at ¶¶ 97, 151; Ex. 2 at 59; Ex. 3 at 82:2-83:2 and 90:25-91:4; Ex. 5 at 113-115.

   2.   ██████████████████████████████████████████████████████████ Ex. 1 at ¶¶ 108-111; ██████████████ Ex. 8, Alexander Tr., at 417; Ex. 5 at

---

[1] Throughout this brief, Wowza refers to (1) Adobe's Motion for Partial Summary Judgment and *Daubert* Motions to Exclude, Dkt. 473, as "Adobe SJM"; (2) Wowza's Second Summary Judgment and Daubert Motions, Dkt. 477, as "Wowza SJM;" (3) Declaration of Alex Long in Support of Adobe SJM, Dkt. 474, as "Long Decl.." In addition, "Ex." refers to exhibits attached to the concurrently filed Decl. of B. Irwin in support of Wowza's Opposition to Adobe's SJM. *See* Ex. 49. Emphasis has been added to quotations, unless otherwise noted. "AW" refers to "ADOBEWOW."

[2] The "critical date" refers to the date one year prior to the priority date of the patent. In this case, the critical date for the '878 Patent is October 15, 2006 and the critical date for the '287 Patent is October 15, 2007

WOWZA'S OPPOSITION                                                    CASE NO. 11-cv-02243-JST

130; and

3. ████████████████████████████████
████████████████████████████ Ex. 1 at pp. 98, 109, 118, 124, and
129 (finding indexing was taught by Bousis, Camp, Jr., Manferdelli, Locasto, and Rabah,
respectively).[3]

As Adobe was attempting to encrypt RTMP communications, and it was well known to encrypt

such communications, to do so by exchanging encryption keys, and to obfuscate such keys by placing

them in random data being exchanged between a client and server, and since RTMP already included an

exchange of random data, a person of ordinary skill in the art seeking to encrypt RTMP communications

would have consider its obvious to modify RTMP by placing encryption keys in the random data

sections being exchanged between the server and the client.  As Adobe's own engineer testified:



Ex. 2, at 32.  To support its obviousness defense, in addition to admissions of Adobe's own witnesses,

Wowza relies upon the testimony of Dr. Alan Sherman, an expert in the field of cryptography, who

describes the state of the art of encryption prior to the critical date of the '878 and '287 patents, and

explains why a person of ordinary skill in the art would have been motivated by the prior art to encrypt

RTMP communications in the precise manner claimed in the '878 and '287 patents.

Adobe does not dispute that the prior art, in combination, discloses all of the limitations of the

'878 and '287 patents claims.  Adobe only alleges that Dr. Sherman's opinion is insufficient, as a matter

of law, to establish obviousness because he allegedly has not established a "motivation to combine" the

prior art references.  But, as the Supreme Court held in *KSR*, obviousness does not turn upon whether

there is a specific teaching, suggestion or motivation to combine prior art references.  *KSR Int'l Co. v.*

---

[3]   Adobe fabricates Wowza's reliance on 15 different prior art references in support of its obviousness argument.  Wowza
independently relies upon the combination of RTMP and either of two references (Hellman or Horman, both teaching
encryption of server client communications through the exchange of cryptographic information).  If either of those two-
reference combinations are not sufficient, Wowza relies upon either of two additional references (Camp or Bousis, both
teaching obfuscation of cryptographic information by placing them in random data) with either of the two-reference
combinations.  Finally, if those three-reference combinations are insufficient, Wowza relies on any of five other
references (teaching information hiding in existing communications).

*Teleflex Inc.*, 550 U.S. 398, 419 (2007).  Indeed, the Supreme Court set forth a number of guide posts for establishing obviousness; one example being that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id*. at 416. Dr. Sherman found the claimed invention of the '287 patent only unites familiar elements (RTMP; encrypting communications with key exchange, and obfuscating keys in random data) in known ways yielding predictable results.  *See* Ex. 1 at ¶ 86.  Dr. Sherman also established that the '878 patent only added the familiar concept of indexing to further obfuscate the key.  *Id.* at ¶¶ 83-84, 90, 93-94.  Dr. Sherman demonstrated which prior art references disclosed the familiar elements, and why the result was predictable.  *Id.* at ¶¶ 86-88.  This alone is sufficient to establish the patents are obvious.

Indeed, Dr. Sherman went through *all* the various Supreme Court guides, and demonstrated how each established the alleged inventions of the '287 and '878 were obvious.  *See Id.* at ¶ 85 (uniting old elements with no change in their respective function), ¶¶ 87-90 (predictable combination), ¶ 91 (obvious application of known techniques), ¶ 92 (reason to combine the prior art), ¶ 93 (common sense combination), and ¶ 94 (finite number of predictable solutions).  All of these independently establish the claims of the '878 and '287 are obvious.  Adobe ignores all of this analysis, and, in a return to pre-*KSR* thinking, argues absent a motivation to combine the references, the claims cannot be obvious.[4]

Even accepting Adobe's obsolete argument that a "motivation to combine" is the only way to establish a claim is obvious, Dr. Sherman explained the motivation to combine the teachings of the prior art to encrypt RTMP communications by placing encryption keys in the preexisting random byte section of the RTMP handshake.  Specifically, Dr. Sherman established that a person of ordinary skill in the art would have been motivated to encrypt RTMP, Ex. 1 at ¶¶ 89-92 (citing evidence establishing desire for encrypted communications), and would have been motivated to do so by exchanging encryption keys.

---

[4]   Adobe's reliance on *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012) and *Innogenetics, N.V. v. Abbott Labs*, 512 F.3d 1363 (Fed. Cir. 2008) is misplaced.  In *ActiveVideo*, an expert's testimony stating the motivation to combine was "to build something better" was insufficient.  *ActiveVideo*, 694 F.3d at 1328.  In *Innogenetics*, the Federal Circuit affirmed a district court's exclusion of expert testimony because the expert "merely list[ed] a number of prior art references and then conclude[d] with the stock phrase 'to one skilled in the art it would have been obvious to perform the [patented method claim].'"  *Innogenetics*, 512 F.3d at 1373.  Adobe's reliance on *Bristol-Meyers Squibb* is perplexing, as the Court there granted summary judgment of obviousness for one of the very reasons that Wowza asserts: known modifications (encryption) were made to an already-known structure (RTMP).  *Bristol-Meyers Squibb Co. v. Teva Pharms. USA, Inc*., 752 F.3d 967, 975 (Fed. Cir. 2014).  Finally, *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp*., 272 F.3d 1335, 1358 (Fed. Cir. 2001) is a pre-*KSR* case.

*Id.* at ¶ 89 (citing evidence establishing benefits of encrypting communications through key exchange).

Dr. Sherman also provides extensive explanations and supporting evidence as to why a person of ordinary skill would have been motivated to exchange such keys by placing them in the existing  RTMP random byte section.  *See id.* at ¶¶ 108-11, 119, 125, 131, 136, 146, and 147 (doing so eliminates the need for additional handshaking and obfuscates the cryptographic information); ¶ 91 (doing so had been used before to improve other server-client communications, and citing such references); ¶ 90 (other techniques would be slower, more complicated and not backward compatible, and placing the key in the RBS was the most advantageous); p. 24 (doing so allows conformance to an existing specification (a known advantage, citing reference)); pp. 24-26 (doing so prevents the key from being readily identifiable (also a known advantage, citing references)); and pp. 25-26 (doing so helps prevent an unauthorized source from easily discovering the existence of the key, obtaining the key or earning the network protocol (again, a known advantage)).  Again, at a minimum, this is enough for a reasonable jury to conclude the '878 and '287 patents are obvious.[5]

Adobe also ignores the numerous confirmations of obviousness by the named inventors of the '878 and '287 patents.  ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

As a last gasp, Adobe argues summary judgment of no obviousness should be entered because the PTAB decided not to institute an IPR based on Wowza's '287 petition.  Adobe relies on a single district court case addressing "anticipation by inherency," something not at issue here.  Adobe SJM at 4 (citing *Procter & Gamble Co. v. Team Techs., Inc.*, Case No. 1:12-cv-552, Dkt. No. 130 at 22 (S.D. Ohio July 3, 2014)).  First, "the PTAB consists of ALJs, that is, lawyers and not persons of ordinary skill in the relevant art or even a related field."  *InterDigital Commc'ns Inc. v. Nokia, Corp.*, Case No. 1:13-

---

[5]   Adobe invents the argument that Dr. Sherman did not tailor his opinions on combining the "Cryptography References" with the "RTMP References." Mot. at 2.  Dr. Sherman explained the obviousness rationale in Section III of his report, and explained the analysis with each specific reference.  *See* Ex. 1 at ¶¶ 83-105, 125, 131, 136, and 137.  ███████████████████  *Id.* at ¶¶ 120-125 (Horman), 126-131 (Bousis), and 132-136 (Camp Jr.); ████████████████████████████████

cv-00010, Dkt. 339 at n.3 (D. Del. Aug. 28, 2014).  The PTAB's agreement, or disagreement, with an

expert's opinion carries little to no weight.  *See Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331,

1343 (Fed. Cir. 2009) ("non-final re-examination determinations [by the PTAB] were of little relevance

to the jury's independent deliberations on the factual issues underlying the question of obviousness.")

Indeed, district courts often preclude PTAB proceedings from even being mentioned during trial.  *E.g.*

*InterDigital*, Dkt. 339 at 3-4 (granting a motion *in limine* to exclude reference to the outcome of an *inter*

*partes* review) and Dkt. 367 (D. Del. Sept. 19, 2014) (affirming the prior exclusion of the outcome of an

*inter-partes* review because it was "of marginal relevance" and "assessed [the merits] with less than a

full record and with less than a full adversarial proceeding");*Personalized Media Commc'ns, LLC v.*

*Zynga, Inc.*, No. 12-cv-0068-JRG, Dkt. 213 (E.D. Tex. Oct. 30, 2013) (same).  Second, Dr. Sherman

relied on evidence of obviousness that the PTAB could not consider because it was marked confidential

under the Protective Order.  For example, Wowza's IPR petition ███████████████████

████████████████████████████████████████████ *E.g.* Long Decl., Ex. 9 at

Section III.C.  Third, Adobe ignores that the PTO (of which the PTAB is part of) has rejected claims

similar in scope to the '287 and '878 patents.  Ex. 1 at ¶¶ 101-105.  For example, the PTO rejected

claims in a continuation application for the '287 patent that were similar in scope to the '287 claims, and

required something more than just inserting cryptographic information into a random data section of a

handshake, and using known techniques for parsing and processing stream chunks.  *See id.* at ¶ 104.

The PTO rejected claims of similar scope to the '878 in other applications as well.  *Id.* at ¶ 105.  This

evidence is equally, if not more persuasive, than the PTAB's non-binding opinion.

 Adobe tells this Court it "need not delve into the technical details of the asserted prior art

references."  Adobe SJM at 5.  But Dr. Sherman's obviousness opinion is based on the technical details

of the references, as it should be.  The trier of fact should consider *all* of Dr. Sherman's analysis.

Dr. Sherman provides more than a sufficient factual basis to find the '878 and '287 patents are invalid

under § 103.  Adobe's motion for summary judgment of no obviousness should be denied.

 ### C. A Reasonable Jury Could Conclude The '287 Patent Is Anticipated.

 The '287 patent was also anticipated by Adobe's own public use of the claimed invention.

Dr. Barry Medoff, an expert in the field of digital communication, analyzed the pre-critical date versions

of Adobe's source code and determined that the claimed invention was reduced to practice in FMS 3.0[6]

on May 15, 2007[7] and in FP9u3 on April 6, 2007.  After the invention was reduced to practice and prior

to the critical date, in an effort to benefit commercially, Adobe distributed its server software to its most

important customers and prospective customers, and distributed millions of copies of its Flash Player.

An invention is invalid when the invention is (1) used in public prior to the critical date, and (2)

ready for patenting at the time of the use.  *Pfaff v. Wells Elecs., Inc.* 525 U.S. 55, 64 (1998).  An

invention is in public use when it is: "(1) [] accessible to the public; or (2) [] commercially exploited."

*Invitrogen Corp. v. Biocrest Mfg.*, L.P., 424 F.3d 1374, 1380 (Fed. Cir. 2005).  Some testing of the

claimed invention is permitted without giving rise to the Section 102(b) patentability bar.  But, once the

invention is reduced to practice, the experimentation exemption no longer applies.  *RCA Corp. v. Data

Gen. Corp.*, 887 F.2d 1056, 1061 (Fed. Cir. 1989).  And, experimentation must be the primary purpose

behind the use, any commercial benefits must be merely incidental.  *LaBounty Mfg., Inc v. U.S. Int'l

Trade Comm'n*, 958 F.2d 1066 (Fed. Cir. 1992).  Further, testing must be of the claimed invention, not

unclaimed features.  *In re Cygnus Telecomm's. Tech., LLC, Patent Litig.*, 536 F.3d 1343, 1355 (Fed. Cir.

2008) (rejecting patentee's experimentation argument because the question of whether the invention

"would work on a commercial scale is distinct from whether the system embodied the claims"); *New

Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1299 (Fed. Cir. 2002) (claims reduced to

practice despite experiments conducted on unclaimed features); *In re Smith*, 714 F.2d 1127, 1134–36

(Fed. Cir. 1983) (claims reduced to practice, as testing was conducted for consumer preference, not to

test claimed features); *Seed Research Equip. Solutions v. Gary W. Clem, Inc.*, 2012 WL 6650873 (D.

Kan. Dec. 20, 2012) (claims reduced to practice, and rejecting patentee's argument that testing and

revising aspects of an embodiment unrelated to the claimed invention showed the invention did not work

for its intended purpose.).  "[I]t is improper to conclude that an invention is not reduced to practice

merely because further testing is being conducted." *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516

---

[6]  FMS 3 stands for "Flash Media Server 3.0" and FP9u3 stands for "Flash Player 9, update 3."

[7]  Dr. Medoff expressed his opinion that the claims of the '287 patent were not reduced to practice in FMS 3 because FMS 3, like WMS, does not "play the data payload," Medoff Rpt. at ¶ 286.  However, because Adobe asserts "playing the data payload" encompasses "reformatting streams," and FMS has had the capability to reformat streams since FMS 2, Dr. Medoff concluded that FMS 3 reduced to practice the claims of the '287 patent under Adobe's (incorrect) interpretation of "playing." Ex. 9, Supp. Medoff Invalidity Rpt., at 6, n.3.

F.3d 1361, 1367 (Fed. Cir. 2008).  As shown below, Adobe distributed FMS 3 and FP9u3 to third parties after the claimed invention of the '287 patent was reduced to practice and before the critical date of the '287 patent; the commercial benefit of this use was not merely incidental; and the use was not for the purpose of testing the claimed invention.  Indeed, ███████████████████████████████████
████████████████████████████████

Once Wowza makes a prima facie showing of public use, the burden then shifts to Adobe to come forward with evidence establishing the experimental use exemption.  *New Railhead Mfg.,* 298 F.3d at 1299.  If a patentee comes forward with evidence establishing the experimental use exemption, the Federal Circuit has identified several factors to determine whether the invention was publicly accessible, including: the circumstances surrounding testing, the nature of the public activity, public access to the use, and confidentiality obligations.  *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008).  Adobe has not come forward with evidence demonstrating that its distribution of FMS 3 and FP9u3 was for purposes of testing the claimed invention, it cannot.  Even if the invention was being tested, Wowza has established a genuine issue of material fact as to whether the claimed invention was publicly accessible and/or commercially exploited.

1.   *Adobe Undisputedly Distributed FMS 3 and FP9u3 To Third Parties After The '287 Claims Were Reduced To Practice And Prior To The Critical Date*

Dr. Medoff established that Adobe reduced to practice the claims of the '287 patent in FP9u3 on April 6, 2007 and in FMS 3 on May 15, 2007.  Ex. 10 at 4.  Dr. Medoff based this analysis on a rigorous analysis of the source code, as well as analysis of internal Adobe documents.  *See* Section III.B, *infra.*

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

After the claims of the '287 were reduced to practice in both FMS 3 and FP9u3 (at latest, May 15, 2007), and prior to the critical date of the '287 patent (October 15, 2007), Adobe distributed FMS 3 and FP9u3 to numerous third parties:

- **June 10, 2007:** ████████████████████████████████████████████████

1

2    ██████████

3    • **June 21, 2007** ████████████████████████████████████████
     ████████████████████████████████

4    • **July 9, 2007:** ████████████████████████████████████

5    • **August 16, 2007:** █████████████████████████████████

6    • **August 2007:** █████████████████████████████████████

7        Adobe **never** disputes these third party uses of FMS 3 and FP9u3 prior to the critical date.  *E.g.*

8    Adobe SJM at 7, n.5 (admitting FMS 3 was released to third parties); *id.* at 6-7 (admitting FP9u3 was

9    released to third parties.)  Instead, Adobe asserts these distributions did not invalidate the claims of the

10   '287 under § 102 because the uses were not "public." However, as shown below, Adobe's argument are

11   legally and factually erroneous.

12           2.      *FMS 3 Use After Reduction to Practice Invalidates the '287 Patent.*

13       As shown above, Adobe undisputedly released FMS 3 to third parties prior to the critical date.

14   Adobe does not dispute that, but instead characterizes these releases as a "private, confidential,

15   invitation-only beta testing program limited to a small, discrete group of testers, bound to a non-

16   disclosure agreement." Adobe SJM at 7, n.5.[8] However, it is well-established law that once claims are

17   reduced to practice, there can be no more experimental use.  *See RCA*, 887 F.2d at 1061.  Adobe does

18   not dispute in its summary judgment motion that it had reduced the '287 patent claims to practice before

19   any pre-release version of FMS 3 was made available to third parties.[9]  Nor does it dispute that FMS 3

20   embodied the claims of the '287 patent.  Because Adobe's only disputed fact (*i.e.* the distribution was

---

21

[8]   Adobe spends a substantial portion of its brief arguing that the demonstration of FMS 3 in Amsterdam and a FMS 3 press
22       release do not establish a public use, and buries the true public use of FMS 3 in a footnote.  Adobe SJM at 5-7.  The pre-
         critical date public use of FMS 3 has always been Wowza's argument—the Amsterdam preview and press release were
23       simply evidence supporting the public availability of FMS 3.  *E.g.* Long Decl., Ex. 3 at 68 ("Although the preview was
         done in a foreign country, the above links and their materials were available in the United States.  **The claims of the '287**
24       **Patent are believed to be invalid in view of public disclosure of Flash Media Server 3.0**").  Because Adobe begins
         with a flawed premise—that Wowza's public use argument is solely based on a press release—Adobe's cited cases are
25       inapplicable here.  *See Speedtrack, Inc. v. Wal-Mart Stores, Inc.*, 2012 WL 581338, at *4 (N.D. Cal. Feb 22, 2012)
         (finding an advertisement did not amount to a commercial offer for sale); *Emergency Fuel, LLC v. Penzoil-Quaker State*
26       *Co.*, 71 Fed. Appx. 826, 834 (Fed. Cir. 2003) (finding an advertisement did not establish a product met a claim limitation).
[9]   As explained in Section III.B, *infra*, Adobe's view of "reduction to practice" is flawed because it does not focus on the
27       claims of the invention.  Because of that, Adobe' ███████████████████████████████████████████
         ████████████████████████████████████████████████████████████████
28       unrelated to the '287 claims.  *See* Section III.B, *infra*.

for "testing") is inapplicable once claims are reduced to practice, Adobe's summary judgment motion should be denied for this reason alone.

### 3.   A Reasonably Jury Could Conclude FMS Use Invalidates the '287

Even assuming claims can be "tested" after being reduced to practice, there is, at least, a genuine issue of material fact as to whether the pre-release FMS 3 runs afoul of the § 102 public use bar.  The use must have been for the purpose of testing RTMPe, and any commercial benefit must merely incidental to the experimental use.  Adobe dodges these issues and asserts that its multiple pre-critical date distributions of FMS 3 were not public uses because the distributions were (1) for testing; (2) private; (3) small; and (4) confidential (*i.e.* only distributed to persons bound to a non-disclosure agreement).  Adobe SJM at 7, n.5.  All of these are, at a minimum, disputed facts, and some are demonstrably false.

**The FMS 3 pre-release did not test RTMPe.**  Any alleged testing of the pre-release FMS 3 was unrelated to the claims of the '287 patent.  As shown above, development and testing of RTMPs was complete.  Adobe asserts it was testing backwards compatibility.  But, ██████████████████████ █████████████████████████████████████████ and it is not part of or inherent in the '287 claims.  Any "testing" of FMS 3 in these pre-critical date releases was unrelated to the claims of the '287.[10]

**The FMS 3 pre-release was for commercial purposes:** ████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████

**The FMS 3.0 pre-release was not private.**  Adobe admitted ████████████████████████

---

[10]   In fact, Adobe argued in its summary judgment motion that third parties who received FMS 3 prior to the critical date ███████████████████████████████████████████ Adobe SJM at 7, n.5 (citing Long Decl.,Ex. 14 at 129.) While untrue , Adobe,  cannot argue it intended to test RTMPe.

1   ███████████████████████████████████████   And Adobe admitted ███████

2   ████████████████████████████████████████████████████████████████████████

3   ████████████   Adobe distributed pre-release products ███████████████████████

4   ████████████████████████████████████████   A release is hardly

5   "private" when anyone interested in the product can gain access, particularly when the intent of the

6   release is to "get the word out."  This was made evident when Adobe issued a press release on

7   September 6, 2007, using quotes from a third party, NBC Universal, a joint venture partner with Fox in

8   Hulu, to promote FMS 3.  Ex. 19.  This quote specifically referred to the "increased content protection"

9   in FMS 3, █████████████████████████████████████████████████████████████

10   ███████████████████████████████   This alone creates a factual dispute as to public use.

11          **The FMS 3 pre-release was not small.**  Documents provided by Adobe show that FMS 3 ████

12   ████████████████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████████

14   Adobe distributed ████████████████████████████████████████████████████████

15   ████████████████████████████████████████   Adobe's pre-critical date release of

16   FMS 3 ████████████████████████████████████████████████████████████████████████

17   Ex. 15 at AW096727.  Again, the size of the pre-critical date release creates, at a minimum, a factual

18   dispute as to whether the use of FMS 3 was public.

19          **The FMS 3 pre-release was not confidential.**  Adobe asserts that the pre-release of FMS 3 was

20   not public because any users were bound by non-disclosure agreements ("NDAs").[11]  Adobe SJM at 7,

21   n.5.  However, "[e]ven a ***single disclosure*** to a third party may constitute a public use if the third party

22   was not under a legal obligation to maintain the secrecy of the disclosure."  *Leader Techs., Inc. v.*

23   *Facebook, Inc.*, 770 F. Supp. 2d 686, 725 (D. Del. 2011) *aff'd*, 678 F.3d 1300 (Fed. Cir. 2012).

24          Adobe only relies on two unauthenticated, unexecuted form agreements—one from 2004 and

25   one from __2012__—to establish confidentiality.  Long Decl., Exs. 39 and 40.  While Adobe has produced

26   hundreds of thousands of pages of documents, Adobe does—and cannot—cite to a single executed

---

[11]   While confidentiality agreements are one factor in evaluating whether a use is public, "the presence or absence of such an agreement is not determinative of the public use issue."  *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266 (Fed. Cir. 1986).

agreement between Adobe and one of the pre-release users.  Adobe SJM at 5-6.  Not only that, the record actually establishes there were at least some recipients of pre-release FMS 3 that did not sign *any* confidentiality agreements.  *See, e.g.,* Ex. 22 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  In addition, the form agreements Adobe produced do not specifically cover the pre-release of FMS 3, but instead purportedly include the FMS 3 pre-release under a "blank coverage" provision.  *See* Long Decl., Exs. 39 and 40.[12] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  At a minimum, this evidence creates a factual dispute as to whether the pre-release FMS 3 was public.

        *4.     A Reasonable Jury Could Conclude That The Public Use Or Sale Of FP9u3 Invalidates the '287 Patent.*

       Again, here, Adobe does not dispute that the claimed invention of the '287 patents was reduced to practice in FP9u3 as of April 6, 2007, or that FP9u3 was publically available prior to the critical date.  Indeed, millions of copies of FP9u3 were distributed prior to the critical date.  Instead, Adobe argues that the existence of the "object code for 'receive-side functionality' for RTMPe" in FP9u3 does not constitute a public use because it was never "made known to" nor "used by" the public. Adobe SJM at 7.  Adobe is wrong for two reasons: (1) Wowza need only show that FP9u3, not the use of the embedded functionality, was publically accessible or known; and (2) there is still substantial evidence showing the claims were in public use under § 102 due to commercial exploitation.

       a.     FP9u3 Was Publically Accessible Prior To The Critical Date

       "[I]t is a basic principle of patent law that public use need not reveal the underlying details of the invention to the public."  *Abaxis, Inc. v. Cepheid*, 2012 WL 3255602, at *7 (N.D. Cal. August 8, 2012) (citing *Egbert v. Lippman*, 104 U.S. 333, 336-37 (1881)).  In determining whether an invalidating public use under § 102 occurred, "the public use itself need not be enabling . . . [the Court] must simply determine whether the public use related to a device that embodied the invention."  *Zenith Elecs. Corp v. PDI Comm'n Sys., Inc.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008); *see also Auction Mgm. Solutions, Inc. v. Manheim Auctions, Inc.*, 2009 WL 801800 (N.D. Ga. March 24, 2009) (the relevant question is whether

---

[12]    Assuming Adobe's unproduced executed agreements with its customers actually exist, accepting Adobe's argument would mean that *all* releases to its customers would be "confidential" and immune from any invalidating public use.

WOWZA'S OPPOSITION

11

CASE NO. CV 11-02243 JST

1   the software was publically available).[13]

2   Adobe admits that over *3.3 million* users downloaded FP9u3 during its so-called "beta testing"[14]

3   period. ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████

7   ████████████████████████████████ Adobe's arguments that FP9u3 does not stream RTMPe without

8   an RTMPe-enabled server are a *non-sequitor*, as are its arguments that the public never understood that

9   RTMPe was in FP9u3. The issue is whether FP9u3 was publically available and embodied the claims of

10  the '287. *See Abaxis*, 2012 WL 3255602, at *7.

11  Even accepting that § 102(b) requires the use of RTMPe, there is still a material dispute as to

12  whether the distribution of FP9u3 invalidates the '287 patent. Adobe asserts that "no evidence exists

13  that there were any pre-critical date, public RTMPe communications, whether by FP 9 u3 beta testers or

14  otherwise." Adobe SJM at 7. First, Adobe's Product Manager admitted ████████████████████████

15  ████████████████████████████████████████████████████████████████

16  Second, the record shows a third party, ████████████████████████████████████████████████

17  ███████████████████████████████████ █ ████████████████████████████████████

18  ███████████ Third, prior to the critical date, ████████████████████████████████████

19  ███████████ Additionally, Adobe claims the '287 covers playing H.264 content, and it is

20  undisputed that the FP9u3 pre-critical date release allowed the user to play H.264 content. Ex. 28,

21  8/22/07 FP9u3 Release Notes.

22  Because Adobe does not dispute that FPu3 was publically accessible prior to the critical date,

23  Adobe's motion for summary judgment of no prior use invalidity should be denied. Adobe's motion

---

24  [13] Adobe's cited support, *3M Co. v. Chemque, Inc.*, does not contradict this well-established principle. In *3M*, the issue was

25  whether the embodiment of the product (a sample sent by 3M) was ever used by the recipient. *See* 303 F.3d 1294, 1301 (Fed. Cir. 2002). Here, there is no dispute that the recipients of FP9u3 used the product.

26  [14] Adobe's "beta test" was, in reality, a free distribution of Flash Player to the public, not a test. Ex. 23 129-130. The only confidentiality obligation of the 3.3 million users ████████████████████████████████████████████████

27  ██████████████

28  [15] Even if a use of an alleged invention is secret, the commercial character of a use makes it a "public use" under § 102(b). *See Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 390 (Fed. Cir. 1984).

1  should also be denied because there is a material dispute as to whether the publically available FP9u3

2  was used to stream RTMPe or H.264 prior to the critical date.

3              b.      Adobe Commercially Exploited FP9u3 Prior To The Critical Date

4      Even accepting Adobe's argument that publically released "object code" is not publicly

5  accessible if not used, there is, at a minimum, a question of fact as to whether Adobe's commercial

6  exploitation of the claims of the '287 patent is an invalidating public use and/or on-sale bar.

7      Adobe freely distributes Flash Player to the public, not out of the goodness of its own heart, but

8  because it is profitable.  Adobe's business model is simple: freely distribute Flash Player to the public to

9  build market share, require a protocol to stream to Flash Player (*e.g.* RTMPe), and sell the only media

10  server (*i.e.* FMS) that streams the protocol. ██████████████████████████████████

11  ████████████████████████████████ The ubiquity of the free Flash Player then

12  drives demand for FMS, and other Adobe products. Ex. 29 at ¶ 31; Ex. 23 at 62.  Adobe used the

13  availability of H.264 and RTMPe functionality (both of which are allegedly covered by the '287 patent)

14  in the Flash Players distributed before the critical date to market and sell FMS. ████████████

15  ████████████████████████████████████████████

16      Adobe also claims the on-sale bar does not apply because it freely distributes Flash Player,

17  instead of selling it.  Adobe SJM at 7.  However, because Adobe freely distributes Flash Player to gain

18  market share for FMS, the Federal Circuit has called into question whether such actions implicate

19  § 102(b)'s on-sale bar.  *See LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1374 (Fed.

20  Cir. 2013) (holding that, in the context of patent exhaustion, freely distributing a product for a future

21  reward was a "sale").

22      The public use bar is meant to encourage inventors to quickly file a patent, not commercially

23  profit and file for a patent years later.  Wowza has put forth enough evidence to create a material factual

24  dispute as to whether the claims of the '287 patent are invalid under § 102(b) due to the pre-critical date

25  distribution of FMS 3 and FP9u3.

26      **D.    Substantive Evidence Establishes Adobe Granted Wowza a License To RTMP**

27      In January 2009, Adobe announced plans to "publish the RTMP specification," providing

28  developers "open and free access to RTMP."  Long Decl., Ex. 18.  In April 2009, Adobe published its

license "to encourage streaming rich content via the RTMP protocol." Long Decl., Ex. 19 (hereinafter, the "RTMP Open License").[16]  Despite this RTMP Open License, and years of technology licensing discussions wherein Adobe never asserted Wowza's use of RTMP violated Adobe's patents, Adobe filed this suit asserting Wowza's support of RTMP infringed the '658 and '509 patents.[17]  *See, e.g.,* Ex. 30. And even though the Court already dismissed these patent infringement allegations, Adobe asserts in it summary judgment motion (for the first time) that this issue is still relevant to its false advertising claims apparently because it helps show that Wowza misled customers as to its RTMP support being "legally sanctioned" by Adobe.

As an initial matter, given that the Court ruled that Wowza's support of RTMP does not infringe the Adobe patents, and that Adobe's new false advertising theory fails as a matter of law, whether support of RTMP was licensed remains moot.  Even if not, the undisputed facts show that Wowza was and is covered by the RTMP Open License.  Therefore, summary judgment is appropriate for Wowza on Adobe's false advertising claims based upon this theory, and on Adobe's assertion that Wowza breached the RTMP Open License by circumvention or interception.[18]

        *1.*     *Adobe Has No Evidence That Any Customer Relied Upon Any Allegedly False or Deceptive Commercial Advertisement*

As demonstrated in Wowza's SJM, there is no evidence that any allegedly false or deceptive Wowza statement proximately caused injury to Adobe.  *See* Wowza SJM at 14-21.  As such, Adobe's Lanham Act claims fail.  *See Minitube of Am., Inc. v. Reprod. Provisions*, *LLC*, 2014 WL 1761317, at *24-25 (E.D. Wis. May 1, 2014) (granting summary judgment where plaintiff failed to violation was proximate cause of alleged injury).  Therefore, whether Wowza's support of RTMP is licensed is irrelevant to any remaining issues, and Adobe's motion should be denied as moot.

---

[16] ██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

[17]  When RTMPe inventor, Michael Kaufman (working for Microsoft at the time) learned of Adobe's lawsuit asserting Wowza's support of RTMP infringed Adobe's patents, he publicly questioned the suit in light of the RTMP Open License.  Ex. 2 at 141-143.

[18]  Wowza contemporaneously cross-moves for summary judgment on these issues.

      2.       *Adobe Must Show Wowza's Activities Are Inconsistent With What A Reasonable Licensee Would Expect.*

Adobe does not deny that it issued the RTMP Open License, or that it allows support of RTMP streaming.  Rather, Adobe claims that Wowza's support of RTMP is not licensed because Wowza breached the terms of that license.  On this issue, Adobe bears the burden of proof.  *See S.O.S., Inc. v. Payday, Inc*., 886 F.2d 1081, 1085 (9th Cir. 1989) (plaintiff bears the burden of proof to prove that defendant's activities were beyond the scope of the license).

Further, the RTMP Open License is a contract of adhesion.  *See* Long Decl., Ex. 19 ("this is an offer to be accepted only on the terms set forth in the Agreement.")  Adhesion contracts should be carefully scrutinized and interpreted such that they are consistent with reasonable expectations, even if what is reasonably expected is outside the strict letter of the agreement.  *See Gray v. Zurich Ins. Co*., 65 Cal. 2d 263, 269-70 (Cal. Sup. Ct. 1966); *Brown-Spaulding & Assocs. v. Int'l Surplus Lines Ins. Co*., 254 Cal. Rptr. 192, 194 (Cal. Ct. App. 1988).  Adobe cannot demonstrate that all reasonable juries, taking all reasonable inferences in favor of Wowza, would conclude that Wowza's activities were inconsistent with reasonable expectations of what was prohibited by the RTMP Open License.

      3.       *Adobe Has Not and Cannot Show That Wowza's Activities Were Inconsistent with Reasonable Expectations of What Was Prohibited.*

The RTMP Open License provides a non-exclusive license to all Adobe Essential Claims to make, use and sell servers and players pursuant to the RTMP Specification.  Long Decl., Ex. 19 at 3.  In the License is a paragraph entitled "Prohibited Uses," which reads:

> **Prohibited Uses**
> The rights and licenses granted by Adobe in the RTMP Specification, including those granted in the Patent License, are conditioned upon Your agreement to use the RTMP Specification for only streaming video, audio and/or data content and not to make, have made, use, sell, offer to sell, import or distribute: (i) any technology that ▮▮▮▮▮ streaming video, audio and/or data content for storage in any device or medium; or (ii) any technology that ▮▮▮▮▮ technological measures for the protection of audio, video and/or data content, including any of Adobe's secure RTMP measures. No right or license to any Adobe intellectual property is granted for such prohibited uses.

In other words, the public obtained a license to use the RTMP Specification for streaming, but <u>not</u> to use the RTMP Specification to make, have made, use, sell, offer to sell, import or distribute technology that "intercepts" streaming content, or "circumvents" protection of content, including "Adobe's secure RTMP measures."  Adobe asserts that Wowza's use of the Wireshark, IDA Pro and RTMP Debugger

1   tools to determine how RTMP and RTMPe worked in order to make an RTMP/RTMPe-compatible
2   server violated the Prohibited Uses provision of the RTMP Open License.  Putting aside for the moment
3   that Adobe relies upon activities that occurred *prior* to the RTMP Open License and *without* using the
4   RTMP Specification, there is no evidence establishing that licensees would reasonably expect such
5   activities to be prohibited under the RTMP Open License.  Indeed, the opposite is true.

6          As an initial matter, as explained by Good himself at his **four** depositions, often *ad nauseam*,
7   none of these tools were used to circumvent protection measures or intercept streams.  ██████████
8   ████████████████████████████████████████████████████████████████████████████████
9   ███████████████████████████████████████████████████████████ Ex. 32, at
10  ¶¶ 89-94; ████████████████  ████████████████████████████████████████████
11  ████████████████████████████████████████████████████████████████████████████████
12  ███████████████  These facts are undisputed, and prove no "interception" or "circumvention" in
13  violation of the RTMP Open License.  *See* Ex. 32 at 34-41.

14         Adobe's own witnesses agree with this interpretation of the "Prohibited Uses" clause.  Adobe
15  ████████████████████████████████████████████████████████████████████████████████
16  ██████████████████████████████████████████████████████████████████████
17  ████████████████████████████████████████████████████████████████████
18  ████████████████████████████████████████████████ The industry has a
19  term for those who maliciously "intercept" streams or "circumvent" the mechanisms that protect them:
20  stream rippers.  Adobe admits ██████████████████████████████████████████████
21  ████████████████████████████ Indeed, ████████████████████████████████████
22  ████████████████████████████████████████████████████████████████████████████
23  ████████████████████████████████████████████████████████████
24  ████████████████████████████████████ It is beyond dispute, ████████████████
25  that Wowza has never been a stream ripper.  ████████████████████████████ Indeed, Wowza
26  simply reverse engineered the protocol, ██████████████████████████████████████

27  ---
    [19]   Even the Digital Millennium Copyright Act, which prohibits circumventing security measures, allows for circumvention
28         to identify and analyze those elements of the program that are necessary to achieve interoperability of an independently
           created computer program with other programs and to develop encryption products.  17 U.S.C. §§ 1201 (f), (g).

████████████████████████████████████████████████████████

       4.    *Adobe's Breach Theory Relies Upon Activity Prior To The RTMP Open License.*

It is axiomatic that one cannot breach a contract that does not yet exist.  *See Gross v. Symantec Corp.*, 2012 WL 3116158, at *11-12 (N.D. Cal. 2012) (breach cannot be predicated on pre-contract activities).  Yet Adobe relies upon activities that occurred ***prior to the creation of the RTMP Open License*** in April 2009.  Wowza released RTMP in 2006, and released RTMPe in 2008.  This Court has already picked up on this failure of proof during a hearing where Adobe was seeking to compel Good's entire hard drives for inspection: "how could he have breached the license by something he did prior to the license being entered into?" Ex. 37, Nov. 16, 2012 Hr'g Tr. at 39.  ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  Adobe's own allegations confirm this timeline.  Yet, Adobe continues to base its argument on activities that occurred prior to the RTMP Open License.

       5.    *Adobe Does Not Allege That Wowza Ever Used The RTMP Specification To Commit "Interception" Or "Circumvention.*

The RTMP Open License prohibits ***use of the RTMP Specification*** to perform the prohibited activities.  Wowza never used the RTMP Specification in connection with the activities asserted to constitute "Prohibited Uses." As stated earlier, Adobe relies upon actions that predated the existence of the RTMP Open License.  Wowza could not have used a Specification that didn't exist.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

From the plain language of the RTMP Open License, mere interception or circumvention is *not* prohibited.  If interception were disallowed, no licensee could ever use a firewall between a client and a server to inspect a stream for malware.  If circumvention was prohibited, a licensee could never run a strength-test to "break" its own stream encryption.  As the License reads and Adobe's Rule 30(b)(6) witness confirmed, the RTMP Specification must be used for the Prohibited Uses.  Wowza never used the RTMP Specification in this manner, and Adobe does not make a single contrary allegation.

1        6.        *Summary Judgment For Wowza On The RTMP Open License Is Appropriate.*

2        There is no genuine issue of material fact that: (i) the Prohibited Uses of the RTMP Open

3    License are only violated by conduct using the RTMP Specification to "intercept" or "circumvent," (ii)

4    Wowza did none of those actions, and (iii) Wowza's actions did not constitute "interception" or

5    "circumvention." Summary judgment is therefore appropriate in favor of Wowza that it is not in

6    violation of the RTMP Open License.

7        7.        *Whether RTMPe Is Covered By The RTMP Open License Is Irrelevant.*

8        Trying to manufacture a victory where there is no battle to be fought, Adobe argues that the

9    RTMP Open License excludes RTMPe. This may very well be true, but it is of no moment. Wowza has

10    never argued that the RTMP Open License provides it a license to support RTMPe.

11   **III.    ADOBE'S *DAUBERT* MOTIONS SHOULD BE DENIED**

12        **A.    Dr. Sherman's Obviousness Opinion is Reliable**

13        Adobe moves to exclude Dr. Sherman's opinion as unreliable on essentially the same grounds as

14    its motion for summary judgment of no obviousness. Adobe SJM at 14. Tellingly, Adobe does not

15    attack Dr. Sherman's credentials—nor could it. Dr. Sherman has a Ph.D from MIT in Computer

16    Science, currently works as a Professor of Computer Science, and has authored numerous papers on

17    cryptography. Ex. 38. Additionally, Adobe does not attack Dr. Sherman's methodology—nor could it.

18    Dr. Sherman rigorously applied the *Graham* and *KSR* factors to form his opinion that the '878 and '287

19    patents were obvious. *See supra*, Section II.B. Instead of focusing on Dr. Sherman's ability to offer

20    reliable testimony, Adobe simply repeats its arguments that Dr. Sherman does not explain how or why a

21    person skilled in the art would have been motivated to combine particular prior art references. Adobe

22    SJM at 14. As shown above, Dr. Sherman did exactly that. *See supra*, Section II.B. While Adobe may

23    disagree, that is not relevant; Dr. Sherman's opinion will assist the trier of fact and should not be

24    excluded under *Daubert*.

25        **B.    Dr. Medoff's Reduction to Practice Opinion is Reliable**

26        Adobe claims that Dr. Medoff's opinion is unreliable because he allegedly failed to "take into

27    consideration that the invention of the '287 Patent was still undergoing testing with respect to its

28    intended purposes before the critical date." Adobe SJM at 15. Adobe's summary judgment motion on

this issue is self-defeating.  Adobe admits that RTMPe is "the claimed subject matter of the '287 Patent."  *Id.*  Adobe also asserts that RTMPe was not tested in the Adobe pre-release programs.  *Id.* at 7.  Adobe cannot have it both ways.  Adobe's inconsistent position alone prevents summary judgment.

Next, Adobe asserts the testing was done to ensure backwards compatibility.  *Id.* at 16.  But, again, backwards compatibility is not a requirement of the claims.  Ex. 39, '287 Patent, at 26:1-28, 29:14-45.  The question is when *the claims* of the patent were reduced to practice; any testing of unclaimed features is irrelevant.[20]  *See supra* at 6.

When determining whether software is reduced to practice, courts look at whether changes to source code after the reduction to practice are related to the claims of the patent.  *Auction Mgmt.*, 2009 WL 801800 at *10-11.[21]  Dr. Medoff performed the analysis previously sanctioned by courts for examining when software claims are reduced to practice.  Dr. Medoff extensively examined changes to the source code after the identified reduction to practice date. ███████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████  Dr. Medoff used a reliable methodology for determining when the *claims* of the '287 patent were reduced to practice in both FMS 3 and FP9u3.  *Id.*

The reliability of Dr. Medoff's opinion is confirmed by Adobe's own documents and testimony.  Dr. Medoff reviewed internal Adobe documents confirming: ████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████

Dr. Medoff's opinion is entirely proper and forms a reliable basis for a trier of fact to conclude

---

[20]  Tellingly, Adobe does not point to any alleged testing of these so-called "intended purposes" performed by the 3 million-plus FP9u3 "beta-testers."  Adobe SJM at 16.

[21]  Adobe's relies on only one Federal Circuit case, *In re Omeprazole Patent Lit.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008), to support its argument.  Adobe SJM at 15.  But that case aligns with Wowza's view of the law, not Adobe's.  *Omeprazole* dealt with *claims* covering a chemical compound; the court found claims were not reduced to practice when the inventors testing a chemical compound for FDA approval, and were unsure of the long-term stability of the compound.  *Omeprazole*, 536 F.3d at 1373.  When patent *claims* a chemical compound, testing as to the claimed compound may be relevant, but it is still *the claim* that is the focus of inquiry.

the claims of the '287 patent were reduced to practice on May 15, 2007 in FMS 3 and April 6, 2007 in

FP9u3.  Adobe's motion to exclude Dr. Medoff's opinion should be denied.

### C.    Dr. Leonard's Damages Opinion Is Reliable

Adobe's complaints regarding Dr. Greg Leonard's expert opinions are unfounded.  Just as

Adobe's damages expert Mr. Bakewell did in his report, Dr. Leonard utilized appropriate sources of

information to gather necessary background information to consider in formulating his opinions.  Each

of these sources were available to Adobe for discovery, and Adobe's *Daubert* arguments now, after fact

discovery is long since closed, ring hollow.  Dr. Leonard also appropriately responded to

Mr. Bakewell's unjust enrichment opinions presented in his original report, which were incredibly vague

in the first instance, and only (somewhat) materialized in Mr. Bakewell's supplemental report.  In any

case, Dr. Leonard responded to Mr. Bakewell's new theories of false advertising liability in his

supplemental rebuttal report served September 19, 2014.  Finally, Dr. Leonard's opinions (unlike Mr.

Bakewell's) accurately depicts a hypothetical negotiation between the parties because (i) a walkway

point is not the same thing as an agreement, and (ii) Adobe ignores the fact that Wowza's use of RTMP

protocols (including RTMPe) expands the Flash ecosystem, which benefits Adobe.

### 1.    Dr. Leonard's Reliance Upon Statements From Wowza Customers, Other Experts, and Wowza Co-Founder David Stubenvoll Is Appropriate.

The Federal Rules of Evidence require that expert testimony be based upon "sufficient facts or

data."  FED. R. EVID. 702.  Many times those facts and data emerge from the record itself in the form of

documents and testimony.  Other information may also be helpful to complete an expert's

understanding.  Accordingly, the Ninth Circuit has held that "experts are entitled to rely on hearsay in

forming their opinions."  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 873 (9th Cir. 2001).

Dr. Leonard obtained such "facts or data" from: (i) Wowza customers to supplement his

understanding of their motivation for purchasing WMS and using certain protocols, (ii) Wowza expert

Dr. Medoff to gain a better understanding of the technical footprint of Adobe's patents, and (iii) Wowza

co-founder David Stubenvoll to better understand Wowza's business and the various features of its

WMS product.  All of these points are relevant to this litigation.

Adobe had ample opportunity to seek discovery regarding the sources that Dr. Leonard

considered.  Regarding Wowza's customers, Adobe first served subpoenas on numerous Wowza customers without warning.  Fearing an onslaught, Wowza sought a protective order that resulted in an agreement that Adobe would pursue its subpoenas on nine of Wowza's customers.  Thereafter, Adobe insisted it was going to serve 40 more subpoenas on Wowza's customers to obtain log data they did not have or that was not as complete as the log data produced by Wowza.  Dkt. No. 193, pp. 50-68.  Again, Wowza sought a protective order, resulting in Adobe voluntarily dropping their demand for log data and seeking to depose 10 Wowza customers.  *Id*.  The Court ordered the parties to work together on Adobe's desire to seek discovery from Wowza's customers.  *Id.*  Thereafter, rather than a telephonic deposition, the parties agreed to deposition by written questions.  Dkt. No. 218-1.  Adobe selected the customers that it wanted to subpoena and served them with those written questions deemed appropriate by the Court.  Dkt. No. 237 at 2.  This history hardly supports excluding Wowza's expert from interviewing other customers, just as Adobe's expert did.

Regarding Dr. Medoff, if Adobe had concerns regarding the propriety of Dr. Leonard's reliance upon discussions with Dr. Medoff, it could have raised them at Dr. Medoff's or Dr. Leonard's depositions.  No such issues were raised.  Ex. 41 at 35-36, 90-93, 104, 317.  The lack of non-infringing alternatives is a point upon which Adobe bears the burden of proof.  *See Riles v. Shell Exploration and Prod., Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002).

Regarding David Stubenvoll, Adobe deposed him, both in a personal and Rule 30(b)(6) capacity, *for over 17 hours* during this case, as recently as a month ago.  Adobe asked Mr. Stubenvoll about the same or similar topics about which they complain Dr. Leonard inquired.  For example, Adobe questioned Mr. Stubenvoll regarding (i) Wowza's development of RTMPe and the level of security it provided or failed to provide (*see, e.g.,* Ex. 43, July 19, 2012 Dep., at 290:19-293:18, (ii) Wowza's implementation of RTMPs (*see, e.g.*, Ex. 44, Dec. 6, 2012 Dep., at 279:17-280:25), and (iii) survey responses and other feedback from Wowza's customers (see, *e.g.*, Ex. 43 at 90:7-112:16; Ex. 44 at 36).  To assert that Mr. Stubenvoll, one of two co-founders of the company, and the only CEO that Wowza has ever known, is not qualified to provide testimony on content protection and Wowza's customers is

1  simply not credible.

2  Adobe's complaints are not only unfounded, they are transparent because Adobe's expert, **Mr.**

3  **Bakewell, relies on the same types of information in his report**. ████████████████████

4  ███████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████ Wowza had no access

6  to these individuals during discovery, or any notice they would be relevant.  Yet Mr. Bakewell ████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████████

9  ███████████████████████████████████████████████

10  Mr. Bakewell also relies upon his conversations with Adobe expert Dr. Peter Alexander for

11  critical assumptions, including one in particular that is found nowhere in Dr. Alexander's report.

12  Specifically, ████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████████

17  ████████████  Yet nowhere in Dr. Alexander's report does he state this opinion.

18  ████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████████

23  2.  *Dr. Leonard Did Assume Wowza Is Liable For False Advertising And Accurately*

24  *Rebutted Mr. Bakewell's Damages Opinions Presented In Mr. Bakewell's*
*Original And Supplemental Reports.*

25  The burden to prove damages rests squarely on Adobe.  *See Hansen Beverage Co. v. Vital*

26  *Pharm., Inc.*, 2010 WL 3069690 (S.D. Cal. 2010).█████████████████████████████

27  ███████████████████████████████████████████████████

28  ███████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ███████████████████████████████████████████

5 ██████████████████████████████████████████████

6 █████████████████████████████

But it was not until Mr. Bakewell's supplemental report, served more than 18 months after the

original report, that Adobe finally revealed that it intended to pursue damages for false advertising under

two separate theories of unjust enrichment, ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ This is

the first time Mr. Bakewell disclosed these damages theories to Wowza. Based upon this new

disclosure, which was untimely and outside the Court's permissible areas for supplementation, Dr.

Leonard addressed each theory specifically in his supplemental rebuttal report served September 19.

Adobe's complaints therefore fall flat because (i) Mr. Bakewell did not disclose his false

advertising theories until his most recent report, and (ii) the issue is mooted anyway because Dr.

Leonard addresses these new theories in his supplemental rebuttal report.

       3.    *Adobe Misinterpreted Dr. Leonard's Analysis Of The Hypothetical Negotiation And The Parties' Respective Bargaining Power.*

Contrary to Adobe's Motion, Dr. Leonard did not opine that Adobe would have accepted a

royalty rate of zero or paid Wowza to use RTMPe. *See* Adobe SJM at 21. Adobe is confusing the

walkaway point (*i.e.*, what Adobe would get if no deal were reached, which is negative because no deal

with Wowza means less participants in Adobe's Flash ecosystem) with the outcome of the negotiation

(which involves a balancing of the parties' bargaining positions).

████████████████████████████████████████████████████

██████████████████████████████████ To be sure, in the context of the "reality

test," it is Mr. Bakewell's opinions that utterly fail on this point, ████████████████████████

███████████████████████████████████

1        **D.      Dr. Ostberg's Survey Opinion is Reliable**

2            Dr. Ostberg is a highly qualified, seasoned survey expert who should be permitted to testify

3    about the fatal flaws in Mr. Klein's survey methodology.  Dr. Ostberg has been retained in more than

4    200 cases, and has frequently spoken before a variety of professional organizations on the use of surveys

5    and related topics.  *See* Ex. 47 at ¶¶ 3; Ex. 48 at 68-70.  Adobe seeks to exclude his critique of

6    Mr. Klein's survey methodology for two reasons, neither of which is grounds for exclusion.

7            First, Adobe seeks exclusion because Dr. Ostberg did not conduct his own survey.  But it is both

8    proper and commonplace for experts to critique the survey methodology of an opposing expert without

9    presenting their own survey.  *E & J Gallo v. Proximo Spirits, Inc.*, 2012 WL 273076, at *18 (E.D. Cal.

10   2012) (admitting Dr. Ostberg's critiques); *see also Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258

11   F.Supp.2d 1197, 1210 (D. Kan. 2003) (relying upon critiques to reject plaintiff's survey); *Graham Webb*

12   *Int'l v. Helene Curtis Inc.*, 17 F.Supp.2d 919, 930 (D. Minn. 1998) (admitting critique testimony).

13           Second, Adobe seeks exclusions because Dr. Ostberg allegedly does not have sufficient factual

14   knowledge of the "protocols or products" at issue.  Again, Adobe's argument misses the point.  Unlike

15   Mr. Klein, Dr. Ostberg did not conduct a consumer survey in connection with this case and does not

16   seek to testify as to whether Wowza's comparison chart misled anyone.  Instead, Dr. Ostberg is opining

17   as an expert with significant, consumer survey experience that Mr. Klein's survey methodology was

18   fatally flawed.  *See* Ex. 48, at 73:10-74:3.  Simply put, Dr. Ostberg has a sufficient understanding of the

19   Wowza comparison chart and the products at issue in it to critique Mr. Klein's methodology surveying

20   respondents as to that comparison chart.  *See* Ex. 48 at 162:22-163:18; 163:25-165:20.  Dr. Ostberg need

21   not be an expert in the underlying technology or businesses practices in this case to offer such expert

22   opinions.  He need only be what he is—an expert in consumer surveys.  *Cf. Fresenius Med. Care*

23   *Holdings, Inc. v. Baxter Int'l, Inc.*, 2006 WL 1329999, at *5 (N.D. Cal. 2006) (admitting expert

24   testimony where expert did not read patents-in-suit because such testimony could help the trier of fact

25   "better understand the evidence that will be presented at trial").

26           Relatedly, Adobe castigates Dr. Ostberg for allegedly not reviewing enough materials or

27   speaking to enough people before preparing his report.  Indeed, the bulk of Adobe's attack on Dr.

28   Ostberg consists of citations to Dr. Ostberg's deposition testimony in which he purportedly professes not

1   to know answers to questions about the underlying industry or products in this case. *See* Adobe SJM at

2   23-34. But Dr. Ostberg reviewed, among other things, the Klein survey and its exhibits,[22] which alone

3   are the subject of his rebuttal testimony. Because Dr. Ostberg's expert opinion is restricted to a criticism

4   of Mr. Klein's survey methodology, Dr. Ostberg reviewed a sufficient amount of case materials in

5   preparing his report. *See* Ex. 47 at ¶ 65; *see also* Ex. 48 at 19. In any event, neither case relied upon by

6   Adobe has anything to do with survey experts, surveys, survey methodology or even intellectual

7   property. Rather, both cases concerned a party attempting to offer a witness -- whom they claimed was

8   an expert in "police policies and practices" -- to opine about a more specific subject matter at issue,

9   namely, "disciplinary shortcomings" or "excessive force." *Berry v. City of Detroit*, 25 F.3d 1342, 1351-

10  52, 1355 (6th Cir. 1994); *Spears v. Cooper*, 2008 WL 5552336 at *8 (E.D. Tenn. Nov. 17, 2008). Here,

11  Dr. Ostberg is a qualified survey expert with years of experience designing and critiquing surveys and

12  he is being offered to opine on Mr. Klein's survey methodology. Dr. Ostberg is qualified to opine as to

13  the fatal flaws in Mr. Klein's survey methodology. As such, his court should deny Adobe's motion to

14  exclude Dr. Ostberg's expert opinions.

15  **IV.    CONCLUSION**

16          For the foregoing reasons, Wowza requests this Court deny all of Adobe's motions for summary

17  judgment and motions to exclude based on *Daubert*.

18  Dated: September 24, 2014                    Respectfully submitted,

19                                               KIRKLAND & ELLIS LLP
20                                                 Brent P. Ray (*pro hac vice*)
                                                   Greg Polins (*pro hac vice*)
21                                                 Diana Chang

22                                               IRWIN IP LLC
                                                   Barry F. Irwin (*pro hac vice*)
23

24                                               By    /s/  Barry F. Irwin
                                                      Attorneys for Defendant and Counterclaimant
25                                                    Wowza Media Systems, Inc.

26  [22] Adobe purports to cite to Dr. Ostberg's deposition testimony to show that he never looked at the Klein appendices to
     calculate the amount of time respondents took on the survey. *See* Adobe SJM at 24, n. 17. The cited testimony does not
27   support that assertion. Dr. Ostberg and/or one of his staff reviewed all of the materials in the appendices. Dr. Ostberg
     simply did not do the calculations that Mr. Klein could have and should have done and could have and should have
28   placed in the body of the Klein Report. *See* Ex. 47 at 130:10-138:6.